# Exhibit 1

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

1717 Pennsylvania Ave. N.W., Ste. 900, Washington D.C. 20006
**T** (202) 640-6400

Jonathan E. Bachand
Jonathan.Bachand@knobbe.com

June 29, 2021
*Via EDIS*

The Honorable Lisa R. Barton
Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

Re:   *In the Matter of Certain Light-Based Physiological Measurement Devices and Components
Thereof*
ITC Inv. No. 337-TA-_____

Dear Secretary Barton:

Enclosed for filing, please find documents in support of a request by Complainants Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Complainants") that the U.S. International Trade Commission ("Commission") institute an investigation pursuant to the provisions of Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 concerning certain light-based physiological measurement devices and components thereof.   Please note that the Complaint, Complainants' Statement on the Public Interest, and certain Confidential Exhibits 11, 15-28, and 30 contain Confidential Business Information and, pursuant to the Commission's Rules of Practice and Procedure, a separate letter requesting confidential treatment of the information accompanies this filing.

On March 16, 2020, the Commission provided "notice that it is temporarily waiving and amending certain of the Commission's rules that required the filing of paper copies, CD-ROMS, and other physical media in section 337 investigations to address concerns about COVID-19." International Trade Commission, Temporary Changes to Filing Procedures, Federal Register Vol. 85, No. 54 (March 19, 2020).   Specifically, the Commission approved the temporary amendment of various rules "to permit parties to file section 337 complaints, exhibits, attachments, and appendices, electronically." *Id.* Accordingly, Complainants' filing only contains electronic documents.   Complainants' submission via EDIS includes the following documents:

1.   One (1) electronic copy of Complainants' Verified Complaint, pursuant to Commission Rule 210,8(a)(1)(i);

2.    A statement on the Public Interest Regarding the remedial orders sought by Complainants in the Verified Complaint, pursuant to Commission Rule 210(8(b);

3.   One (1) electronic copy of the public exhibits to the Verified Complaint pursuant to Commission Rules 210.8(a)(1) and 210.12(a)(9);

4.   One (1) electronic copy of the confidential exhibits to the Verified Complaint, pursuant to Commission Rules 201(6)(c) and 210.8(a)(1)(ii);

5. One (1) electronic certified copy of each of U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and 7,761,127 listed as Exhibits 1-5 in the Complaint, pursuant to Commission Rules 210.8(a)(1)(i) and 210.12(a)(9)(i);

6. One (1) electronic certified copy of each assignment for each of U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and 7,761,127 listed as Exhibits 6-10 in the Complaint, pursuant to Commission Rules 210.8(a)(1)(i) and 210.12(a)(9)(ii);

7. A certified copy of each of the prosecution histories for U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and 7,761,127, listed as Appendices A, C, D, E, and G in the Complaint, pursuant to 19 C.F.R. 210.12(c)(1); [1]

8. A copy of each currently available cited technical reference identified in the prosecution histories of the Asserted Patents, identified as Appendices B, F, and H to the Complaint, pursuant to 19 C.F.R. 210.12(c)(2);[2] and

9. A letter of certification pursuant to 19 C.F.R. 201.6(b) and 210.5(d) requesting confidential treatment of information appearing in the Complaint, Complainants' Statement on the Public Interest, and Confidential Exhibits 11, 15-28, and 30.


Thank you for your attention to this filing.  Please contact the undersigned if you have any questions.

Respectfully submitted,


/s/ *Jonathan E. Bachand*
Jonathan E. Bachand

---

[1]    Due to USPTO errors, Complainants submitted certificates of correction to correct typographical errors in U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648 as originally issued. Although these certificates of correction have been approved, and certificates of correction have been issued for both U.S. Patent Nos. 10,912,501 and 10,945,648, the certificate of correction for U.S. Patent No. 10,912,502 has not yet issued.  Additionally, Complainants have not yet received certified copies of the prosecution histories, which contain the information related to the certificates of correction for U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648.   Accordingly, Complainants are submitting uncertified copies of the prosecution histories of U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648, and will submit certified copies once received.  Once the certificate of correction issues for U.S. Patent No. 10,912,502, Complainants will seek leave to amend the complaint to add the certificate of correction.

[2]    Because U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648 are related, there is a substantial overlap of the patents and applicable pages of each technical reference mentioned in the prosecution histories, and the copies are provided together in Appendix B.

# Knobbe Martens

KNOBBE, MARTENS, OLSON & BEAR, LLP

1717 Pennsylvania Ave. N.W., Ste. 900, Washington D.C. 20006
**T** (202) 640-6400

Jonathan E. Bachand
Jonathan.Bachand@knobbe.com

June 29, 2021
*Via EDIS*

The Honorable Lisa R. Barton
Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

Re:   *In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof*
       ITC Inv. No. 337-TA-_____

Dear Secretary Barton:

In accordance with 19 C.F.R. §§ 201.6 and 210.5, Complainants Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Complainants") request confidential treatment for the Confidential Business Information contained in Confidential Exhibits 11, 15-28, and 30 to Complainants' Verified Complaint, confidential treatment for the Confidential Business Information in the Verified Complaint itself, and confidential treatment for Complainants' Statement on the Public Interest.

The information for which confidential treatment is sought is proprietary commercial information not otherwise publicly available and consists of the following:

- Business proprietary information regarding technical specifications and designs for the products on which Complainants' claim of domestic industry is based (Confidential Exhibits 20-27);

- Business proprietary information regarding Complainants' purchase of an infringing article (Confidential Exhibit 30);

- Business proprietary information regarding the license agreement between Masimo Corporation and Cercacor Laboratories, Inc. (Confidential Exhibit 11);

- Business proprietary information regarding the investments and products on which Complainants' claim of domestic industry is based (Confidential Exhibit 28, the Verified Complaint, and the Statement of the Public Interest); and

- Business proprietary information relating to evaluations of the infringing article (Confidential Exhibits 15-19).

The information described above qualifies as Confidential Business Information pursuant to Rule 201.6(a) because:

1.     It is not publicly available;

2.     Unauthorized disclosure of such information could cause substantial harm to the competitive position of Complainants; and

# Knobbe Martens

3.      The disclosure of such information could impair the Commission's ability to obtain information necessary to perform its statutory function.

I certify under penalty of perjury that to the best of my knowledge, information and belief, founded after a reasonable inquiry, that substantially identical information is not available to the public.

Please contact me at 202-640-6406 if you have any questions about this request, or if this request is not granted in full.

Respectfully submitted,

/s/ *Jonathan E. Bachand*
Jonathan E. Bachand

34793297

knobbe.com

## UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

**In the Matter of Certain Light-Based Physiological Measurement Devices and Components Thereof**

Investigation No. 337-TA-_____

### COMPLAINANTS' STATEMENT ON THE PUBLIC INTEREST

Pursuant to Commission Rule § 210.8(b), Complainants Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Masimo" or "Complainants") submit this Statement on the Public Interest for the remedial orders sought against Respondent Apple, Inc. ("Apple" or "Respondent").

Through years of innovation in the United States, Masimo revolutionized pulse oximetry technology for monitoring patients.  In particular, Masimo discovered how to reliably measure arterial oxygen saturation, even in the presence of motion and low blood flow, without drawing blood.  This was a major breakthrough in the field of pulse oximetry.  Masimo manufactures and sells pulse oximeters with this technology that caregivers use to monitor over 200 million patients a year.  By developing various consumer products, Masimo has now made its hospital-grade technology directly available to everyone.  Masimo protected its innovations through numerous patents.

In 2013, Apple met with Masimo about integrating Masimo's technology into the Apple Watch.  Soon thereafter, Apple began hiring Masimo employees, starting with Masimo's Chief Medical Officer.  In the Fall of 2020, Apple introduced the Series 6, manufactured in Asia.  Apple claims the Series 6 watch can measure arterial oxygen saturation.  The importation and sale of that

product infringes multiple Masimo patents (as well as incorporates Masimo's trade secrets, a claim the parties are litigating in California).

Masimo seeks an order excluding from entry into the United States the Series 6 watch and components thereof, and any other wearable electronic devices with light-based pulse oximetry functionality and components thereof, imported by Apple that infringe one or more claims of U.S. Patent Nos. 10,912,502, 10,912,501, 10,945,648, 10,687,745, and 7,761,127, (collectively, "the Asserted Patents"). Masimo also seeks permanent cease and desist orders prohibiting Apple from engaging in the importation, sale for importation, marketing and/or advertising, distribution, offering for sale, sale, testing, use after importation, sale after importation, or other transfer within the United States of those devices and components. These remedies will not have an adverse effect on the public health or welfare, competitive conditions in the United States economy, production of like or directly competitive articles in the United States, or United States consumers.

A.   **Explanation of how the articles potentially subject to the requested remedial orders are used in the United States.**

The Series 6 is just one of several Apple smartwatches, which function like a smartphone on the wrist. The Series 6 is the only currently available Apple Watch that claims to measure blood oxygen. Apple heavily markets that feature of the Series 6 to give the watch the appearance of a medical device. Yet, hidden from the millions of purchasers of the Series 6, Apple warns in the fine print that the blood oxygen measurements should not be relied upon for medical purposes. *See* https://www.apple.com/apple-watch-series-6. Thus, despite all the marketing about the significance of the addition of this measurement, the Apple Series 6 watch is not for medical use.

B.   **Identification of any public health, safety, or welfare concerns relating to the requested remedial orders.**

Masimo's requested remedial orders would not raise public health, safety, or welfare concerns for many reasons. First, Masimo offers pulse oximetry devices with reliable medical-

2

grade measurements, directly to consumers.  Indeed, Masimo is the recognized leader in reliable medical-grade pulse oximetry in the United States.  Numerous other companies also sell pulse oximeters, including wearable pulse oximeters, directly to consumers.

Second, the pulse oximetry functionality in Apple's infringing Series 6 watches is not essential to the public health or welfare.  The COVID-19 pandemic heightened the public's awareness of the importance of blood oxygen measurements.  Apple capitalized on this awareness by introducing the Apple Series 6 watch with a very heavy marketing focus on the addition of blood oxygen measurement.  But, as noted above, Apple warns users in the fine print they actually should not rely on the blood oxygen measurements.  Some have even observed that the inaccurate physiological measurements of the Series 6 watch endanger public health.  *See, e.g.*, Fowler, Geoffrey, "The new Apple Watch says my lungs may be sick.  Or perfect.  It can't decide." *Washington Post*, September 23, 2020.  The Series 6 watches provide no unique service or feature related to public health, safety, or welfare that would warrant a denial of Masimo's requested relief.

Third, the strong public interest in protecting Masimo's intellectual property rights justifies exclusion.  *See, e.g.*, *Certain Baseband Processor Chips and Chipsets, Transmitter and Receiver (Radio) Chip, Power Control Chips, and Products Containing Same, Including Cellular Telephone Handsets*, Inv. No. 337-TA-543, Comm'n Op. at 136-37 (June 19, 2007); *see also Certain Wearable Monitoring Devices, Systems, and Components Thereof*, 85 Fed. Red. 2440 (Jan. 15, 2020) (instituting investigation into health monitoring devices without requiring ALJ to make a determination on the public interest).  That public interest is particularly acute here, because Masimo has spent decades researching and developing its revolutionary technology to the benefit of the public.  Its patents reflect Masimo's innovations.  Masimo's technology is used by 9 of the top 10 hospitals in the United States.  It is also directly available to consumers.

████████████████████████████████████████

Apple, with its market dominance in the consumer market, should not be allowed to infringe Masimo's patents, yet escape exclusion under the guise of public health. The Commission has found public interest considerations to outweigh the need to protect intellectual property rights only where "inadequate supply within the United States—by both the patentee and domestic licensees—meant that an exclusion would deprive the public of products necessary for some important health or welfare need[.]" *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1360 (Fed. Cir. 2010). No such inadequate supply exists, as explained below.

### C.   <u>Identification of like or directly competitive articles that Complainants and/or third parties make which could replace the subject articles if they were excluded.</u>

Even if smartwatches were necessary for some important public interest function, Apple and other third parties can provide an adequate supply of alternatives to consumers. *See Certain Personal Data & Mobile Commc'n Devices & Related Software*, Inv. No. 337-TA-710, Comm'n Op. at 74 (Dec. 29, 2011) ("That 'mobile phones' may play a critical role in public health and safety does not mean that [the infringing phones] play a critical role in public health and safety that other smartphones cannot.").

Apple sells other smartwatches, including the Apple Watch Series 3 and Apple Watch SE. Neither of those watches include blood oxygen measurement, so they would not be impacted by any remedial order. Moreover, multiple significant companies supply smartwatches in the United States, including, Fitbit, Fossil, Garmin, Samsung and many others, ensuring numerous options for consumers. The breadth of available options ensures manufacturers could quickly and fully replace the infringing products in the event of an exclusion order without escalating prices.

For consumers looking for reliable pulse oximetry, the Series 6 watch does not provide it as Apple admits in the fine print. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████  This will be well before any exclusion order could take effect.

**D.**  **Identification of whether Complainants and/or third parties have the capacity to replace the volume of articles subject to the requested remedial orders in a commercially reasonable time in the United States.**

No public interest concerns exist when the market contains an adequate supply of substitute products for those subject to a remedial order.  *Certain Lens-Fitted Film Packages*, Inv. No. 337-TA-406, Comm'n. Op. at 18 (June 28, 1999).  Apple and the many large and reputable companies identified above have the capacity to replace the volume of articles subject to the requested remedial orders, and such replacement would entail no delay in reaching consumers given current manufacturing and distribution levels.

**E.**  **Statement regarding how the requested remedial orders would impact consumers.**

A remedial order would benefit consumers.  Excluding Apple's Series 6 watch would prevent consumers from unwittingly relying on its blood oxygen saturation number as medically relevant.  More importantly, the remedial order would foster new innovations that would benefit the consumer.  Apple cannot claim that a consumer choice justifies continued importation.  "[T]he mere constriction of choice cannot be a sufficient basis" for denying relief.  *See Certain Personal Data & Mobile Commc'n Devices & Related Software*, Inv. No. 337-TA-710, Comm'n Op. at 69 (Dec. 29, 2011).

Thus, no public interest concerns exist with the remedies sought by Masimo.

Respectfully submitted,

Dated:  June 29, 2021                    By: /s/ Jonathan E. Bachand
                                         Jonathan E. Bachand
                                         KNOBBE, MARTENS, OLSON & BEAR, LLP
                                         1717 Pennsylvania Ave NW STE 900
                                         Washington, DC 20006

Telephone: 202-640-6400
Facsimile: 949-760-9502

Stephen C. Jensen
Joseph R. Re
Sheila N. Swaroop
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**WASHINGTON, D.C.**

**In the Matter of Certain Light-Based**
**Physiological Measurement Devices and**
**Components Thereof**

Investigation No. 337-TA-_____

**COMPLAINT UNDER SECTION 337 OF**
**THE TARIFF ACT OF 1930, AS AMENDED**

Complainants:

Masimo Corporation
52 Discovery
Irvine, CA 92618
Telephone: 949-297-7000

Cercacor Laboratories, Inc.
15750 Alton Pkwy
Irvine, CA 92618
Telephone: 800-610-8522

Respondent:

Apple Inc.
One Apple Park Way
Cupertino, CA 95014
Telephone:  408-996-1010

Counsel for Complainants:

Stephen C. Jensen
Joseph R. Re
Sheila N. Swaroop
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA  92614
Telephone:  (949) 760-0404

Jonathan E. Bachand
KNOBBE MARTENS OLSON & BEAR, LLP
1717 Pennsylvania Ave NW, Suite 900
Washington DC, 20006
Telephone: (202) 640-6400

## <u>TABLE OF CONTENTS</u>

**Page No.**

I. INTRODUCTION ................................................................................................................ 1

II. COMPLAINANTS ............................................................................................................ 3

III. PROPOSED RESPONDENT ........................................................................................... 7

IV. PRODUCTS AND TECHNOLOGY AT ISSUE ............................................................. 8

    A.   <u>Complainants' Technology</u> ................................................................................... 8

    B.   <u>Apple's Copying of Complainants' Technology</u> ................................................ 11

    C.   <u>The Accused Products</u> ........................................................................................ 13

V. THE ASSERTED PATENTS ........................................................................................... 14

    A.   <u>U.S. Patent No. 10,912,501</u> ............................................................................... 14

        1.   Identification of the Patent and Ownership by Masimo Corporation ....... 14

        2.   Foreign Counterparts to the '501 Patent .................................................. 17

        3.   Non-Technical Description of the '501 Patent ......................................... 17

    B.   <u>U.S. Patent No. 10,912,502</u> ............................................................................... 18

        1.   Identification of the Patent and Ownership by Masimo Corporation ....... 18

        2.   Foreign Counterparts to the '502 Patent .................................................. 20

        3.   Non-Technical Description of the '502 Patent ......................................... 20

    C.   <u>U.S. Patent No. 10,945,648</u> ............................................................................... 21

        1.   Identification of the Patent and Ownership by Masimo Corporation ....... 21

        2.   Foreign Counterparts to the '648 Patent .................................................. 24

        3.   Non-Technical Description of the '648 Patent ......................................... 24

    D.   <u>U.S. Patent No. 10,687,745</u> ............................................................................... 25

        1.   Identification of the Patent and Ownership by Masimo Corporation ....... 25

       2.      Foreign Counterparts to the '745 Patent ................................... 26

       3.      Non-Technical Description of the '745 Patent ......................... 26

    E.     U.S. Patent No. 7,761,127 .................................................... 27

       1.      Identification of the Patent and Ownership by Cercacor .......... 27

       2.      Foreign Counterparts to the '127 Patent ................................... 28

       3.      Non-Technical Description of the '127 Patent ......................... 28

    F.     Licensees ........................................................................... 29

VI. UNLAWFUL AND UNFAIR ACTS OF PROPOSED RESPONDENT ............................. 29

VII. THE DOMESTIC INDUSTRY Related to Asserted Patents ................................ 37

    A.     Technical Prong .................................................................. 38

    B.     Economic Prong .................................................................. 39

VIII. SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE ............................. 40

IX. CLASSIFICATION OF THE INFRINGING PRODUCTS UNDER THE HARMONIZED
    TARIFF SCHEDULE OF THE UNITED STATES ....................................... 41

X. RELATED LITIGATION ............................................................................ 41

XI. REQUESTED RELIEF ............................................................................. 42

**LIST OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 1 | Certified Copy of U.S. Patent No. 10,912,501 |
| 2 | Certified Copy of U.S. Patent No. 10,912,502 |
| 3 | Certified Copy of U.S. Patent No. 10,945,648 |
| 4 | Certified Copy of U.S. Patent No. 10,687,745 |
| 5 | Certified Copy of U.S. Patent No. 7,761,127 |
| 6 | Certified Assignment Documents for U.S. Patent No. 10,912,501 |
| 7 | Certified Assignment Documents for U.S. Patent No. 10,912,502 |
| 8 | Certified Assignment Documents for U.S. Patent No. 10,945,648 |
| 9 | Certified Assignment Documents for U.S. Patent No. 10,687,745 |
| 10 | Certified Assignment Documents for U.S. Patent No. 7,761,127 |
| 11 | CONFIDENTIAL EXHIBIT: Amended and Restated Cross-Licensing Agreement between Masimo Laboratories and Masimo Corporation Effective January 1, 2007 |
| 12 | Listing of All Foreign Patents and All Foreign Patent Applications Corresponding to Asserted Patents |
| 13 | Representative Photos of Representative Apple Watch Series 6 (Model No. 109.627 shown) |
| 14 | Product Literature Regarding the Apple Watch Series 6 |
| 15 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Claims of the '501 Patent to an Apple Watch Series 6 |
| 16 | CONFIDENTIAL EXHIBIT: Claim Chart Comparing Claims of the '502 Patent to an Apple Watch Series 6 |
| 17 | CONFIDENTIAL EXHIBIT: Claim Chart Comparing Claims of the '648 Patent to an Apple Watch Series 6 |
| 18 | CONFIDENTIAL EXHIBIT: Claim Chart Comparing Claims of the '745 Patent to an Apple Watch Series 6 |
| 19 | CONFIDENTIAL EXHIBIT: Claim Chart Comparing Claims of the '127 Patent to an Apple Watch Series 6 |
| 20 | CONFIDENTIAL EXHIBIT Drawings, Photographs, or Other Visual Representations of Masimo's rainbow® Sensors |
| 21 | CONFIDENTIAL EXHIBIT:  Drawings, Photographs, or Other Visual Representations of Masimo's Confidential Domestic Industry Product |
| 22 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Exemplary Claims of the '501 Patent to Masimo's Domestic Industry Product |
| 23 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Exemplary Claims of the '502 Patent to Masimo's Domestic Industry Product |
| 24 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Exemplary Claims of the '648 Patent to Masimo's Domestic Industry Product |

| Exhibit No. | Description |
|---|---|
| 25 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Exemplary Claims of the '745 Patent to Masimo's Domestic Industry Product |
| 26 | CONFIDENTIAL EXHIBIT:  Claim Chart Comparing Exemplary Claims of the '127 Patent to Masimo's Domestic Industry Products |
| 27 | CONFIDENTIAL EXHIBIT:  Confidential Declaration of Bilal Muhsin |
| 28 | CONFIDENTIAL EXHIBIT: Confidential Declaration of Micah Young |
| 29 | September 15, 2020 Press Release |
| 30 | CONFIDENTIAL EXHIBIT: Invoice dated April 19, 2021 |
| 31 | Photographs of Product Packaging of the Apple Watch Series 6 |
| 32 | January 28, 2021 Apple 10K Filing with SEC |
| 33 | Fowler, Geoffrey, "The new Apple Watch says my lungs may be sick. Or perfect.  It can't decide." *Washington Post*, September 23, 2020. |
| 34 | Masimo Form 10-K, dated February 23, 2021 |
| 35 | "The Apple Watch's blood oxygen sensor is less accurate than you think" |
| 36 | "Can the Apple Watch Series 6 Keep the Doctor Away?" |
| 37 | "Apple Watch Series 6 review – Minute Improvements" |
| 38 | "The New Apple Watch 6 May Have a Problem.  Oddly Enough, That's OK" |
| 39 | "Apple Watch Series 6 and SE Review – Watch Out for the Upsell" |
| 40 | Provisional Application No. 60/367,428 |

**LIST OF APPENDICES**

| Appendix | Description |
| --- | --- |
| A | File History for U.S. Patent No. 10,912,501 |
| B | Relevant Technical References Cited in File History for U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648 |
| C | File History for U.S. Patent No. 10,912,502 |
| D | File History for U.S. Patent No. 10,945,648 |
| E | Certified File History for U.S. Patent No. 10,687,745 |
| F | Relevant Technical References Cited in File History for U.S. Patent No. 10,687,745 |
| G | Certified File History for U.S. Patent No. 7,761,127 |
| H | Relevant Technical References Cited in File History for U.S. Patent No. 7,761,127 |

# I.  INTRODUCTION

1.      Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Masimo" or "Complainants") request that the United States International Trade Commission ("Commission") institute an investigation into violations of Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337") committed by Respondent Apple Inc. ("Apple") ("Apple" or "Respondent").

2.      This Complaint is based on Respondent's unlawful and unauthorized importation into the United States, sale for importation, and/or sale within the United States after importation of certain light-based physiological measurement devices and components thereof. Respondent's products, including, but not limited to, the "Apple Watch Series 6," or "Series 6" ("Accused Products") infringe at least one claim of U.S. Patent No. 10,912,501, titled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," ("the '501 Patent"), U.S. Patent No. 10,912,502, titled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," ("the '502 Patent"), U.S. Patent No. 10,945,648, titled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," ("the '648 Patent"), U.S. Patent No. 10,687,745, titled "Physiological Measurement Devices, Systems, and Methods," ("the '745 Patent"), and U.S. Patent No. 7,761,127, titled "Multiple Wavelength Sensor Substrate," ("the '127 Patent") (collectively, "the Asserted Patents"), either literally or under the doctrine of equivalents.

3.      The Accused Products directly infringe and/or induce the infringement of, literally or under the doctrine of equivalents, at least the following claims (collectively, "the Asserted Claims") of the Asserted Patents:

| U.S. Patent | Asserted Claims[1] |
|---|---|
| '501 Patent | **1**-9, 11-18, **19**-25 and **26**-30 |
| '502 Patent | **1**-2, 4-6, 8-12, 14-18, **19**-22, 24-26, and **28**-30 |
| '648 Patent | **1**-5, **6**-17, 19, and **20**-30 |
| '745 Patent | **1**-6, 8-9, 11, 14, **20**-24, and 26-27 |
| '127 Patent | **7**-9 |

Further discovery may reveal that Respondent infringes additional claims.

4.      Certified copies of the '501 Patent, '502 Patent, '648 Patent, '745 Patent, and '127 Patent are attached hereto as **Exhibits 1, 2, 3, 4, and 5**, respectively.  Masimo Corp. owns by assignment the entire right, title, and interest in and to the '501 Patent, '502 Patent, '648 Patent, and '745 Patent (collectively, "the Masimo Patents").  Certified copies of the recorded assignments of the Masimo Patents are attached hereto as **Exhibits 6, 7, 8, and 9**, respectively. Masimo Corp. exclusively licenses certain rights to the Masimo Patents to Cercacor.  A copy of the Amended and Re-Stated Cross-Licensing Agreement between Masimo Corp. and Cercacor (formerly known as Masimo Laboratories) granting the license to Cercacor is attached hereto as **Confidential Exhibit 11**.  Cercacor owns by assignment the entire right, title, and interest in and to the '127 Patent ("the Cercacor Patent").  Certified copies of the recorded assignment of the Cercacor Patent are attached hereto as **Exhibit 9**.  Masimo is a licensee of certain exclusive rights to the Cercacor Patents, as reflected in **Confidential Exhibit 11.**

5.      Respondent's activities with respect to the importation into the United States, the

---

[1]      Independent claims are noted in **BOLD**.

sale for importation into the United Sates, and/or the sale within the United States after importation of certain light-based physiological measurement devices and components thereof, described more fully *infra*, are unlawful under 19 U.S.C. § 1337(a)(1)(B)(i) in that they constitute infringement of the valid and enforceable Asserted Patents.

6.     As required by Section 337(a)(2) and defined by Section 337(a)(3), industries exist in the United States relating to articles covered by the Asserted Patents or alternatively such industries relating to articles protected by the Asserted Patents are in the process of being established.

7.     Complainants seek relief from the Commission in the form of a permanent limited exclusion order, pursuant to Section 337(d), excluding from entry into the United States the Accused Products that infringe one or more claims of the Asserted Patents.  Complainants also seek a permanent cease and desist order, pursuant to Section 337(f), directing Respondent to immediately cease and desist from importing, marketing, advertising, demonstrating, warehousing inventory for distribution, distributing, offering for sale, selling, or using in the United States the certain light-based physiological measurement devices and components thereof that infringe one or more claims of the Asserted Patents.

8.     Complainants further seek as relief a bond, for the 60-day Presidential review period pursuant to Section 337(j), for the importation of the certain light-based physiological measurement devices and components thereof that infringe one or more claims of the Asserted Patents.

## II.  <u>COMPLAINANTS</u>

9.     Complainant Masimo Corporation is a Delaware corporation having its principal place of business at 52 Discovery, Irvine, California 92618.  Masimo owns the Masimo Patents and has certain exclusive rights to the Cercacor Patent.  (*See* **Exhibits 1-4, 6-9, Confidential**

**Exhibit 11**).   Complainant Cercacor is a Delaware corporation having its principal place of business at 15750 Alton Pkwy, Irvine, CA 92618.  Cercacor is the owner of the Cercacor Patent and has certain exclusive rights to the Masimo Patents.  (*See* **Exhibits 5 and 10, Confidential Exhibit 11**).

10.     Masimo is a global medical technology company that has revolutionized non-invasive monitoring of physiological parameters, such as pulse rate, arterial oxygen saturation and many others.  These innovations have been repeatedly recognized by Federal courts.  *See Mallinckrodt, Inc. v. Masimo Corp.*, Case No. 2:00-CV-06506 (C.D. Cal. Apr. 5, 2004), ECF No. 588; *Mallinckrodt, Inc. v. Masimo Corp.*, Case No. 2:00-CV-06506 (C.D. Cal. July 12, 2004), ECF No. 622; *Mallinckrodt, Inc. v. Masimo Corp.*, Case No. 2:00-CV-06506 (C.D. Cal. Aug. 4, 2004), ECF No. 632, *aff'd in part and rev'd in part*, 147 F. App'x 158 (Fed. Cir. 2005); *Mallinckrodt, Inc. v. Masimo Corp.*, 147 F. App'x 158 (Fed. Cir. 2005); *Masimo Corp. v. Philips Elec. N. Am. Corp.*, Case No. 1:09-CV-00080 (D. Del. Oct. 17, 2014), ECF No. 919; *Masimo Corp. v. Philips Elec. N. Am. Corp.*, Case No. 1:09-CV-00080 (D. Del. May 18, 2015), ECF No. 997; *Masimo Corp. v. Philips Elec. N. Am. Corp.*, Case No. 1:09-CV-00080 (D. Del. May 18, 2015), ECF No. 998.

11.     Masimo develops, manufactures, and markets a variety of noninvasive patient monitoring technologies and hospital automation solutions as part of its mission to improve patient outcomes and reduce the cost of patient care.  Masimo's patient monitoring solutions are systems that generally incorporate a monitor or circuit board, proprietary single-patient use or reusable sensors, software and/or cables.  Masimo primarily sells its products to professional caregivers, such as hospitals, emergency medical service providers, home care providers,

physician offices, veterinarians, long term care facilities and also to consumers, through its direct sales force, online, distributors, and original equipment manufacturer (OEM) partners.

12.     Masimo has rapidly expanded its workforce despite the COVID-19 Pandemic.  As of December 28, 2019, Masimo had approximately 1,600 full-time employees and approximately 3,700 dedicated contract personnel worldwide.  **Exhibit 34** (Masimo Form 10k) at 34.  By January 2, 2021, Masimo had grown to 2,000 full-time employees and approximately 4,200 dedicated contract personnel worldwide.

13.     Masimo's core business is referred to as Masimo SET® pulse oximetry.  Pulse oximetry allows for the noninvasive measurement of the oxygen saturation level of arterial blood, which delivers oxygen to the body's tissues.  Pulse oximetry also allows for the measurement of pulse rate.  "SET" refers to Masimo's Signal Extraction Technology, a technology invented by Masimo that, for the first time, allowed pulse oximeters to provide accurate measurements of oxygen saturation even during patient motion and low perfusion (i.e., decreased arterial blood flow) conditions.

14.     Over the years, Masimo's product offerings have expanded significantly to also include rainbow® Pulse CO-Oximetry, with its unique ability to allow for real-time non-invasive monitoring of additional physiological measurements, including  carboxyhemoglobin (SpCO®), methemoglobin (SpMet®), total hemoglobin concentration (SpHb®) and fractional arterial oxygen saturation (SpfO2™).  Rainbow® Pulse CO-oximetry also has the ability to measure pulse rate, perfusion index (Pi), Pleth Variability Index (PVi®) and respiration rate from the pleth (RRp®).  The rainbow SET® platform also allows for the calculation of Oxygen Content (SpOC™) and Oxygen Reserve Index (ORi™).

15.     Masimo's current technology offerings also include remote patient monitoring, connectivity, and hospital automation solutions, including Masimo Patient SafetyNet™, Masimo Patient SafetyNet™ Surveillance, Replica™, Iris®, MyView®, UniView™ and Trace™. Masimo's technologies are supported by a substantial intellectual property portfolio.

16.     Masimo invests significantly in its research and development efforts, and currently spends about 10% of its sales revenue on research and development activities. For the year ending January 2, 2021, Masimo spent approximately $118,689,000 for research and development activities. **Exhibit 34** (Masimo Form 10k) at 66. The majority of these activities take place in the United States. **Exhibit 34** (Masimo Form 10k) at 62. As a result of these efforts, Masimo has been awarded numerous patents in the United States and around the world. As of January 2, 2021, Masimo had approximately 800 issued patents and approximately 500 pending applications in the U.S., Europe, Japan, Australia, Canada and other countries throughout the world. **Exhibit 34** (Masimo Form 10k) at 32.

17.     Masimo owns two facilities in Irvine, California, with combined square footage of approximately 314,400, housing its corporate headquarters and the majority of its U.S. research and development activities. Masimo also owns approximately 86,500 square feet of property in Hudson, New Hampshire, which is used to develop and manufacture advanced light emitting diodes and other advanced component-level technologies, as well as warehousing and administrative operations.

18.     Masimo also leases and occupies approximately 105,800 square feet of additional building space in Irvine, California for product manufacturing and warehousing. Masimo also leases or owns an additional 61,000 square feet at various locations throughout the United States, that provide centers for distribution of Masimo's products directly to its customers, and is in the

████████████████████████████████████████

process of establishing distribution centers throughout the United States, ███████████

████████████████████████████████████

19.     Complainant Cercacor is a health and wellness innovator based in Irvine, California.  In 1998, Masimo spun certain technology off into a new company, Masimo Laboratories, Inc. or "Masimo Labs," to further research and develop the technologies.  The name of the company was later changed to "Cercacor."  Cercacor and Masimo have a license agreement between them to facilitate collaboration between the companies.

20.     Like Masimo, Cercacor is an innovator of non-invasive monitoring technologies. Cercacor is on the frontline of understanding how measuring, tracking, and analyzing physiological parameters can impact pre-diabetic and diabetic patients, endurance sports training and performance, and overall health and wellness.  Cercacor continued the development that started at Masimo on numerous non-invasive parameters.  Leading hospitals around the world use Cercacor technology licensed to Masimo and sold under the name Masimo rainbow SET®. This technology was the first, and remains the only, noninvasive monitoring technology that can measure carbon monoxide, methemoglobin, and total hemoglobin in the blood.

## III.  PROPOSED RESPONDENT

21.     Respondent Apple Inc. ("Apple") is a California corporation having a principal place of business at One Apple Park Way, Cupertino, California 95014.  Apple unlawfully sells for importation, imports, and/or sells after importation into the United States certain light-based physiological measurement devices and components thereof, including the Apple Watch Series 6, that infringe the '501 Patent, the '502 Patent, the '648 Patent, the '745 Patent, and the '127 Patent, either literally or under the doctrine of equivalents.

22.     Apple is in the business of designing, manufacturing, and marketing smartphones, personal computers, tablets, wearables, and accessories, and sells a variety of related services.

Apple's wearables include certain light-based physiological measurement devices and components thereof, including the Apple Watch Series 6.

## IV.  PRODUCTS AND TECHNOLOGY AT ISSUE

### A.  Complainants' Technology

23.     Products that practice one or more claims of the Asserted Patents—including the Accused Products and Masimo's Domestic Industry products—are light-based physiological measurement devices and components thereof.  These physiological measurement devices typically rely on light that is transmitted through the body tissue.  The received light, that has been attenuated by the various components of the body tissue, including the pulsing arterial blood, is known in the industry as a photoplethysmography or "PPG."  The transmission and receipt of this light is typically accomplished through a sensor that is applied to a body part such as a finger, arm, toes, forehead or ear.

24.     Before Masimo, non-invasive measurements from the PPG were plagued by unreliability, often when the measurement was needed most, due to the person moving or having low peripheral blood flow (known as "low perfusion").  The industry had essentially given up on solving these problems, concluding they were largely unsolvable.  In the medical context, clinicians had to live with the results—patient monitors gave excessive false alarms, froze their measurements for prolonged periods of time despite potential changes in the physiological parameter (e.g., oxygen saturation or pulse rate), delayed notification of alarms due to long averaging times of sensor data, produced inaccurate measurements, or were unable to obtain data on the most critical patients and babies who cannot be instructed to stay still.  Masimo's pioneering Masimo SET® technology, solves this problem and dramatically improved the reliability of monitoring and reporting physiological signals derived from the PPG.

█████████████████████████████████

25.     Following its initial success with Masimo SET® technology, Masimo invested heavily in developing additional breakthrough measurement technologies, such as non-invasively measuring total hemoglobin, carboxyhemoglobin, and methemoglobin.  Masimo has continued to innovate, succeeding where others have consistently failed.  Masimo was the first, and remains the only, company delivering these game-changing technologies to hospitals in the United States.  Use of Masimo's technology in the clinical setting has been proven to reduce blindness in premature infants, detect congenital heart disease in infants, save lives on the general care floor and post-surgery, and improve transfusion management, while also saving substantial money for the hospitals providing care.

26.     Masimo's investment in its technology and research and development has included significant investments in wrist-worn devices for measurements of physiological parameters.  Masimo's patent filings as early as 2002 disclose wrist-worn devices for measuring physiological parameters that wirelessly connected to monitors.  *See* **Exhibit 40** (Provisional Application No. 60/367,428 filed on March 25, 2002).

27.     One of Masimo's commercially marketed wrist-worn device for measuring physiological parameters, the Radius PPG, was cleared by the FDA in May of 2019.  The Radius PPG eliminated the need for a cabled connection to a pulse oximetry monitor, allowing patients to move freely and comfortably while still being continuously monitored reliably and accurately. The device communicated with monitors via a wireless connection allowing patients to benefit from mobility.

28.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

29.     Given its success selling medical-grade devices for non-invasively measuring physiological parameters, Complainants decided to leverage these clinical grade products for sale directly to consumers where allowable.  Masimo noticed that there has been many devices sold to consumers purporting to provide physiological measurements, but could identify none that provided clinical grade measurement.  The devices available to consumers were more like toys. In 2013, Masimo first began selling its pulse oximetry products to the consumer market.  After Masimo began selling directly to consumers, it also increased its investment in direct-to-consumer advertising, including being a premium sponsor of the BNP Paribas Open Tennis Tournament in Palm Springs, CA.

30.     Notably, despite the acute awareness of pulse oximetry created by the COVID-19 pandemic, the large multitude of so-called pulse oximeters offered to consumers are prohibited for medical purposes.  Unfortunately, the consumers do not recognize this, which puts their health at risk.

31.     The Asserted Patents claim devices and/or components of devices used in the non-invasive measurement of physiological parameters such as oxygen saturation.  For example, the four Masimo Patents claim devices containing multiple optical sources that emit light at different wavelengths and numerous light detectors.  The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection.  The devices are configured in specific ways which improve the successful detection of the signal while minimizing the effects of light-piping.  The Cercacor Patent also claims novel technologies assisting in the non-invasive measurement of physiological parameters.  The '127

Patent claims a sensor using a thermal mass within a substrate to measure and account for effects on measurements from temperature changes.

### B.   Apple's Copying of Complainants' Technology

32.     In 2013, Apple contacted Masimo and asked to meet regarding a potential collaboration.  Apple told Masimo that Apple would like to understand more about Masimo's technology to potentially integrate that technology into Apple's products.  Apple and Masimo later entered into a confidentiality agreement, and Masimo's management met with Apple.  The meetings included confidential discussions of Masimo's technology.  After what seemed to Masimo to have been productive meetings, Apple quickly began hiring Masimo's employees, including engineers and key management.

33.     Masimo employed Michael O'Reilly as its Chief Medical Officer and Executive Vice President for Medical Affairs beginning in January 2008.  As part of the Masimo executive team, O'Reilly was privy to extremely sensitive information, including information about mobile medical products and applications, wellness applications, clinical data gathering and analytics, and other technology of Masimo.  Upon information and belief, Apple employed O'Reilly in July 2013, shortly after the meetings with Masimo, to assist in wellness and mobile applications that include non-invasive measurement of physiological parameters.  Not long after, by December of 2013, O'Reilly was already meeting with the FDA on behalf of Apple to discuss medical applications and discuss medical products that non-invasively measures blood constituents.

34.     Apple systematically recruited other key Masimo personnel, such as Marcelo Lamego (a named inventor on many of the Asserted Patents), who was the former Chief Technical Officer of Cercacor and a former Research Scientist at Masimo.  Lamego was a

Masimo employee during 2000-2001 and 2003-2006, and the Cercacor Chief Technical Officer during 2006-2014.

35.     Lamego had unfettered access to Complainants' technical information.  He was trained and mentored at Masimo by the most skilled engineers and scientists, and was taught about the keys to effective non-invasive monitoring, something he was not involved in prior to Masimo.  Masimo engineers and scientists including, among others, Ammar Al-Ali, Mohamed Diab, and Walter Weber, exposed Lamego to all of Masimo's technology on non-invasive monitoring.   The Masimo engineers, including Al-Ali, Diab, and Weber, were Masimo employees at all relevant times.   Lamego also had access to and learned guarded secrets regarding Complainants' mobile medical products, including key technology and advance plans for future products.

36.     When Lamego left Cercacor, he assured Complainants that he would not violate his agreements with Complainants and volunteered that he would not work on technology similar to Complainants' technology.   On January 24, 2014, Complainants sent a letter to Apple explaining that Lamego possessed Complainants' confidential proprietary information and warning Apple to respect Complainants' rights in such information.  The letter stated, "we trust that Apple will employ Mr. Lamego in an area that does not involved healthcare technology, including mobile health applications and the measurement of physiological information."  The letter also asked that "Apple refrain from inducing Mr. Lamego to take actions that would violate the Agreement while he performs services for Apple" and asked Apple to "direct Mr. Lamego to honor his obligations to all of his prior employers."  Based on Complainants' conversations with Lamego, Complainants' letter to Apple, and Complainants' confidentiality agreement with Apple, Complainants' reasonably believed that Lamego would not use or disclose Complainants'

12

confidential information and that Apple would not induce Lamego to do so or itself use Complainants' confidential information.

37.     Unbeknownst to Complainants at the time, it now appears that, shortly after joining Apple in January 2014, Lamego began pursuing on behalf of Apple numerous patent applications directed toward technologies he worked on at Complainants, and with which he had no prior experience or knowledge.

38.     Apple announced the first version of its watch in September 2014 and began shipping its watch in April 2015.   On information and belief, Apple began incorporating Masimo's technology in later versions of its watch.   Ultimately with the launch of the Apple Watch Series 6 in September 2020, Apple for the first time purported to have incorporated the ability to measure blood oxygen saturation (pulse oximetry) into its watches—technology, which as described in more detail below, infringes the Asserted Claims.   Unfortunately for U.S. consumers, the Apple Watch Series 6 differs from Masimo's medical grade technology in that Apple's Accused Products do not reliably measure blood oxygen concentrations, as described in **Exhibits 33 and 35-39**.

### C.     <u>The Accused Products</u>

39.     Pursuant to 19 C.F.R. § 210.12(a)(12), the category of the Accused Products may be plainly described as wearable electronic devices with light-based pulse oximetry functionality, including various devices made by Apple, including, but not limited to, various models of the Apple Watch Series 6.   The Apple Watch Series 6 is an electronic smartwatch, which purportedly includes pulse oximetry functionality.   Relevant here, the Accused Products contain LEDs, photodiodes, and other features within the scope of the Masimo Patents to measure the oxygen saturation of the user.   The Accused Products also contain the thermal mass technology

claimed in the '127 Patent.  The infringing products—including their associated systems, and components thereof—are further described in **Exhibits 15, 16, 17, 18, and 19**, which include claim charts comparing the Asserted Claims to the Apple Watch Series 6.  The Apple Watch Series 6 either infringes these claims upon importation or Apple induces consumers to infringe these claims through its sale of the Apple Watch Series 6 and its recommendation, encouragement, and/or instruction to users to use the Apple Watch Series 6 in connection with an iPhone.

40.     The Apple Watch Series 6 is imported into and sold within the United States by or on behalf of Apple.  On information and belief, commercially significant volumes of infringing products are maintained in inventory by Apple in the United States.

41.     The identification of exemplary Accused Products is intended purely for illustration and is not intended to limit the scope of the investigation.  Any remedy should extend to all present and future infringing products of Apple, regardless of model number, name, or type of product.

## V.  THE ASSERTED PATENTS

### A.  U.S. Patent No. 10,912,501

#### 1.     Identification of the Patent and Ownership by Masimo Corporation

42.     Masimo Corporation owns by assignment the entire right, title, and interest in the '501 Patent, entitled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," which issued on February 9, 2021.  **Exhibit 1**.  The '501 Patent issued from U.S. Patent Application Serial No. 17/031,356, filed on September 24, 2020.  The '501 Patent is a continuation of U.S. Patent Application No. 16/834,538, filed March 30, 2020, which is a continuation of U.S. Patent Application No. 16/725,292, filed December 23, 2019, which is a

continuation of U.S. Patent Application No. 16/534,949, filed August 7, 2019, which is a continuation of U.S. Patent Application No. 16/409,515, filed May 10, 2019, which is a continuation of U.S. Patent Application No. 16/261,326, filed January 29, 2019, which is a continuation of U.S. Patent Application No. 16/212,537, filed December 6, 2018, which is a continuation of U.S. Patent Application No. 14/981,290 filed December 28, 2015, which is a continuation of U.S. Patent Application No. 12/829,352 filed July 1, 2010, which is a continuation of U.S. Patent Application No. 12/534,827 filed August 3, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, and 61/091,732 filed August 25, 2008.  U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,528 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25, 2008.  U.S. Patent Application No. 12/497,528 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008.   U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,523 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August

25, 2008.  U.S. Patent Application No. 12/497,523 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008.  A certificate of correction issued on the '501 Patent on April 6, 2021.  Pursuant to Commission Rule 210.12(a)(9)(xi) the expiration date of the '501 Patent is August 25, 2028.

43.     The inventors of the '501 Patent, Jeroen Poeze, Marcelo Lamego, Sean Merritt, Cristiano Dalvi, Hung Vo, Johannes Bruinsma, Ferdyan Lesmana, Massi Joe E. Kiani, and Greg Olsen, assigned to Masimo Laboratories, Inc. the entire right, title, and interest throughout the world in, to and under said improvements in the invention described and claimed in U.S. Patent Application No. 12/534,827 and all divisions and continuations thereof, which includes the '501 Patent.  **Exhibit 9**.  On August 2, 2010, Masimo Laboratories Inc. changed its name to Cercacor Laboratories, Inc.  **Exhibit 9**.  On July 29, 2019, Cercacor assigned to Masimo Corporation, the entire right, title and interest to U.S. Application No. 16/212537 and all continuations thereof, which includes the '501 Patent.  **Exhibit 9**.  Cercacor is the licensee of certain exclusive rights to the '501 Patent.  **Confidential Exhibit 17**.  The '501 Patent is valid, enforceable, and is currently in full force and effect.

44.     Pursuant to Rule 210.12(c) of the Commission's Rules of Practice and Procedure, this Complaint is accompanied by: 1) an electronic copy of the prosecution history of the '501 Patent[2]; and 2) an electronic copy of each patent and applicable pages of each technical reference

---

[2]     Due to USPTO errors, Complainants submitted certificates of correction to correct typographical errors in U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648 as originally issued.  Although these certificates of correction have been approved, and certificates of correction have been issued for both U.S. Patent Nos. 10,912,501 and 10,945,648, the certificate of correction for U.S. Patent No. 10,912,502 has not yet issued.  Additionally, Complainants have not yet received certified copies of the prosecution histories which contain the information related to the certificates of correction for U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648.  Accordingly, Complainants are submitting uncertified copies of the

mentioned in the prosecution history.  These materials are included in Appendices A and B, respectively.

## 2. <u>Foreign Counterparts to the '501 Patent</u>

45.     Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign patent application that has been denied, abandoned, or withdrawn corresponding to the '501 Patent.  **Exhibit 12**.  No other foreign patents or patent applications corresponding to the '501 Patent are known to Masimo Corporation.

## 3. <u>Non-Technical Description of the '501 Patent</u>

46.     The '501 Patent involves devices for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate.  The devices include multiple optical sources that emit light at different wavelengths and numerous light detectors.  The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection.  This data is then processed by a processing device which outputs a measurement of the physiological parameter.  The '501 Patent includes limitations to novel architecture features to implement the required measurement while limiting any light noise that could impact the accuracy of measurements.  The '501 Patent also includes limitations to novel arrangements of light sources and photodetectors.  The '501 Patent also contains limitations to processors, network devices, and user interfaces, allowing the device to be easily used by consumers.

---

prosecution histories of U.S. Patent Nos. 10,912,501, 10,912,502, and 10,945,648, and will submit certified copies once received.

47.     In sum, the invention of the '501 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters. ███████████████ █████████████████████████████████████████████.

48.     The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '501 Patent.

**B.     U.S. Patent No. 10,912,502**

**1.     Identification of the Patent and Ownership by Masimo Corporation**

49.     Masimo Corporation owns by assignment the entire right, title, and interest in the '502 Patent, entitled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," which issued on February 9, 2021. **Exhibit 2**.  The '502 Patent issued from U.S. Patent Application Serial No. 17/031,407, filed on September 24, 2020.  The '502 Patent is a continuation of a continuation of U.S. Patent Application No. 16/834,538, filed March 30, 2020, which is a continuation of U.S. Patent Application No. 16/725,292, filed December 23, 2019, which is a continuation of U.S. Patent Application No. 16/534,949, filed August 7, 2019, which is a continuation of U.S. Patent Application No. 16/409,515, filed May 10, 2019, which is a continuation of U.S. Patent Application No. 16/261,326, filed January 29, 2019, which is a continuation of U.S. Patent Application No. 16/212,537, filed December 6, 2018, which is a continuation of U.S. Patent Application No. 14/981,290 filed December 28, 2015, which is a continuation of U.S. Patent Application No. 12/829,352 filed July 1, 2010, which is a continuation of U.S. Patent Application No. 12/534,827 filed August 3, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application

Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, and 61/091,732 filed August 25, 2008. U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,528 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25, 2008. U.S. Patent Application No. 12/497,528 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008. U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,523 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25, 2008. U.S. Patent Application No. 12/497,523 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008. On May 25, 2021, the PTO approved a certification of correction for the '502 patent, which has not yet issued. Pursuant to Commission Rule 210.12(a)(9)(xi) the expiration date of the '502 Patent is August 25, 2028.

50.     The inventors of the '502 Patent, Jeroen Poeze, Marcelo Lamego, Sean Merritt, Cristiano Dalvi, Hung Vo, Johannes Bruinsma, Ferdyan Lesmana, Massi Joe E. Kiani, and Greg

Olsen, assigned to Masimo Laboratories, Inc. the entire right, title, and interest throughout the world in, to and under said improvements in the invention described and claimed in U.S. Patent Application No. 12/534,827 and all divisions and continuations thereof, which includes the '502 Patent. **Exhibit 7**. On August 2, 2010, Masimo Laboratories Inc. changed its name to Cercacor Laboratories, Inc. **Exhibit 7**. On July 29, 2019, Cercacor assigned to Masimo Corporation, the entire right, title and interest to U.S. Application No. 16/212537 and all continuations thereof, which includes the '502 Patent. **Exhibit 7**. Cercacor is the licensee of certain exclusive rights to the '502 Patent. **Confidential Exhibit 11**. The '502 Patent is valid, enforceable, and is currently in full force and effect.

51.     Pursuant to Rule 210.12(c) of the Commission's Rules of Practice and Procedure, this Complaint is accompanied by: 1) an electronic copy of the prosecution history of the '502 Patent; and 2) a electronic copy of each patent and applicable pages of each technical reference mentioned in the prosecution history. These materials are included in Appendices C and B, respectively. Because the '501 Patent, '502 Patent, and '648 Patent are related, there is a substantial overlap of the patents and applicable pages of each technical reference mentioned in the prosecution histories and the copies are provided together in Appendix B.

## 2.     Foreign Counterparts to the '502 Patent

52.     Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign patent application that has been denied, abandoned, or withdrawn corresponding to the '502 Patent. **Exhibit 12**. No other foreign patents or patent applications corresponding to the '502 Patent are known to Masimo Corporation.

## 3.     Non-Technical Description of the '502 Patent

53.     Like the '501 Patent, the '502 Patent involves devices for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate.  The devices include multiple optical sources that emit light at different wavelengths and numerous light detectors.  The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection.  This data is then processed by a processing device which outputs a measurement of the physiological parameter.  The '502 Patent includes limitations to novel architecture features to implement the required measurement while limiting any light noise that could impact the accuracy of measurements.  The '502 Patent also includes limitations to novel arrangements of light sources and photodetectors.  The '502 Patent also contains limitations to processors, network devices, and user interfaces, allowing the device to be easily used by consumers.

54.     In sum, the invention of the '502 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters.  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

55.     The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '502 Patent.

C.     **U.S. Patent No. 10,945,648**

1.     **Identification of the Patent and Ownership by Masimo Corporation**

56.     Masimo Corporation owns by assignment the entire right, title, and interest in the '648 Patent, entitled "User-Worn Device for Noninvasively Measuring a Physiological Parameter of a User," which issued on March 16, 2021.  (*See* **Exhibit 3**).  The '648 Patent issued

from U.S. Patent Application Serial No. 17/031,316, filed on September 24, 2020.  The '648 Patent is a continuation of is a continuation of U.S. Patent Application No. 16/834,538, filed March 30, 2020, which is a continuation of U.S. Patent Application No. 16/725,292, filed December 23, 2019, which is a continuation of U.S. Patent Application No. 16/534,949, filed August 7, 2019, which is a continuation of U.S. Patent Application No. 16/409,515, filed May 10, 2019, which is a continuation of U.S. Patent Application No. 16/261,326, filed January 29, 2019, which is a continuation of U.S. Patent Application No. 16/212,537, filed December 6, 2018, which is a continuation of U.S. Patent Application No. 14/981,290 filed December 28, 2015, which is a continuation of U.S. Patent Application No. 12/829,352 filed July 1, 2010, which is a continuation of U.S. Patent Application No. 12/534,827 filed August 3, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, and 61/091,732 filed August 25, 2008. U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,528 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25, 2008. U.S. Patent Application No. 12/497,528 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008. U.S. Patent Application No. 12/829,352 is also a continuation-in-part of U.S. Patent Application No. 12/497,523 filed July 2, 2009, which claims the benefit of priority under 35 U.S.C. § 119(e) of

the following U.S. Provisional Patent Application Nos. 61/086,060 filed August 4, 2008, 61/086,108 filed August 4, 2008, 61/086,063 filed August 4, 2008, 61/086,057 filed August 4, 2008, 61/078,228 filed July 3, 2008, 61/078,207 filed July 3, 2008, and 61/091,732 filed August 25, 2008.  U.S. Patent Application No. 12/497,523 also claims the benefit of priority under 35 U.S.C. § 120 as a continuation-in-part of the following U.S. Design Patent Application Nos. 29/323,409 filed August 25, 2008 and 29/323,408 filed August 25, 2008.  A certificate of correction issued on the '648 Patent on April 20, 2021.  Pursuant to Commission Rule 210.12(a)(9)(xi) the expiration date of the '648 Patent is August 25, 2028.

57.     The inventors of the '648 Patent, Jeroen Poeze, Marcelo Lamego, Sean Merritt, Cristiano Dalvi, Hung Vo, Johannes Bruinsma, Ferdyan Lesmana, Massi Joe E. Kiani, and Greg Olsen, assigned to Masimo Laboratories, Inc. the entire right, title, and interest throughout the world in, to and under said improvements in the invention described and claimed in U.S. Patent Application No. 12/534,827 and all divisions and continuations thereof, which includes the '648 Patent.  **Exhibit 8**.  On August 2, 2010, Masimo Laboratories Inc. changed its name to Cercacor Laboratories, Inc.  **Exhibit 8**.  On July 29, 2019, Cercacor assigned to Masimo Corporation, the entire right, title and interest to U.S. Application No. 16/212537 and all continuations thereof, which includes the '648 Patent.  **Exhibit 8**.  Cercacor is the licensee of certain exclusive rights to the '648 Patent.  **Confidential Exhibit 11**.  The '648 Patent is valid, enforceable, and is currently in full force and effect.

58.     Pursuant to Rule 210.12(c) of the Commission's Rules of Practice and Procedure, this Complaint is accompanied by: 1) an electronic copy of the prosecution history of the '648 Patent; and 2) a electronic copy of each patent and applicable pages of each technical reference mentioned in the prosecution history.  These materials are included in Appendices D and B,

23

respectively. Because the '501 Patent, '502 Patent, and '648 Patent are related, there is a substantial overlap of the patents and applicable pages of each technical reference mentioned in the prosecution histories and the copies are provided together in Appendix B.

### 2. Foreign Counterparts to the '648 Patent

59.     Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign patent application that has been denied, abandoned, or withdrawn corresponding to the '648 Patent. **Exhibit 12**. No other foreign patents or patent applications corresponding to the '648 Patent are known to Masimo Corporation.

### 3. Non-Technical Description of the '648 Patent

60.     Like the '501 and '502 Patents, the '648 Patent involves devices for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate. The devices include multiple optical sources that emit light at different wavelengths and numerous light detectors. The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection. This data is then processed by a processing device which outputs a measurement of the physiological parameter. The '648 Patent includes limitations to novel architecture features to implement the required measurement while limiting any light noise that could impact the accuracy of measurements. The '648 Patent also includes limitations to novel arrangements of light sources and photodetectors. The '648 Patent also contains limitations to processors, network devices, and user interfaces, allowing the device to be easily used by consumers.

61.     In sum, the invention of the '648 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters. ████████████████████████ ████████████████████████████████████████████████████.

62.     The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '648 Patent.

**D.     U.S. Patent No. 10,687,745**

**1.     Identification of the Patent and Ownership by Masimo Corporation**

63.     Masimo Corporation owns by assignment the entire right, title, and interest in the '745 Patent, entitled "Physiological Monitoring Devices, Systems, and Methods," which issued on June 23, 2020.  (*See* **Exhibit 4**).  The '745 Patent issued from U.S. Patent Application Serial No. 16/835,772, filed on March 31, 2020.  The '745 Patent is a continuation of U.S. Patent Application No. 16/791,963, filed February 14, 2020, which is a continuation of U.S. Patent Application No. 16/532,065 filed August 5, 2019, which is a continuation of U.S. Patent Application No. 16/226,249 filed December 19, 2018, which is a continuation of U.S. Patent Application No. 15/195,199 filed June 28, 2016, which claims priority benefit under 35 U.S.C. § 119(e) from U.S. Provisional Application No. 62/188,430, filed July 2, 2015.  A certificate of correction issued on the '745 Patent on September 22, 2020.  Pursuant to Commission Rule 210.12(a)(9)(xi) the expiration date of the '745 Patent is June 28, 2029.

64.     The inventor of the '745 Patent, Ammar Al-Ali, assigned to Masimo Corporation the entire right, title, and interest in in U.S. Patent Application No. 15/195199, and all divisions and continuations thereof, which includes the '745 Patent.  **Exhibit 9**.  Cercacor is the licensee of certain exclusive rights to the '745 Patent.  **Confidential Exhibit 11**.  The '745 Patent is valid, enforceable, and is currently in full force and effect.

65.     Pursuant to Rule 210.12(c) of the Commission's Rules of Practice and Procedure, this Complaint is accompanied by: 1) an electronic copy of the certified prosecution history of the '745 Patent; and 2) an electronic copy of each patent and applicable pages of each technical reference mentioned in the prosecution history.  These materials are included in Appendices E and F, respectively.

## 2.     Foreign Counterparts to the '745 Patent

66.     Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign patent application that has been denied, abandoned, or withdrawn corresponding to the '745 Patent.  *See* **Exhibit 12**.  No other foreign patents or patent applications corresponding to the '745 Patent are known to Masimo Corporation.

## 3.     Non-Technical Description of the '745 Patent

67.     The '745 Patent involves devices for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate.  The devices include multiple optical sources that emit light at different wavelengths and numerous light detectors.  The devices also include optical transmission materials configured to change the shape of the emitted light or diffusers to spread the light.  The devices also contain light blocks to inhibit light from the optical sources from reaching the detectors before being attenuated by the user's skin.  The light detectors are configured to detect the optical radiation from the tissue and output a respective signal stream responsive to this detection.  This data is then processed by a processing device which outputs a measurement of the physiological parameter.  The '745 Patent includes limitations to novel architecture features to implement the required measurement while limiting any light noise that could impact the accuracy of measurements.  The '745 Patent also includes limitations to novel arrangements of light sources and photodetectors.

████████████████████████████████████████████

68.     In sum, the invention of the '745 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters.  ████████████████████ ██████████████████████████████████████████████.

69.     The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '745 Patent.

### E.     U.S. Patent No. 7,761,127

#### 1.     Identification of the Patent and Ownership by Cercacor

70.     Cercacor owns by assignment the entire right, title, and interest in the '127 Patent, entitled "Multiple Wavelength Sensor Substrate," which issued on July 20, 2010.  **Exhibit 5**. The '127 Patent issued from U.S. Patent Application Serial No. 11/366,209, filed on March 1, 2006.  The '127 Patent claims priority to Provisional Application No. 60/657,596, filed on March 1, 2005, Provisional Application No. 60/657,281, filed on March 1, 2005, Provisional Application No. 60/657,268, filed on March 1, 2005, and Provisional Application No. 60/657,759, filed on March 1, 2005.  Certificates of correction issued on the '127 Patent on January 4, 2011 and February 1, 2011.  Pursuant to Commission Rule 210.12(a)(9)(xi) the expiration date of the '127 Patent is April 28, 2029.

71.     The inventors of the '127 Patent, Ammar Al-Ali, Mohamed Diab, Marcelo Lamego, James Coffin, and Yassir Abdul-Hafiz, assigned to Masimo Laboratories, Inc. the entire right, title, and interest in U.S. Patent Application No. 11/366,209, and all patents granted thereof, which includes the '127 Patent.  **Exhibit 10**.  On August 2, 2010, Masimo Laboratories, Inc. changed its name to Cercacor Laboratories, Inc.  **Exhibit 10**.  Masimo is a licensee of

certain exclusive rights to the '127 Patent.  **Confidential Exhibit 11**.  The '127 Patent is valid, enforceable, and is currently in full force and effect.

72.     Pursuant to Rule 210.12(c) of the Commission's Rules of Practice and Procedure, this Complaint is accompanied by: 1) an electronic copy of the certified prosecution history of the '127 Patent; and 2) an electronic copy of each patent and applicable pages of each technical reference mentioned in the prosecution history.  These materials are included in Appendices G and H, respectively.

## 2.     Foreign Counterparts to the '127 Patent

73.     Pursuant to Commission Rule 210.12(a)(9)(v), Complainants submit the attached list of foreign patents, foreign patent applications (not already issued as a patent), and each foreign patent application that has been denied, abandoned, or withdrawn corresponding to the '127 Patent.  **Exhibit 12**.  No other foreign patents or patent applications corresponding to the '127 Patent are known to Masimo Corporation.

## 3.     Non-Technical Description of the '127 Patent

74.     The '127 Patent discloses and involves a physiological sensor for the non-invasive measurement of physiological parameters such as blood oxygen saturation and pulse rate.  The sensor includes a thermal mass, a plurality of light emitting sources operating at a plurality of wavelengths thermally coupled to the thermal mass, a temperature sensor to determine the bulk temperature of the thermal mass, and a detector capable of detecting light emitted from the light emitting sources after attenuation by the user's skin.  Based on the bulk temperature of the thermal mass, the sensor is able to compensate for shifts in the LED wavelengths due to temperature.

75.     In sum, the '127 Patent provides a novel combination of features allowing for the measurement of a user's physiological parameters.  Confidential samples of rainbow® sensors that embody the claims of the '127 Patent are available upon request.

76.     The foregoing non-technical description of the patented technology is not intended to limit, define, or otherwise affect the scope of the claimed inventions, nor is the non-technical description in any way intended to construe or define any word, phrase, term, or limitation recited in any claim of the '127 Patent.

**F.     Licensees**

77.     Masimo has licensed certain exclusive rights to the Masimo Patents to Cercacor. **Confidential Exhibit 11**.  Cercacor has licensed certain exclusive rights to the Cercacor Patent to Masimo.  **Confidential Exhibit 11**.  There are no other licensees to the Asserted Patents.

**VI.   UNLAWFUL AND UNFAIR ACTS OF PROPOSED RESPONDENT**

78.     Respondent manufactures, markets, sells for importation, imports and/or sells after importation into the United States products that directly infringe the '501 Patent, the '502 Patent, the '648 Patent, the '745 Patent, and the '127 Patent, either literally or under the doctrine of equivalents.  Apple also induces the infringement of claims 20-24 and 26-27 of the '745 Patent by recommending, encouraging, and/or suggesting that consumers use their Apple Watch Series 6 with the consumer's iPhone in an infringing manner.  On information and belief, Apple has knowledge of the '745 Patent because it monitors Masimo's patent filings.  Apple will also have knowledge of the '745 Patent before the issuance of any requested relief in this Investigation, from the filing of this lawsuit itself and service of this complaint.

79.     Respondent's Apple Watch Series 6 are sold under the below model names and numbers.

| Model Name | Model Number |
|---|---|
| Apple Watch Series 6 (GPS) 40 mm case | A2291 |
| Apple Watch Series 6 (GPS) 44 mm case | A2292 |
| Apple Watch Nike (GPS) 40 mm case | A2291 |
| Apple Watch Nike (GPS) 44 mm case | A2292 |
| Apple Watch Series 6 (GPS + Cellular) Aluminum 40 mm case | A2293 |
| Apple Watch Series 6 (GPS + Cellular) Aluminum 44 mm case | A2294 |
| Apple Watch Nike (GPS + Cellular) 40 mm case | A2293 |
| Apple Watch Nike (GPS + Cellular) 44 mm case | A2294 |
| Apple Watch Series 6 (GPS + Cellular) Stainless Steel 44 mm case | A2293 |
| Apple Watch Series 6 (GPS + Cellular) Stainless Steel 44 mm case | A2294 |
| Apple Watch Hermes (GPS + Cellular) 40 mm case | A2293 |
| Apple Watch Hermes (GPS + Cellular) 44 mm case | A2294 |
| Apple Watch Edition (GPS + Cellular) Titanium 40 mm case | A2293 |
| Apple Watch Edition (GPS + Cellular) Titanium 44 mm case | A2294 |

80.     Photographs of a representative Apple Watch Series 6 (specifically Model No. 2291) are attached to this Complaint as **Exhibit 13**.  A copy of information regarding the Apple Watch Series 6 from Apple's website is attached hereto as **Exhibit 14**.  Samples of the Apple Watch Series 6 can be made available upon request.

81.     On information and belief, Respondent and others on its behalf manufacture the Accused Products at least in China, and then import them into the United States, sell them for importation into the United States, and/or sell them within the United States after importation.

82.     These acts of Respondent constitute infringement of the Asserted Patents.

83.     Claim charts demonstrating how a representative Apple Watch Series 6 infringes the '501 Patent, the '502 Patent, the '648 Patent,'745 Patent, and the '127 Patent are attached as **Confidential Exhibits 15, 16, 17, 18, and 19**, respectively.  While a representative Apple Watch Series 6 is shown in the claim charts in **Confidential Exhibits 15, 16, 17, 18, and 19**, Respondent does not distinguish in any relevant manner between other model numbers of the Apple Watch Series 6 in their marketing or promotional materials, and Masimo alleges that all of Respondent's Apple Watch Series 6 identified in ¶79 above infringe at least one Asserted Claim of the Asserted Patents.

84.     Masimo has not licensed or otherwise authorized Respondent to make, use, sell, offer to sell, or import the Accused Products.

85.     Respondent has sought to capitalize on Masimo's extensive research and development efforts.

## VII.  THE DOMESTIC INDUSTRY RELATED TO ASSERTED PATENTS

86.     A domestic industry exists or is in the process of being established as defined by 19 U.S.C. §§ 1337(a)(2)–(3) relating to Masimo's significant investment in plant and equipment; significant employment of labor or capital; research and development activities; and substantial investment in exploitation of the patents, including engineering with respect to Masimo's physiological measurement devices and monitors.  With respect to the '501 Patent, the '502 Patent, the '648 Patent, and the '745 Patent, Masimo's activities in the United States with respect to ███████████████████████████████████—constitute a domestic industry for purposes of Section 337.  To the extent it is determined that a domestic industry does not currently exist with respect to the '501 Patent, the '502 Patent, the '648 Patent, and/or the '745 Patent, Masimo is in the process of establishing a domestic industry ████████████████

████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ is protected by one or more claims of each of the '501 Patent, the '502 Patent, the '648 Patent, and the '745 Patent.

87.     With respect to the '127 Patent, Masimo's activities in the United States with respect to at least its rainbow® sensor technology constitute a domestic industry for purposes of Section 337.  Masimo's rainbow® sensors—including the, RD rainbow® Set-2, rainbow® R1, rainbow® R25, rainbow® R20, rainbow® DCI SC 200, rainbow® DCI SC 400, rainbow® DCI SC 1000, rainbow® DCI mini SC-200, rainbow® DCI mini SC-400, rainbow® DCI mini SC-1000, rainbow® Super DCI mini SC-200, rainbow® Super DCI mini SC-400, rainbow® Super DCI mini-SC-1000, rainbow® DCI, rainbow® DCI-dc, RD rainbow® 8 λ SpCO Adhesive Sensor, LNCS-II™ rainbow® DCI® 8λ SpHb, LNCS-II™ rainbow® DCIP® 8λ SpHb, LNCS-II™ rainbow® DCI® 8λ SpCO, and LNCS-II™ rainbow® DCIP® 8λ SpCO—are protected by at least one claim of the '127 Patent.

A.     **Technical Prong**

88.     Masimo has designed and developed its domestic industry products through its extensive research and development efforts based almost entirely in the United States. Moreover, Masimo ███████████████████████████████████ in the United States and manufactures a material amount of the components of its rainbow® sensors in the United States.  As set forth in more detail herein, Masimo's domestic industry products incorporate the inventions claimed in one or more claims of the Asserted Patents.

89.     Drawings, photographs, or other visual representations of representative Masimo domestic industry products (specifically, ███████████████ and certain rainbow® sensors) are

attached hereto as **Confidential Exhibit 20 and Confidential Exhibit 21**.  Claim charts showing how a representative Masimo domestic industry product practices exemplary claims of the '501 Patent, the '502 Patent, the '648 Patent, the '745 Patent, and the '127 Patent are attached hereto as **Confidential Exhibits 15, 16, 17, 18 and 19**, respectively.  Additional information regarding the domestic industry products is found in the Declaration of Bilal Muhsin, attached hereto as **Confidential Exhibit 27**.

        **B.**     **Economic Prong**

90.     The domestic industry in this case is based on significant investments Masimo has made and/or plans to make and activities Masimo has undertaken and/or plans to undertake in the United States relating to products protected by one or more claims of the Asserted Patents. These investments and activities include research and development, manufacturing, testing, and engineering for the Masimo domestic industry products.  Specific, non-limiting examples of Masimo's substantial investments and activities related to the Asserted Patents are set forth in the confidential declaration of Micah Young, attached to this complaint as **Confidential Exhibit 28**.

91.     Masimo employs a significant number of employees in its U.S facilities in Irvine, California.  These employees devote substantial personnel-hours toward the research and development, testing and engineering for the Masimo domestic industry products.  The confidential declaration of Micah Young sets forth details regarding the investments it has made in these U.S. employees.

92.     Masimo also invests capital toward manufacturing and research and development for products protected by the Asserted Patents.  The confidential declaration of Micah Young provides additional details regarding Masimo's capital investments.

93.     In addition, Masimo has made substantial investments in plant and equipment in the United States.  Masimo's facilities in Irvine, California, houses activities for research and development, manufacturing, testing and engineering for the Masimo domestic industry products.  Masimo also owns a facility in New Hampshire where manufacturing activities for its rainbow® sensors take place.  The confidential declaration of Micah Young includes further non-limiting examples of Masimo's investments in this category.

94.     To the extent it is determined that a domestic industry does not currently exist, Masimo is in the process of establishing a domestic industry with respect to the Masimo Patents because it is actively engaged in the steps leading to the exploitation of its intellectual property rights, and there is a significant likelihood that an industry will be established in the United States in the future ███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████.  Further, non limiting examples regarding the active steps taken by Masimo to establish a domestic industry are included in the confidential declaration of Micah Young filed herewith as **Confidential Exhibit 28**.

## VIII.  <u>SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE</u>

95.     Respondent, and/or others on its behalf, manufactures the Accused Products at least in China, and then imports them into the United States, sells them for importation into the United States, and/or sells them after importation into the United States.  Respondent sells and offers for sale the Accused Products directly to customers in the United States.  Respondent stated in a press release dated September 15, 2020, that it was introducing the Series 6 in the United States for sale starting on September 18, 2020.  **Exhibit 29**

96.     Prior to filing this Complaint, a representative Apple Watch Series 6 product was purchased on April 19, 2021, in the United States.  A copy of the invoice of this purchase is

attached hereto as **Confidential Exhibit 30**.  The packaging of this Accused Product indicates that it was made outside the United States.  Photographs of the product packaging for this Apple Watch product, showing that it was made in China, are attached hereto as **Exhibit 31**.

97.     In addition, Apple's 10K filed with the SEC on January 28, 2021 states that "[s]ubstantially all of the Company's hardware products are manufactured by outsourcing partners that are located primarily in Asia, with some Mac computers manufactured in the U.S. and Ireland."  **Exhibit 32**.

### IX.  CLASSIFICATION OF THE INFRINGING PRODUCTS UNDER THE HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

98.     Upon information and belief, the Accused Products may be classified under at least the following heading of the Harmonized Tariff Schedules of the United States: 8517.62.0090.  This HTS identification is illustrative and not exhaustive.  The identification is not intended to limit the scope of the Investigation, nor is it intended to restrict the scope of any exclusion order or other remedy ordered by the Commission.

### X.  RELATED LITIGATION

99.     On January 9, 2020, Masimo Corp. and Cercacor filed suit in the United States District Court for the Central District of California, Case No. 8:20-cv-00048.  In that case, Complainants assert that Respondent Apple has, *inter alia*, engaged in trade secret misappropriation and has infringed patents not asserted in this complaint by the sale of the certain products, including the Apple Watch Series 6.  Complainants also seek a declaration of ownership of several patents and applications filed by Apple.  That case is currently pending before the district court, but Complainants' patent infringement claims are stayed pending resolution of the below referenced *inter partes* review proceedings.

100.    Respondent has filed numerous petitions for *inter partes* review of the patents involved in Case No. 8:20-cv-0048, none of which are asserted in this complaint:  IPR2020-01520 (Instituted March 2, 2021); IPR2021-00208 (Instituted June 3, 2021); IPR2020-01521 (Instituted April 14, 2021); IPR2021-00193 (Instituted June 3, 2021); IPR2021-00195 (Instituted June 3, 2021); IPR2021-00209 (Instituted June 3, 2021); IPR2020-01524 (Instituted April 16, 2021); IPR2020-01722 (Instituted May 12, 2021); IPR2020-01723 (Institution denied May 12, 2021); IPR2020-01536 (Instituted March 2, 2021); IPR2020-01537 (Instituted March 2, 2021); IPR2020-01538 (Instituted March 2, 2021); IPR2020-01539 (Instituted March 2, 2021); IPR2020-01526 (Instituted April 16, 2021); and IPR2020-01523 (Instituted April 14, 2021).

101.    There have been no other foreign or domestic court or agency litigations involving any of the Asserted Patents.

## XI.  <u>REQUESTED RELIEF</u>

102.    WHEREFORE, by reason of the foregoing, Complainants request that the United States International Trade Commission:

a)  institute an immediate investigation pursuant to 19 U.S.C. § 1337 into the violations of that section based on Respondent's unlawful importation into the United States, sale for importation into the United States, and/or sale in the United States after importation of certain light-based physiological measurement devices and components thereof that infringe one or more claims of U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and/or 7,761,127;

b)  schedule and conduct a hearing pursuant to Section 337(c), for the purposes of receiving evidence and hearing argument concerning whether there has been a violation of Section 337;

42

c) determine that there has been a violation of Section 337 by Respondent;

d) issue a permanent exclusion order, pursuant to 19 U.S.C. § 1337(d), excluding from entry into the United States all of Respondent's light-based physiological measurement devices and components thereof, including Apple Watch Series 6, that infringe one or more claims of U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and/or 7,761,127;

e) issue a permanent cease and desist order, pursuant to 19 U.S.C. § 1337(f), directing Respondent to cease and desist from importing, marketing, advertising, demonstrating, warehousing of inventory for distribution, sale, or use of certain light-based physiological measurement devices and components thereof that infringe one or more claims of U.S. Patent Nos. 10,912,501, 10,912,502, 10,945,648, 10,687,745, and/or 7,761,127;

f) impose a bond upon Respondent should Respondent continue to import infringing articles during the 60-day Presidential Review period pursuant to 19 U.S.C. § 1337(j); and

g) grant such other and further relief as the Commission deems appropriate and just under the law, based on the facts complained of herein and determined by the investigation.

Respectfully submitted,

Dated:  June 29, 2021                 By: /s/ *Jonathan E. Bachand*
                                          Jonathan E. Bachand
                                          KNOBBE, MARTENS, OLSON & BEAR, LLP
                                          1717 Pennsylvania Ave NW STE 900
                                          Washington, DC 20006
                                          Telephone: 202-640-6400

Facsimile: 949-760-9502

Stephen C. Jensen
Joseph R. Re
Sheila N. Swaroop
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA  92614
Telephone:  (949) 760-0404
Facsimile:  (949) 760-9502

## <u>VERIFICATION OF COMPLAINT</u>

I, Jonathan E. Bachand, declare, in accordance with 19 C.F.R. §§ 210.4 and 210.12(a), under penalty of perjury, that the following statements are true:

1.      I am Counsel for Complainants Masimo Corporation and Cercacor Laboratories, Inc. and I am duly authorized to sign the Complaint on behalf of Complainants;

2.      I have read the foregoing Complaint;

3.      To the best of my knowledge, information, and belief, based upon reasonable inquiry, the foregoing Complaint is well-founded in fact and is warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law, or the establishment of new law;

4.      The allegations and other factual contentions have evidentiary support or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

5.      The foregoing Complaint is not being filed for an improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation.

Executed this 29th day of June, 2021.


/s/ *Jonathan E. Bachand*
Jonathan E. Bachand
Counsel for Complainants
Masimo Corporation and Cercacor
Laboratories, Inc.

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| 10X GENOMICS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 22-cv-261-MFK |
| | ) | |
| NANOSTRING TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| -------------------------------------------------- | ) | |
| | ) | |
| NANOSTRING TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| 10X GENOMICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON 10X GENOMICS' MOTION TO SEVER AND CONSOLIDATE
(FILED IN CASE NO. 22-CV-261) AND ON NANOSTRING TECHNOLOGIES,
<u>INC.'S MOTION TO CONSOLIDATE (FILED IN CASE NO. 22-CV-1375)</u>**

MATTHEW F. KENNELLY, District Judge:

10X Genomics and co-plaintiff President and Fellows of Harvard College

(collectively 10X) have sued NanoString Technologies for patent infringement in Case

No. 22-cv-261 (the 261 case).  In the 261 case, 10X alleges infringement of five patents

owned by Harvard and licensed by 10X.  NanoString asserted as a counterclaim a claim

that 10X was infringing a patent owned by NanoString, the '689 patent.  10X did not

oppose adding this counterclaim but reserved the question of whether the counterclaim

regarding the '689 patent should be tried together with 10X's patent infringement claims.

About 10 weeks after NanoString added the '689 infringement counterclaim in the

261 case, it filed Case No. 22-cv-1375 against 10X (the 1375 case).  The 1375 case concerns NanoString's '142 patent.  The '142 patent arises from the same patent application as NanoString's '689 patent.  In addition, NanoString's infringement claims against 10X regarding both the '142 and the '689 patents involve the same 10X product that is claimed to infringe.

10X has filed a motion in the 261 case asking to sever NanoString's counterclaim regarding the '689 patent from the 261 case and join it with the 1375 case.  NanoString opposes the motion and has moved (in the 1375 case) to consolidate the 261 case in its entirety with the 1375 case.

The Court grants 10X's motion (with one point reserved, noted below) and overrules NanoString's motion.  The subject matter in these cases is already highly complex, and conducting pretrial proceedings (e.g., claim construction), summary judgment proceedings, and a trial regarding the 10X patents that are involved in the 261 case is going to be complicated enough.  Including a claim of infringement by a separate party involving a different patent runs a very high risk of overcomplicating the proceedings in the 261 case.  For this reason, severing NanoString's infringement counterclaim is appropriate.

The only real downside to severing the NanoString infringement counterclaim is that the 261 case is, at this point, a bit further along than the 1375 case.  But any delay severance might cause with respect to the '689 infringement counterclaim is likely to be minimal.  In sum, severing the '689 infringement counterclaim from the 261 case and consolidating it with the 1375 case will promote expedition and economy and will cause no unfair prejudice.

By contrast, NanoString's proposal to combine the two cases in their entirety would be highly likely to cause unnecessary and unwarranted overcomplexity.  Among other things, the Court believes it to be extraordinarily unlikely that a joint jury trial involving all of the infringement claims made by both sides in the two cases could be done in a manageable way.

Any scheduling hiccups that might result from taking the '689 infringement counterclaim out of the 261 case and adding it to the 1375 case can and should be addressed by way of proposed revisions to the case management schedule in the 1375 case.  In addition, the Court acknowledges that there are witnesses who are common to both cases, and there is an interest in not making them appear twice, at least for depositions, unless that is not reasonably avoidable.  This, too, should be addressed by way of proposed revisions to the case management schedules in the two cases.  The parties are directed to confer on these points and are to submit a proposed revision by no later than February 3, 2022.

The Court reserves until later whether all claims in the 1375 case in its new form should be tried together as part of a single trial.  That's a decision better made far closer to trial.

**Conclusion**

In sum, 10X Genomics' motion to sever and consolidate (Case No. 22-cv-261, dkt. no. 65) is granted, and NanoString's motion to consolidate (Case No. 22-cv-1375, dkt. no. 16) is denied.  NanoString's infringement counterclaim regarding the '689 patent, now part of Case No. 22-cv-261, is stricken without prejudice, and NanoString is directed to promptly file an amended complaint in Case No. 22-cv-1375 that includes

that claim of infringement.

Date:  January 24, 2023

_____
MATTHEW F. KENNELLY
United States District Judge

# Exhibit 3

```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                   IN AND FOR THE DISTRICT OF DELAWARE

 3                             - - -

 4
        SIEMENS INDUSTRY, INC.,          :    CIVIL ACTION
 5                                        :
                        Plaintiff,        :
 6                                        :
            vs.                           :
 7                                        :
        WESTINGHOUSE AIR BRAKE            :
 8      TECHNOLOGIES CORPORATION          :
        (d/b/a WABTEC CORPORATION)        :
 9      and WABTEC RAILWAY                :
        ELECTRONICS, INC.,                :
10                                        :
                        Defendants.   :    NO. 16-284 (LPS) (CJB)
11

12                             - - -

13                                   Wilmington, Delaware
                                     Thursday, August 17, 2017
14                                   3:00 o'clock, p.m.
                                     ***Telephone conference
15                             - - -

16
        BEFORE:  HONORABLE CHRISTOPHER J. BURKE, U.S. MAGISTRATE
17      JUDGE

18                             - - -

19      APPEARANCES:

20              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                BY:  STEPHEN J. KRAFTSCHIK, ESQ.
21

22                      -and-

23

24                                   Valerie J. Gunning
25                                   Official Court Reporter
```

1    Those issues are very, very different.  The vast majority of

2    the evidence is not going to overlap between there, and

3    given that relatively limited overlap in subject matter

4    between the two cases weighed against the risk of jury

5    confusion that we've discussed before, we think that the

6    fairest, most just way of approaching this is to sever the

7    two sets of claims.

8              THE COURT:  Okay.  Thank you, Mr. Supko.

9              I'm going to go ahead and decide the motion to

10   sever now on our call and the transcript of this call will

11   serve as the substance of the Court's order.  And let me

12   just set out in a little bit of detail the basis for my

13   decision.

14             I start with Rule 21, Federal Rule of Civil

15   Procedure 21, which is the rule, of course, that authorizes

16   a Court to sever any claim again a party, and both parties

17   have recognized in their briefing that a motion for

18   severance is one where the District Court has broad

19   discretion.  Both sides have also cited the Carlo case from

20   the Eastern District of Pennsylvania as a case that sets out

21   exemplary factors that can be considered in deciding a

22   motion to sever, and I will rely on those here.  And just

23   for the record, those include, first, whether the claims

24   arise out of the same transaction or occurrence.

25             Second, whether those claims present some common

1      questions of law or fact.

2              Third, whether settlement of the claims or

3      judicial economy would be facilitated.

4              Fourth, whether prejudice would be avoided if

5      severance were granted.

6              And, fifth, whether different witnesses and

7      documentary proof are required for the separate claims.

8              And in assessing those factors, I will go

9      through them at least briefly here.

10             I think in total, they weigh in favor of

11     severance, and I say that for the following reasons.

12             First, as to whether the claims at issue in the

13     counterclaims from Wabtec arise out of the same transaction

14     or occurrence as the claims in the Siemens case, they don't

15     here.  Now, these are patent infringement claims asserting

16     infringement of different patents by different products,

17     the amount of permissive, non-permissive counterclaims and

18     so they don't arise out of the same transaction or

19     occurrence.

20             Second, as to whether there's common questions

21     of law or fact between the two sets of cases, I would

22     acknowledge, of course, that there are some.  For example,

23     as defendants noted, their patents are directed to the same

24     general technology area as nine of the plaintiff's patents,

25     and certain of the defendants' patents even cite to certain

1    of the plaintiff's patents-in-suit.  Additionally, some of

2    the plaintiff's patents may be prior art to the defendants'

3    patents.

4              And, thirdly, it appears that at least the

5    parties' products on each side are the commercial

6    embodiments of certain of the patents-in-suit in both cases.

7    So it looks like it's going to be the case that the same

8    products would come up in both sets of cases as to lost

9    profits issues or obviousness defenses, for example.

10             But there's more ways in which the questions of

11   law and fact I think will be different.  For example, just

12   to note a few, the defendants' counterclaims obviously

13   involve different patents than are at issue in the Siemens

14   case, some of which do not overlap with certain of the

15   technology areas involved as to certain of plaintiff's

16   patents-in-suit.

17             Obviously, defendants' patents have different

18   inventors that are at issue in the Siemens case.  There's

19   different prosecution histories involved.  There's going to

20   be different infringement and noninfringement arguments and

21   evidence in the two cases.  And the prior art is going to

22   largely be different, in part because there's a real

23   temporal difference between the priority dates at issue as

24   to Wabtec's patents and those at issue with respect to

25   certain of Siemens' patents.

1          Thirdly, whether the settlement of the claims or

2     judicial economy would be facilitated by severance, to me,

3     this is the most significant factor, and I think judicial

4     economy, and as that relates to the ability to try a case, I

5     think it's going to be facilitated by severance.

6          The Siemens case on its own is already way too

7     big and it's going to need to get smaller, not bigger.  It's

8     a 13-patent case that right now has 120 asserted claims at

9     issue.  The parties needed double the amount of pages

10    typically needed for the Markman process to get through

11    claim construction as to just those patents.  It's certainly

12    a case that is going to have to be condensed and streamlined

13    prior to a January 2019 trial, and it's going to take a lot

14    of work to do that.  And, indeed, if the parties don't do

15    it, I'm fairly certain Chief Judge Stark is going to make

16    them do it.

17         And I also think that plaintiffs are right, that

18    the LG case that they cited is pretty on point.  I'm

19    familiar with the case.  I worked with Chief Judge Stark

20    on it, and I think the District Court's concerns there with

21    the complexity involved in that case, which could have been

22    an eight-patent case if the counterclaims were added, only

23    are amplified here when we've got a 13-patent case that

24    Wabtec wants to turn into a 16-patent case all for one

25    trial.

1          As Chief Judge Stark said there, "It's too easy

2     to see how at every step of this case, things will be more

3     complicated," end quote, if Wabtec gets its way and the

4     cases aren't severed.

5          And then as to the fourth factor, whether

6     prejudice would be avoided if severance were granted, I

7     think prejudice can be avoided.  I think it's going to be

8     not too difficult to get a Wabtec case up and running with a

9     schedule that the parties are already following, and they

10    can get a trial date on the calendar on or around the time

11    period that the parties are contemplating that that would

12    happen.  And I may be able to do some work to help make sure

13    in the scheduling of that next case that things stay on

14    track and Wabtec is not prejudiced.

15         And then lastly, as to whether different

16    witnesses and documentary proof are required for the

17    separate claims.  For the most part, I think they will be.

18    There's certainly going to be some overlap as to witnesses

19    and documents such as with regard to certain inventor

20    testimony or perhaps expert witnesses, but to the extent

21    there is overlap between witnesses and documents, I think

22    the plaintiffs are right.  The parties can deal with that by

23    agreeing to use certain documents in one case that are at

24    issue in the other and by coordinating depositions of

25    certain witnesses.  So I think it can be managed.

1          At the end of the day, whether to sever or to

2   keep this all as one big case, I think severance can make

3   sense and I think it can be helpful.  For example, I think

4   it gives at least a better chance for Siemens' affirmative

5   case to actually get to trial in January 2019.  As I said,

6   Siemens is going to have to do some work to narrow that case

7   for trial because I'm certain Chief Judge Stark is not going

8   to go to trial in a 13-patent case in January of 2019.  But

9   if we add three more patents, I'm doubly certain that we

10   wouldn't have just one trial in the case.  There would be

11   more than one for sure.

12          Here, I think Siemens has a chance if I sever of

13   getting to trial on whatever it believes are the best

14   patents and claims in January 2019, and having Siemens'

15   affirmative claims such as they are totally resolved by

16   then, and though this would mean a separate trial as to

17   the defendants' patents, at least it would give defendants

18   some certainty as to when it would get to trial on its

19   claims.

20          I also do think there's something to be said for

21   what Mr. Supko said.  For a jury that's already going to

22   have some difficulty, some significant difficulty in dealing

23   with all of these issues, it may be cleaner and easier for

24   them to see one case with one plaintiff who is seeking their

25   affirmative relief for infringement and then a separate case

1    with a different plaintiff who is seeking its affirmative

2    relief as opposed to mixing up those issues all in one huge

3    case.

4              So for all of those reasons, I think the motion

5    to sever is well-taken and I will grant the plaintiff's

6    motion.  I will issue a short oral order after our call

7    today that will memorialize that decision and give the

8    parties some additional guidance in how we can move forward

9    and make sure we get a second case up and running soon.

10   That decision on the motion to sever obviously moots the

11   motion to amend in the sense that the motion to amend sought

12   to have one schedule issued in the 284 case that includes

13   the counterclaims.  Here, we'll simply be creating a

14   schedule in the new matter that will be focused on those

15   counterclaims itself.

16             Lastly, I should say, as I mentioned, I know

17   there's a motion to stay pending that has now been fully

18   briefed, and I know that a part of the impetus for that

19   motion was that it be filed and resolved before the claim

20   construction hearing that's currently scheduled for early

21   September.  I will resolve that motion by way of short order

22   before the Markman hearing, but I would just, to give the

23   parties a heads-up, I would note it's very, very unlikely

24   that I'm going to grant that motion to stay in light of what

25   has happened with regard to the PTAB proceedings from which

# Exhibit 4

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                           - - -
        LG ELECTRONICS, INC. and
 4      LG ELECTRONICS U.S.A., INC.,          :
                                              :    CIVIL ACTION
 5                Plaintiffs,                  :
        v                                     :
 6                                            :
        TOSHIBA SAMSUNG STORAGE               :
 7      TECHNOLOGY KOREA CORPORATION,         :
                                              :
 8                Defendant.                  :
        ------------------------------------- :
 9      TOSHIBA SAMSUNG STORAGE               :
        TECHNOLOGY KOREA CORPORATION,         :
10                                            :
                  Counterclaim-Plaintiff,     :
11      v                                     :
                                              :
12      LG ELECTRONICS, INC., LG              :
        ELECTRONICS U.S.A., INC., and LG      :
13      International (AMERICA), INC.,         :    NO. 12-1063-LPS
                                              :
14                Counterclaim-Defendants.

15                           - - -

16                   Wilmington, Delaware
                   Wednesday, July 22, 2015
17                   Telephone Conference

18                           - - -

19      BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge

20      APPEARANCES:               - - -

21
                MORRIS JAMES, LLP
22              BY:  MARY B. MATTERER, ESQ.

23                   and

24
                                   Brian P. Gaffigan
25                                 Registered Merit Reporter
```

```
 1    APPEARANCES:  (Continued)

 2
                   ROTHWELL FIGG ERNST & MANBECK, P.C.
 3                 BY:  STEVEN LIEBERMAN, ESQ.,
                        JENNY L. COLGATE, ESQ., and
 4                      MICHAEL H. JONES, ESQ.
                        (Washington, District of Columbia)
 5
                            Counsel for LG Electronics, Inc. and
 6                          LG Electronics U.S.A., Inc.

 7
                   DLA PIPER, LLP
 8                 BY:  DENISE SEASTONE KRAFT, ESQ.

 9                     and

10                 DLA PIPER, LLP
                   BY:  SAORI KAJI, ESQ.
11                      (East Palo Alto, California)

12                     and

13                 DLA PIPER, LLP
                   BY:  STANLEY J. PANIKOWSKI, ESQ.
14                      (San Diego, California)

15                          Counsel for Toshiba Samsung Storage
                            Technology Corporation and Toshiba
16                          Samsung Storage Technology Korea
                            Corporation

17

18

19

20                          - oOo -

21                     P R O C E E D I N G S

22                 (REPORTER'S NOTE:  The following telephone

23    conference was held in chambers, beginning at 9:05 a.m.)

24                 THE COURT:  Good morning, everybody.  This is

25    Judge Stark.  Who is there, please?
```

1          MS. MATTERER:  Good morning, Your Honor.  This

2     is Mary Matterer from Morris James.  And I have with me

3     Steven Lieberman, Jenny Colgate, and Michael Jones from the

4     Rothwell Figg law firm for the plaintiff.

5          THE COURT:  Okay.  Thank you.

6          MS. KRAFT:  Good morning, Your Honor.  This is

7     Denise Kraft on behalf of the TSST parties; and with me is

8     Sam Panikowski and Saori Kaji, all of DLA Piper.

9          THE COURT:  Okay.  Good morning to all of you.

10    And I have my court reporter here with me.

11          For the record, it is our case of LG Electronics

12    Inc. et al versus Toshiba Samsung Storage Technology Korea

13    Corporation, Civil Action No. 12-1063-LPS.

14          I set this as a time to talk about scheduling.

15    I have reviewed your proposed scheduling order as well as

16    the detailed response to the joint management checklist

17    which is very helpful.  Thank you very much for that.  But

18    I did think as a result of seeing all that, it would be

19    helpful if we talk before I implement a schedule here so

20    that's the reason for the call.

21          Let me give plaintiff a chance first to speak to

22    whatever issues you think are important for us to address in

23    our time together this morning, so go ahead, please.

24          MR. LIEBERMAN:  Good morning, Your Honor.  This

25    is Steve Lieberman.

1    As you have seen, the parties have agreed on a

2 large number of issues with respect to scheduling and

3 discovery and the various other matters covered in the

4 Court's checklist.  There are six issues to which the

5 parties did not agree:  two issues which I would call major

6 issues that affect a number of items and the two major

7 issues are interrelated, and then four very specific

8 relatively minor differences that affect things like the

9 length of a particular deposition or one aspect of core

10 technical document production.  So I'd like to flag the two

11 major issues that I believe are interrelated and that affect

12 the number of items with the Court's permission.

13    The first item is the question of whether the

14 counterclaims asserted by TSST, whether the Court should

15 decline jurisdiction of the counterclaims, several of the

16 counterclaims, set them as a separate case.  There are a

17 variety of options that the Court has.

18    And the second related issue has to do with an

19 anticipated stay motion that LG intends to make with respect

20 to the TSST case.  Specifically, LG intends to file by next

21 Friday IPRs on all four of the patents.  Two of those IPRs

22 may be filed as early as Friday of this week but all four of

23 them will be filed by next Friday.  The present stay issue

24 relates to issues on how the counterclaims are handled but

25 it made sense to discuss the two issues together.

1          THE COURT:  Now, before you go any further, let

2     me ask you a couple of questions about those two broad

3     issues.

4          First off, in looking at the docket, I see that

5     you have filed a motion to dismiss for failure to state a

6     claim.  That goes to the TSST counterclaims; is that right?

7          MR. LIEBERMAN:  That's correct, Your Honor.  In

8     response to that motion, TSST filed an amended pleading

9     which we believe only partially cures the problem, and we're

10    in the process of considering whether or not our response to

11    the amended pleading will be another motion to dismiss.

12         THE COURT:  All right.  But in addition to

13    motion to dismiss, your question about whether I should

14    decline jurisdiction or sever or do something with the

15    discretionary authority that I would have, that has not been

16    teed up as a motion yet.  That is at this point simply a

17    request in a case management context; is that right?

18         MR. LIEBERMAN:  That's correct, Your Honor.  In

19    consultation with Delaware counsel, in reviewing the past

20    history of this Court's cases, we saw that the Court likes

21    to avoid motion practice as much as possible.  And we

22    thought it might be useful to discuss the issue at this

23    conference and then follow the Court's guidance as to

24    whether you wish us to file a formal motion.

25         THE COURT:  Right.  And then in terms of

1    background further in the checklist, the parties indicate

2    that they would jointly consent to the Magistrate Judge

3    having jurisdiction to resolve any motions to dismiss stay,

4    transfer, or sever.  Do I understand that to mean what it

5    sound like it means, and if so, might your current motion

6    to dismiss or your proposed motion to stay or maybe even a

7    motion to sever, might that all go to the Magistrate or is

8    that not what you had in mind?

9              MR. LIEBERMAN:  I think certainly with respect

10   to the motion to dismiss and the motion to sever, the

11   parties have agreed that those motions would go to the

12   Magistrate.  We didn't know, since the Court set this

13   conference, whether the Court would want to deal with the

14   issue of declining jurisdiction or severance or leave it to

15   the Magistrate Judge, but since Your Honor is in the process

16   of setting a schedule, and since these two issues are

17   critical to the issue of setting of an appropriate schedule,

18   we thought it made sense to raise the issues with Your Honor

19   during this conference.

20              Certainly, as to the motion to dismiss or a

21   motion to stay, we're amenable, if the Court would like, for

22   that issue to be decided by the Magistrate Judge.

23              THE COURT:  All right.  So go ahead then and

24   talk about these two issues just a little bit.  But what I

25   am mostly going to be thinking as you are talking is whether

1  or not, particularly on the severance question or the larger

2  question of what do we do with the TSST counterclaims, is

3  that the kind of thing that I'm really going to be comfortable

4  deciding after just a discussion or am I going to need

5  formal briefing, and if so, who is going to decide it.  But

6  with that background, please go ahead and say what you would

7  like.

8            MR. LIEBERMAN:  Thank you, Your Honor.  We think

9  the issue is clear on this point, but I thought lots of

10  issues have been clear on things in the past where it turns

11  out they are a bit more complicated.

12            In this case, LG filed its complaint on four

13  patents back in August of 2012.  Those four patents all

14  relate to the general subject matter of how information is

15  stored and formatted on disks and how defects are handled,

16  what is called defect management so.  For example, if there

17  is a scratch or dust on the disk or part of a disk is worn

18  out, how the software controls where the information is

19  put so it minimizes the damage to the -- or maximizes the

20  ability of the information.  So they're all related to

21  softwares aspects.

22            A little more than two and-a-half years later,

23  on April 2nd, 2015, TSST filed its answer and counterclaims

24  in which it asserted four patents against LG.  Those four

25  patents, while they relate to optical disk drives, have no

1    other connection to the four patents that LG had sued on.

2    That is, each of the four patents relates to a particular

3    mechanical aspect of optical disk drives:  to the lens, to

4    the way the disk is balanced, for example.  They're hardware

5    patents and they each relate to specific components.

6         Now, Your Honor might wonder what was going on

7    in the interim.  In the interim, there had been a motion to

8    dismiss filed by the TSST entities for lack of in personam

9    jurisdiction.  That took a while to be addressed.  And while

10   it was being considered by the Court, the case was essentially

11   stayed although there was no formal stay order.

12        TSST had also chosen to file two IPR petitions,

13   directed to two of the four patents.  They didn't file with

14   respect to the other two.  As to those two IPR petitions,

15   certain claims were invalidated and certain claims were not.

16   On the '126 patent, there were several claims that we are

17   alleging are infringed in this lawsuit.  Where the IPR was

18   not instituted on the '162 patent, all of the claims that

19   we contend are infringed were invalidated by the PTAB.

20   We filed an appeal and our opening brief is due on

21   September 11th.

22        As I mentioned, on April 2nd, TSST filed its

23   counterclaims on these four mechanical patents.  We have now

24   had a chance to identify the prior art, go through the very

25   complex process of putting together IPR petitions.  And we

1    are going to be file IPR petitions on the four patents by

2    next Friday.

3            And Your Honor knows it's very typical in patent

4    litigation now for there to be essentially two stages and

5    two different venues for patent litigation.  The first is

6    the patents are often fought over before the PTAB either in

7    IPRs or CBMs, and then when the dust settles, the PTAB

8    litigation continues, if there is anything left, in the

9    District Courts.

10            TSST had the opportunity to do that with respect

11    to the four LG patents.  It only exercised the opportunity

12    with respect to two, but it had the opportunity to do that

13    and to go through the whole process before the litigation

14    began.

15            We have not yet had that opportunity with

16    respect to the TSST patents.  So our request is that because

17    the patents cover completely different subject matter,

18    subject matter which is connected only because the patents

19    all relate to optical disk drives, connected in no other

20    way, that the two cases be handled on separate tracks so

21    that when we file our stay motion and the Court decides

22    whether or not to stay this case, it will be easy to

23    separate the two sets of claims.

24            Both cases, as the parties have agreed, are

25    exceedingly complicated, requiring a large number of

1   depositions and I wouldn't say an extremely extended

2   schedule but a schedule sufficient to allow the issues to

3   be prepared in discovery.

4          Making this an eight patent case would make

5   this difficult for the parties, making it difficult for the

6   Court, making it difficult for the ultimate trier of fact

7   particularly here since the total number of claims involved

8   in the TSST counterclaims, they have in excess of 150 claims

9   in those patents.

10          THE COURT:  So your request would be I exercise

11  discretion and effectively sever the counterclaim patents

12  and maybe open that as a separate case and deal with

13  scheduling of that case independent of the case that you

14  initially brought.  Is that essentially your request?

15          MR. LIEBERMAN:  That is correct, Your Honor.

16  Our preference would be if the Court were to stay that case

17  while it had the chance to consider our motion for a stay

18  based on the IPR filings.  We are aware of a number of

19  decisions from this Court in which you preferred to decide

20  the issue of the stay after the PTAB has acted on the

21  question of whether or not to institute the IPRs.  And we

22  understand that is the Court's sort of default preference.

23  We would urge that in this case it makes good sense to

24  actually stay the counterclaims from this point on.

25          The parties are going to have quite a lot to do

1    with respect to LG's claims; and we ask as a matter of

2    parity that we be able to take our shot at the TSST patents

3    in the same way that TSST was able to take a shot at our

4    patents in the litigation.

5                THE COURT:  Your view of the counterclaims is

6    that they are not compulsory counterclaims, but they are,

7    although it took awhile for us to resolve the motion, they

8    are timely counterclaims.  Do I have both of those points

9    correct?

10               MR. LIEBERMAN:  You do, Your Honor.

11               THE COURT:  Let me stop you there, and let me

12   hear from the defendants just on these points we've

13   addressed to this point.

14               MR. PANIKOWSKI:  Good morning, Your Honor.  This

15   is Stanley Panikowski from DLA Piper for defendant and

16   counterclaimant TSST-K.

17               Your Honor, we believe there is a threshold

18   procedural matter that the issues that LG has raised with

19   respect to possible severance of the counterclaims and the

20   possible stay pending a possible IPR petition should be

21   resolved by formal motion.  As we stand now, we have not

22   yet seen any IPR petitions from LG.  We have identified a

23   number of exemplary claims or counterclaims for each of the

24   asserted patents.  We do not know at this point what claims

25   LG's promised IPR petitions will be challenging.  We don't

1    know the grounds for those.  We haven't had an opportunity

2    to see what their arguments are.  And for that reason alone,

3    the request right here is premature and TSST-K should have

4    the opportunity to see LG petition, see their full argument

5    for why these counterclaims should be severed and stayed and

6    then have a full opportunity to respond to those arguments.

7                    THE COURT:  Well, let me --

8                    MR. PANIKOWSKI:  To address some of the --

9                    THE COURT:  Hold on a second.  I think, at

10   least from what I have heard to this point, I'm seeing a

11   distinction between the severance question and the stay

12   issue.  I certainly agree with you in the context of even

13   this case, I don't think that I should stay your counterclaims

14   without at least seeing a motion and at least seeing what

15   they put at issue in the IPRs.  So I don't believe I'll be

16   staying anything today.

17                   But what more do I need to know other than what

18   you are going to argue now about whether or not I should

19   sever your counterclaims?  Why would we need a formal motion

20   on that?

21                   MR. PANIKOWSKI:  Your Honor, LG had said the

22   opposite of their argument, that they believed that the

23   questions of severance and stay are interrelated.  And that

24   is why we believe on their motion to sever that it would be

25   appropriate for us to seek a formal motion.  But to the

1   extent that Your Honor is viewing those issues as separate

2   at this stage, we do not see any reason to sever the TSST

3   counterclaims into a different case.

4          We do have commonalities here in terms of both

5   sets of patents relating to optical disk drive technology.

6   We have issues relating to the level of ordinary skill in the

7   art that will be similar here.  The types of technologies

8   across the eight patents are different, but there are no

9   differences that would require these patents to proceed in

10  separate cases.

11          The parties have the same counsel for all these

12  patents, and the parties have already been dealing with

13  discovery and other issues with respect to both the LG patents

14  and the TSST-K patents, and it would be most efficient, Your

15  Honor, for the parties to continue to proceed with all of

16  those issues together.

17          Your Honor, LG has referred to the fact that

18  its claims have been pending for a longer time than TSST-K's

19  counterclaims.  However, Your Honor, we do not think that

20  that is material to the severance issue because what is

21  relevant is where we are now as opposed to how we got here.

22  TSST-K's counterclaims are timely.  We did not know until

23  relatively recently whether TSST-K was even going to be a

24  party subject to personal jurisdiction of this Court.

25          As it stands now, both LG's claims and TSST-K's

1  counterclaims are essentially in the same place with respect

2  to the discovery.  Even LG's motion to dismiss was a partial

3  motion to dismiss.  It was simply directed to the allegations

4  of induced infringement and willful infringement.  It did not

5  in any way affect the allegations of direct infringement

6  against LGE USA.  So we know that we're going to be receiving

7  an answer to the counterclaims at least with respect to LGE

8  USA as LGE decides what approach it wants to take in response

9  to our amended counterclaims before Your Honor.

10           It makes sense for not only the cases to proceed

11  at the same pace but also to do so in the same case for

12  purposes of efficiency.  And to the extent there might be any

13  issues, Your Honor, with respect to the number of claims and

14  the amount of material that is going to be presented to a

15  trier of fact, you could of course address that as this Court

16  has done in many other instances by considering whether it

17  makes sense to have back-to-back trials at the end of the day

18  on the separate sets of claims.

19           THE COURT:  All right.  All that said, do you

20  agree that severance is a discretionary decision and I have

21  discretion to sever and order you to proceed in a separate

22  case on your patents?

23           MR. PANIKOWSKI:  Yes, Your Honor.  TSST-K agrees

24  you have the discretion to sever or not to sever here.

25           THE COURT:  And would that be particularly

1    prejudicial to your client?

2         MR. PANIKOWSKI:  Your Honor, if the cases were

3    to proceed at the same pace, severance into separate cases

4    would not be particularly prejudicial.  However, we do not

5    see any particular efficiencies or benefit arising from any

6    severance of LG's claims and TSST-K's counterclaims.

7         THE COURT:  Okay.  Is there anything else,

8    Mr. Panikowski, you want to add on severance or stay at this

9    point?

10        MR. PANIKOWSKI:  No, Your Honor.  There is

11   nothing further that we want to add with respect to severance.

12        With respect to stay, we understand that Your

13   Honor is likely to be addressing that only in response to a

14   formal motion by LG.  We would like to note that LG's appeals

15   on the two patents that were the subject of invalidation of

16   certain claims in the IPR proceedings are now pending and LG

17   has not agreed to stay any proceedings on the '126 patent or

18   the '162 patent.

19        We understand from what LG's counsel said today

20   that they do believe that they're going to be proceeding on

21   claims with respect to the '126 patent, and we have not yet

22   heard what claims they may be proceeding on there.  All of

23   the claims that were in LG's complaint with respect to the

24   '126 and '162 patents were invalidated.  And, Your Honor, we

25   just wanted to note that as a reference point where the LG

1    patents are in a very, very different procedural situation

2    with respect to IPR than the TSST-K counterclaim patents,

3    yet LG has not agreed to stay any proceedings on those

4    patents which have already gone through the complete PTAB

5    process and are currently on appeal.

6                    THE COURT:  At this point --

7                    MR. PANIKOWSKI:  And other than that --

8                    THE COURT:  At this point, I don't have a motion

9    to stay with respect to those patents from you; correct?

10                   MR. PANIKOWSKI:  That is correct, Your Honor.

11   We have not yet filed a stay motion, and we expect to file

12   a stay motion on those patents within the next week.

13                   THE COURT:  Okay.  Thank you.  Mr. Lieberman, is

14   there anything else you want to add on severance or stay at

15   this point?

16                   MR. LIEBERMAN:  Three very quick points.

17                   On page 26 of the submission that we made to

18   the court, Document No. 63, we cite a decision by Judge

19   Robinson which we believe is directly on point on the issue

20   of severance and declining jurisdiction, a case called

21   *Matallgesellscaft v Foster Wheeler*.  If I could just read

22   one sentence from that decision.

23                   "First, I decline to further delay resolution

24   of, I forgot the case number, the progress of which has been

25   negligible since the completion of the initial

1    jurisdictional discovery phase.  As significant, I conclude

2    that the joint adjudication of MG's patent claims and FW's

3    patent claims would unduly complicate the intrinsically

4    complex factual and legal issues at bar.  Judicial economies

5    can be accomplished without litigating all the disputes

6    between these parties in one action."

7        This is a case that is eerily similar to what we

8    have here.  So I would urge the Court's consideration of

9    that decision.

10        No. 2.  Mr. Panikowski said that he will get at

11    least an answer with respect to the direct infringement

12    claim.  I don't believe that is right.  If we decide that

13    we're going to move against the indirect infringement claims

14    and the willful infringement claims, I believe that also

15    stays our time to provide an answer with respect to the

16    parties on behalf of which we move.

17        And the third point has to do with the '126

18    patent.  There are two claims, claims 3 and 4, as to which

19    TSST had asked for institution of an IPR and as to which the

20    PTAB had declined institution.  Those are claims we believe

21    are infringed as well as is claim 5 which was not the

22    subject of a request for IPR institution.  That would have,

23    of course, become relevant when TSST filed its motion for a

24    stay.

25        THE COURT:  All right.  But are you, at this

1   point, reserving the right to proceed on claims of your

2   patents that did not emerge successfully, from your

3   perspective, from the PTAB?

4           MR. PANIKOWSKI:  Yes, Your Honor.  Particularly

5   in light of the fact that we have four patents in our

6   complaint and they only instituted, they only sought

7   institution of IPR on two of the four.  So two of the four

8   are certainly going to go forward.  And we certainly believe

9   it makes sense to go forward on the three claims that we

10  believe are infringed but were not the subject of the IPR

11  decision at the same time.

12          THE COURT:  Right.  I think my question wasn't

13  clear.  I meant to focus on those that were the subject of

14  IPR and where you did not prevail with respect to those,

15  so they were cancelled or rejected or whatever.  Are you

16  reserving the right to proceed on those claims as well in

17  this litigation?

18          MR. PANIKOWSKI:  I think that is something we

19  would like to think about, Your Honor.  We don't have a

20  finality on that yet.

21          THE COURT:  Okay.  Thank you.  And then,

22  Mr. Panikowski, is there anything else you want to add on

23  severance or stay?

24          MR. PANIKOWSKI:  Your Honor, I would simply like

25  to point out two things.

1          One.  With respect to receiving an answer from

2     LGE USA to the counterclaims, we know that we will be

3     receiving such an answer.  We do not know when we will be

4     receiving that answer.  But the point there is that we know

5     that regardless of how LG decides to respond to the amended

6     counterclaims and what may happen with any motion practice

7     there that we will be moving forward with an answer from at

8     least one counterclaim defendant on those patents.  And,

9          Second, Your Honor, with respect to the 1992

10     decision that LG cited in support of the severance request,

11     Your Honor, that decision is distinguishable because it

12     was not clear whether the Court was going to be ultimately

13     proceeding on the counterclaim patents that were asserted

14     there.

15          Here, Your Honor, we know that we're going to be

16     proceeding on those regardless of what happened from LG's

17     perspective in response to our amended counterclaims.  So,

18     Your Honor, in this instance, there is not that basis for a

19     discretionary severance.

20          We also have issues, Your Honor, where there is

21     a possibility that at least some of the LG patents will be

22     stayed pending the appeal from the IPR.  LG has said that

23     they want to file a stay motion on the TSST-K patents.  And

24     we think, Your Honor, that it would make sense to look at

25     both of those motions to stay in the context of the same

1    case given that we don't know what the outcome those will

2    be.  We don't know if none of the patents will be stayed,

3    some of the patents will be stayed, or maybe the entirety

4    of both cases will be stayed.

5            That is another reason, Your Honor, to keep all

6    of the patents in the same case, so that the Court can

7    consider all of these issues, not just the common issues of

8    law and fact but all of these similar procedural issues in

9    the context of the same case.

10            THE COURT:  All right.  Thank you.

11            MR. PANIKOWSKI:  That is all, Your Honor.  Thank

12    you.

13            THE COURT:  Thank you.  I think it was helpful

14    to focus first on these questions of severance and stay,

15    though as I indicated in the questioning, while they're

16    related, I don't see them as fully intertwined either

17    substantively or procedurally, and I'm mostly focused on

18    the process right now.  And by that, I mean I believe I

19    now have all that I need in order to decide the severance

20    question, but I don't have everything I need to decide the

21    stay question.  So I'm going to decide severance but I'm

22    not going to decide any stay issues today.

23            In terms of severance, it is undisputed that

24    I have discretion to sever the counterclaims, that is, the

25    infringement claims brought by TSST as counterclaims.  They

1    were timely permissive but not compulsory counterclaims.

2    And exercising that discretion in the context of this case,

3    I do hereby order severance.  That is because I believe, as

4    an exercise of my discretion, that it will be best for the

5    overall efficient management of what will become two cases

6    to treat them as two cases because, in my mind, they are two

7    cases despite the overlap of the parties and the overlap at

8    a broad general level of the technology.

9         So I do hereby order that the what are now

10    counterclaims be severed, and should, as I assume is the

11    case, TSST wish to proceed on those, that they do so through

12    opening a new case.

13         My reasons for exercising my discretion in this

14    way include that it has taken quite some time for the LG

15    case to get started, and I see no reason to further delay

16    or in any way risk delaying the start of what began as the

17    LG case on four of LG's patents.  I think probably just as a

18    matter of common sense, a case that involves eight patents

19    is more difficult to manage and, all else being equal, will

20    proceed more slowly than a case with four patents.  Similarly,

21    a case in which patents are being asserted by both sides as

22    opposed to just by one side, likewise is all else being

23    equal more complex and will proceed more slowly.

24         I'm certainly very concerned about, if we get to

25    trial, what a trial would look like with eight patents and

1  in particular with four on each side.  And I recognize I

2  could defer deciding trial-related issues until later in

3  the case.  But the reason I don't think that is the best

4  exercise of my discretion here is it is just too easy to see

5  how at every step of this case things will be more

6  complicated and therefore probably proceed more slowly if I

7  have what are effectively two cases, eight patents, four on

8  each side, combined into one case.

9            So, again, I am granting the request for severance.

10            In terms of a stay, I don't have any formal

11  request for a stay.  That is something that at least in the

12  context of this case, if anybody wants me to stay something,

13  unless you agree on it, it is going to have to be requested

14  through a formal motion, particularly if it is a request for

15  a stay pending the review by the PTAB or an appeal from a

16  PTAB.  The factors there require or at least I think merit

17  a fuller discussion particularly with respect to IPRs, for

18  instance, that haven't even been filed yet.  We need to

19  know what exactly those IPRs look like, which claims, which

20  patents they go to, how that compares to the patents overall

21  and the claims overall that might be in the suit.  And both

22  sides should be entitled to a full chance to respond at

23  least in writing to a request like that.

24            So I am not deciding any stay issues today.

25  That said, the default as I think it was described by Mr.

1    Lieberman, that is true, it is hard to persuade me to stay

2    a case pending IPR when the IPR hasn't even been granted or

3    initiated yet by the PTAB, but that doesn't mean you can't

4    ask.  So we will deal with that when we get there.

5             And in terms of how we will deal with it

6    procedurally, if the parties, in what will now be two cases,

7    if the parties are in agreement that you will consent to

8    Magistrate Judge jurisdiction to handle motions to dismiss,

9    motions to stay, motions to transfer, motions to sever, you

10   need to prepare an order that I can enter in this case and

11   then in the new case, assuming it is coming, to make that

12   happen, and as long as you all unanimously agree to consenting

13   to the Magistrate jurisdiction, that takes me out of the

14   appeals route.  He will be the final say on any of those

15   motions.

16            So I do want to give you just a few moments to

17   touch on what may be four or so specific issues that at

18   least the plaintiff wants to raise, and I want to give

19   defendant a chance as well.  I don't have too much more time

20   left but let's try to move quickly through at least now

21   what the plaintiff identifies as four additional issues.

22            Go ahead, please.

23            MR. LIEBERMAN:  Your Honor, the first issue has

24   to do with, it's on page 7 of Document No. 63.  It has to do

25   with the amount of time for the deposition for Mr. Ko.

1    Mr. Ko is a Samsung employee who Samsung contends actually

2    invented the subject matter of two of the LG patents and

3    they claim that LG derived its invention from Mr. Ko.

4            Samsung has proposed either seven or 10

5    and-a-half hours.  It's 10 and-a-half of Mr. Ko to testify

6    in a language other than English.  We're proposing 14.  He

7    is a critical witness in the case.  And we raise this issue

8    now because it is just very difficult, particularly if the

9    deposition is going to be taken outside the United States,

10   to plan for a critical deposition without knowing how many

11   hours.

12           So I think it is probably a fair assumption he

13   will be testifying in a language other than English.  It is

14   really a difference of 10 and-a-half or 14, and we just ask

15   for certainty in that regard.

16           THE COURT:  Okay.  Next issue.

17           MR. LIEBERMAN:  Core technical documents.  That

18   appears on page 20 of the submission.  I think the only real

19   issue on that dispute is as to the source code.  We agree

20   that the source code can be produced.  This is Samsung, TSST

21   source code can be produced pursuant to the terms of the

22   protective order, but TSST had proposed that the source code

23   be limited to source code concerning the controller.

24           We think that is too limited.  That the patents

25   in this case implicate any piece of hardware or software

1    involved in defect management or storage of formatting

2    information.  So that code could relate to device drivers

3    or software tools.  So we prefer that the phrase "accused

4    features" or any of the language that I just set forth for

5    the Court.  We think that limiting it to the controller

6    means it will be back in front of the Court again, saying

7    we need more.

8              That's the second issue.

9              THE COURT:  Okay.  Move on.

10             MR. LIEBERMAN:  The third issue has to do with

11   e-mail searching.  And on further consideration, although

12   the issue is disputed in the submission, I believe we agree

13   that the ten search terms and three custodians makes sense.

14   So the e-mail searching so that is not really in dispute.

15             And the fourth and last issue has to do with the

16   number of claim terms to be construed.  The parties agreed

17   that for the LG case, it would be up to 10 claim terms.  For

18   the TSST case, our view is that 15 claim terms make more

19   sense at this point because there are a total of 153 claims

20   in the four TSST patents, and there are 21 claims that are

21   specifically identified as allegedly infringed in TSST's

22   counterclaims.  So since we could be dealing with a very

23   large number of patent claims, we just wanted the flexibility.

24   But that is not really an issue that needs to be decided now

25   anymore since the TSST case will be a separate case.

1  THE COURT: Okay. Thank you. Let me hear the

2  defendants' response on those four issues, please.

3  MR. PANIKOWSKI: Your Honor, my colleague Ms.

4  Kaji is going to address these two remaining disputed issues

5  briefly.

6  THE COURT: Okay.

7  MS. KAJI: Good morning, Your Honor. This is

8  Saori Kaji from DLA Piper for TSST-K.

9  I believe counsel misspoke a few times in

10  referencing Defendants as Samsung. We are representing

11  TSST-K this morning so I just wanted to clarify that.

12  As to the first point, regarding the deposition

13  transfers, Mr. Ko, we simply believe that 14 hours is not

14  warranted in this case. Mr. Park, who is LG's witness and

15  the main inventor on three of the patents, should be subject

16  to a longer deposition time simply because of the number of

17  issues that we believe will be involved, but as to Mr. Park,

18  we think the standard seven hours or ten and-a-half for

19  translating the deposition should be more than sufficient

20  to cover the issues with respect to that witness.

21  Secondly, as to the core technical documents,

22  TSST-K agrees that source code will be relevant. We intend

23  to make those available for inspection rather than production

24  pursuant to the terms of the protective order that the parties

25  are currently negotiating.

1          As to whether or not source code should be

2     limited to controller, I think given that the source code

3     is the crown jewel of TSST-K's technology, whatever source

4     code we produce should be limited to what is truly at stake

5     in the case and what is most relevant to describing the

6     relevant functions and features of the products.

7          And as to the third issue, which is the e-mail

8     searching, I think the parties are now in agreement.

9          As to the fourth issue regarding the claim

10    terms, we again think that ten terms across both TSST-K's

11    claims and LG's claims are sufficient to address any claim

12    construction issues.

13          THE COURT:  All right.  Thank you.  So with

14    respect to these issues that the plaintiff has raised, I

15    agree with the plaintiff on the Ko deposition and hereby

16    order it can be up to 14 hours.  I don't think that is an

17    unduly large amount of time for that deposition given that

18    individual's role in the case.

19          In terms of core technical documents, while I

20    don't necessarily look forward to the day that you come

21    back here with that dispute, I'm not going to decide it

22    now.  I'll decide it in the context of a specific discovery

23    dispute, should you find, as you go forward into discovery,

24    that you have a disagreement as to the scope of the source

25    code that needs to be produced.

1             There is no dispute on the e-mail searching.

2             On the number of claim terms, it will be limited

3   by agreement to ten disputed terms in this case, now the LG

4   case.

5             And in the separate case, the TSST case, you

6   will all meet and confer; and you should be assuming that

7   case is opened and filed and there is a response.  We'll

8   move to scheduling in that case as quickly as possible.  And

9   in that context, you all ought to talk again about whether

10   you can agree on 10 or 15 or some number in between.  And

11   if you can't, I'll decide that in the context of another

12   scheduling conference in that case.

13             Let me tell you a few other things from what I

14   saw in what you submitted, and then even though I am out of

15   time, I will give defendant a chance if there is any other

16   issue that I haven't addressed that you want to raise.

17             Let me say further, I need a revised proposed

18   schedule, the plaintiff should submit it on behalf of all

19   parties by next Monday, reflecting the decisions that we

20   have made today as well as other decisions and dates I am

21   about to give you.

22             So in terms of the dispute at the various

23   footnotes about the number of hours and other discovery

24   limits when you didn't know if I would sever the case or

25   not, you now know I have severed, but I am nonetheless

1    adopting the defendants' position there, and so all the

2    limits that the defendants said should apply, whether or

3    not the counterclaims were severed, those are the limits

4    in this case even though I have severed the counterclaims.

5              Elsewhere in the scheduling order, paragraph 17,

6    the hearing on claim construction will begin at 1:00 p.m. on

7    June 27th, 2016.  That's paragraph 17.

8              The hearing on case dispositive and *Daubert*

9    motions at page 14, April 25th, 2017, beginning at 9:00 a.m.

10             Pretrial conference, July 28th, 2017, beginning

11   at 9:00 a.m.

12             The proposed pretrial order will be due on

13   July 17th, 2017.

14             And we'll schedule this for a jury trial of five

15   days beginning on August 14th, 2017.

16             With all that, let me turn to defendants

17   briefly.  Were there any other issues you had hoped to raise

18   that we haven't gotten to?

19             MS. KAJI:  Yes, Your Honor.

20             MR. PANIKOWSKI:  Your Honor --

21             MS. KAJI:  Oh.

22             MR. PANIKOWSKI:  Yes.  Go ahead, Ms. Kaji, please.

23             MS. KAJI:  On the deposition limitation issue,

24   in addition to Mr. Ko, we also need to extend the deposition

25   time as to Mr. Parks who is the main inventor on LG's

1 patents. And I believe in the footnote, LG has indicated

2 that it would agree to similarly a 14 hour deposition time

3 as to Mr. Park. And TSST-K would request an order from the

4 Court to extend Mr. Park's deposition time to 14 hours.

5     THE COURT: Right. I understood there was no

6 dispute on that; is that correct?

7     MS. KAJI: That is correct.

8     MR. LIEBERMAN: That is correct, Your Honor. So

9 in the revised proposed order we'll submit to the Court,

10 we'll include the statement that Mr. Parks' deposition can

11 extend up to 14 hours.

12     THE COURT: Okay. Thank you. Are there any

13 other issues from defendants?

14     MR. PANIKOWSKI: No, Your Honor. No further

15 issues from TSST-K. Thank you very much for your time

16 today.

17     THE COURT: We'll look for the submissions I

18 outlined. Thank you all very much for your time today.

19 Good-bye.

20    (Telephone conference ends at 9:49 a.m.)

21

22   I hereby certify the foregoing is a true and accurate
transcript from my stenographic notes in the proceeding.

23

24       /s/ Brian P. Gaffigan
        Official Court Reporter
25        U.S. District Court