# EXHIBIT 1

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 2

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 3

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 4

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 5

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 6

# EXHIBIT 7

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 8

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

**EXHIBIT 9**

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 10

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 11

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 12

*[Submitting counsel on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: JUUL LABS, INC., MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 19-md-02913-WHO **JOINT DISCOVERY STATUS REPORT** |
| This Document Relates to: ALL ACTIONS | Judges: Hon. Jacqueline Scott Corley Courtroom: Video Conference Hearing Date: August 18, 2021 Hearing Time: 8:30 a.m. |

Pursuant to the Court's instructions at the hearings on October 30, 2020 and for

July 26, 2021, counsel for Defendants Juul Labs, Inc. ("JLI"), Altria,[1] Director

Defendants,[2] E-Liquid Defendants,[3] Retailer Defendants,[4] and Distributor Defendants[5]

---

[1] "Altria" refers to Altria Group, Inc., and the Altria-affiliated entities named in Plaintiffs' Consolidated Class Action Complaint and Consolidated Master Complaint (collectively, "Complaints"), *see* ECF Nos. 387, 388.

[2] "Director Defendants" refers to Messrs. James Monsees, Adam Bowen, Nicholas Pritzker, Hoyoung Huh, and Riaz Valani.

[3] "E-Liquid Defendants" refers to Mother Murphy's Labs, Inc., Alternative Ingredients, Inc., Tobacco Technology, Inc., and Eliquitech, Inc.

[4] "Retailer Defendants" refers to Chevron Corporation, Circle K Stores, Inc., Speedway LLC, 7-Eleven, Inc., Walmart, and Walgreen Co.

[5] "Distributor Defendants" refers to McLane Company, Inc., Eby-Brown Company, LLC, and Core-Mark Holding Company, Inc.

1

(collectively "Defendants"), and Plaintiffs' Co-Lead Counsel ("Plaintiffs") (collectively referred to herein as the "Parties") respectfully provide this Joint Discovery Status Report in advance of the Discovery Conference scheduled for August 18, 2021.

## II.     DISCOVERY FROM DEFENDANTS

### A.     JLI

#### Document Productions

To date, JLI has produced approximately 7.5 million documents, consisting of over 23 million pages, including re-productions of materials produced to federal and state authorities.

On April 19, 2021, JLI indicated that the vast majority of its production was complete. JLI continues to make rolling document productions, including of custodial files of individuals the Parties have identified as likely deposition witnesses and of documents being produced in the State Attorney General cases.

#### Depositions

To date, Plaintiffs have noticed or requested more than 68 depositions of JLI-related witnesses. This includes at least 58 Rule 30(b)(1) or Rule 45 depositions. Plaintiffs have completed 26 30(b)(1) depositions of current and former JLI employees, and Plaintiffs' remaining JLI-related deposition requests include 19 former employees, 4 non-parties, 2 current or former Board members, and 7 current employees. To help streamline discovery, Plaintiffs have pulled back deposition notices for 14 Rule 30(b)(1) witnesses.

Plaintiffs continue to seek mutually agreeable dates for deposing JLI witnesses pursuant to CMO 10-A.

#### Privilege Log Disputes

The Parties have continued to meet-and-confer regarding JLI's privilege logs. Based on these conferrals and the Court's July 6, 2021 guidance (ECF 2052) JLI is conducting an ongoing re-review of its logs. As of August 6, 2021, JLI has de-designated

(in full or some part) approximately 15,000 documents after a review of more than 64,000 previously withheld documents. There are approximately 9,000 remaining documents to produce as part of this re-review process.

Separately, based in part on recent deposition testimony, plaintiffs have challenged JLI's privilege claims regarding communications among board members that were shared with third parties. JLI has agreed to produce documents shared with third parties who were merely board observers, but has maintained privilege claims for certain individuals pursuant to well-recognized exceptions to the general rule plaintiffs cite. The parties continue to exchange views.

In connection with the board observers dispute noted above, Plaintiffs further identified specific privilege log entries with K.C. Crosthwaite as a recipient before he became CEO of JLI--on September 25, 2019--and was a board observer for Altria. Plaintiffs seek production of this material sufficiently in advance of Mr. Crosthwaite's deposition. JLI indicated that it will produce some communications involving Mr. Crosthwaite but expects to continue to withhold on the basis of a Joint Defense and Common Interest agreement between JLI and Altria. Plaintiffs have requested that Defendants identify all entries designated privileged on these grounds for further assessment and will bring this issue to the Court for resolution, if necessary.

In addition, the parties have the following outstanding disputes:

Gould Exhibit Clawback. The parties have a disagreement over whether two documents pertaining to preparation for certain Congressional testimony are privileged and should be subject to clawback. Plaintiffs' counsel presented both documents during the deposition of Ashley Gould on July 13, 2021, but she was instructed not to answer questions about them and JLI later issued a notice to claw them back. A telephonic meet-and-confer occurred on August 9, 2021, but the parties were unable to resolve the dispute. Accordingly, they plan on seeking Court intervention.

3

Broader Clawback. The parties have met-and-conferred extensively regarding a
substantial clawback notice JLI issued in May 2021 covering around 370 documents.
There are approximately 7-10 substantive documents (*i.e.*, not counting near duplicates
that increase the total to 50 items) that currently remain in dispute and may potentially
require Court resolution.  Plaintiffs are reviewing and considering a recent proposal JLI's
counsel sent on August 8, 2021, to resolve all remaining items.

Documents concerning #juulnation.  The parties disagree concerning whether
deposition testimony by a former JLI employee related to a "hashtag" found on social
media posts and her discussions with JLI in-house counsel about the hashtag were
privileged.  Plaintiffs first raised the privilege challenge on March 19, two weeks after the
employee was deposed and was instructed not to answer questions that would reveal
privileged communications.  JLI diligently responded to Plaintiffs' privilege challenge
both informally and formally on April 7 and April 10.  In response to JLI's April 10 letter,
Plaintiffs served interrogatories on April 12 seeking, among other things, information
related to the hashtag testimony.  JLI responded to the interrogatories on May 26 and
again asserted privileged over communications with counsel related to the hashtag issue.
Until this report, Plaintiffs have not re-raised any privileged challenges, either in response
to JLI's April 10 letter explicitly discussing the privilege challenge or JLI's responses to
the interrogatories asserting privilege.  To the extent a dispute remains, the parties will
brief the dispute for the Court's consideration the week of August 23rd.

Over 800+ individual challenges.  From March 2021 to the present, Plaintiffs have
made individual and some broader custodial challenges to documents in advance of
depositions.  There have been approximately 500 withdrawals of privilege but over 800
challenged for which JLI stood on its claims of privilege.  Plaintiffs are reserving the right
to seek in camera review as to a subset of those documents to determine if the privilege is
properly applied.

The Parties will continue to meet and confer on this issue and will bring any disputes to Your Honor's attention, if necessary.

## B. __Altria__

### *Document Production*

To date, Altria has produced approximately 875,000 documents, consisting of over 6.6 million pages. These document productions have included Altria's productions to the FTC, as well as the documents that hit on the parties' agreed search terms and from among the files of custodians previously agreed to. Recently, the parties have negotiated an additional set of custodians and search terms related to communications between Altria and JLI prior to 2017.

### *Depositions*

To date, Plaintiffs have taken 16 depositions of current and/or former Altria employees. Three additional depositions, including those covering topics within Plaintiffs' 30(b)(6) notice regarding the transaction between Altria and JLI, and one continuation of a prior deposition, are scheduled. The parties continue to discuss scheduling, custodial file, and privilege issues as they arise.

### *Written Discovery*

Altria has provided responses to all of Plaintiffs' written discovery requests that have come due. Plaintiffs and Altria continue to meet and confer on these responses and will bring any disputed issues to Your Honor's attention, if necessary.

## C. __Director Defendants__

### *Document Productions and Depositions*

The Director Defendants have produced documents responsive to Plaintiffs' discovery requests. The parties have taken or scheduled depositions for nearly all of the Director Defendants and personnel associated with the Directors.

### D.    E-Liquid Defendants

Mother Murphy's Laboratories Inc. and Alternative Ingredients Inc., are proffering Eduardo Berea, Charles Trout, and Don Jarell, who will be available on some combination of September 28, 29, and/or 30.  Eliquitech and Tobacco Technology has not yet designated the witness as they are stating they need a meet and confer before doing so. The parties will have a meet and confer this week to finalize the deposition witnesses and schedule.

### E.    Retailer and Distributor Defendants

Counsel for Plaintiffs, the Retailer Defendants, and the Distributor Defendants are continuing to meet-and-confer regarding finalization of search terms, hit reports, and production of custodial files.  Retailer and Distributor Defendants have made productions pursuant to Plaintiffs' requests, and the parties continue to meet-and-confer regarding search terms and custodians for supplemental productions. Plaintiffs have reached agreements regarding custodians with the following Defendants:  Eby-Brown, 7-Eleven, Core-Mark, and McLane.  Additionally, counsel for the Plaintiffs are engaging in meet-and-confers with Wal-Mart, Walgreens, and Chevron to finalize custodians and related issues.  Plaintiffs' counsel will continue to arrange additional meet-and-confers with the remaining Retailer Defendants to finalize custodians.  Walmart served its interrogatory responses on March 5, 2021.  Speedway and 7-Eleven served their interrogatory responses on July 23, Walgreens served its interrogatory responses on July 30, and Circle K served its interrogatory responses on August 6. Chevron will serve its interrogatory responses by August 24, 2021.

Further, McLane and Plaintiffs are working together cooperatively to ensure McLane's carriers have access to Plaintiff Fact Sheets.

III.    **DISCOVERY FROM PLAINTIFFS**

   A.    <u>Personal Injury Plaintiffs</u>

   In addition to the initial discovery of the bellwether candidates prior to the Court's selection of the final four bellwether candidates, Defendants have now taken ten additional fact witness depositions, and an additional three are scheduled. Defendants may have an issue to discuss with the Court *in camera* regarding a deposition issue with a fact witness for one of the bellwether plaintiffs.

   JLI also served its First Set of Requests for Admission and Second Set of Requests for Production on these Plaintiffs on July 16, 2021, and a Second Set of Requests for Admission on Roberto Pesce on August 17, 2021.

   Altria served interrogatories in each of the four personal injury bellwether cases on July 1. The Parties have agreed that Plaintiffs will serve responses on August 16, 2021.

   Defendants' seek an order from this Court permitting Dr. Matkovic, the psychiatrist who has done most of the other mental evaluations for bellwether plaintiffs, to evaluate Mr. Fish remotely under the jurisdiction of this Court. Such an order would ameliorate any concerns Defendants and Dr. Matkovic have regarding the Kentucky licensure laws. Additionally, the parties are meeting and conferring regarding physical medical exams of the bellwether plaintiffs as relates to their alleged injuries and previous treatment, if any. The issues under discussion include the location of the in-person exam, the extent of the exam (lung scan, etc.) and the timing of the exams. To the extent the parties are unable to resolve these issues, they will file a joint statement not to exceed three pages per side on these issues by 5 pm ET on Tuesday, August 24th.

   Plaintiffs indicated to Defendants that both plaintiffs Bain and Pesce will have pulmonary examinations completed by August 30, 2021. Plaintiffs also offered to share those examination results and proposed briefing this issue on September 3, 2021, after

Defendants had the benefit of those reports. Defendants declined this proposed compromise.

      **B.**      <u>Class Plaintiffs</u>

*Subpoenas on schools attended by certain class representatives*

In late April 2021, Defendants served document subpoenas on schools attended by certain class representatives. In July 2021, six additional subpoenas were served on schools attended by certain individual bellwether plaintiffs. To date, a number of those school districts have responded to the subpoenas and produced documents.

Defendants, however, have received no documents from two of the schools (RC Murphy Junior High and Ward Melville High School), both of whom were served with the subject subpoenas in April. In May and June, counsel for the school district (Three Village Central School District) raised questions about the scope of those subpoenas, which were discussed at the June 30, 2021 Discovery Conference. (6/30/2021 Hr'g Tr. at 29:19-31:6). After receiving the Court's guidance on that issue, on July 20, 2021, counsel for the school district over the two subpoenaed schools informed Defendants that responsive documents were being collected and would be produced the following week. To date, however, the two subpoenaed schools have produced no documents, nor have they committed to a date for production prior to the second half of September. Defendants request the Court's guidance on setting a deadline for these schools' production.

Plaintiffs are working to resolve this issue and will be prepared to update the Court at the August 18, 2021 hearing.

      **D.**      <u>Government Entity Plaintiffs</u>

Altria has served contention interrogatories on the Government Entity Bellwether Plaintiffs, to which they served responses and objections. Altria wrote to the Government Entity Bellwether Plaintiffs regarding deficiencies in their responses and the parties met and conferred on those issues. Three Government Entity Bellwether Plaintiffs have provided supplemental responses and the remaining three will provide supplemental

responses by August 20, 2021. Altria is in the process of reviewing the supplemental responses and will bring any disputed issues to Your Honor's attention, if necessary.

## IV.    THIRD-PARTY DISCOVERY

### *Depositions*

To date, Plaintiffs have deposed two third-party witness. Plaintiffs have scheduled two additional third-party depositions. Plaintiffs continue to confer with counsel to schedule others.

### *Subpoenas*

Plaintiffs have issued third party subpoenas to more than 166 entities or persons. In total, responsive recipients have thus far produced approximately 135,000 pages of documents and negotiations are ongoing with numerous others.

To date, JLI has issued approximately 143 third-party subpoenas. JLI is conferring with the recipients, but may require the Court's intervention through an informal discovery conference and/or motions practice.

JLI currently has one issue it wishes to bring to the Court's attention. JLI has served eight third party subpoenas on entities in Washington State, seeking information related to the allegations made by Government Entity Bellwether Plaintiff King County. The substantial majority of the work on those subpoenas is complete. There are, however, five outstanding subpoenas—to the Washington state Board of Health, Department of Health, Department of Revenue, State Board of Education and Consumer Protection Division— over which JLI and the third parties are still negotiating. The Washington Attorney General is responding on behalf of all five entities. JLI granted the AG a number of extensions to respond and subsequently engaged in a series of productive meet and confers that effectively resolved most disputes by July 29. Since then, however, discussions have turned to search terms and have temporarily stalled, in part because the AG's office represented that its members had pre-planned summer vacations that interrupted their review of the remaining issues.

9

JLI continues to believe that the outstanding issues may be resolved without court intervention, but the delays associated with these five subpoenas mean that any disputes likely will not ripen by August 31, the current date for the end of fact discovery with respect to King County.  JLI therefore asks the Court to extend the time for JLI and these five third parties to resolve any dispute, and for the third parties to complete their productions, until September 30, 2021, in order to avoid potentially premature motion practice on the remaining disputes and on the sufficiency of these entities' eventual productions.  The AG has informed JLI that that it joins in this request for an extension of time, but takes no position regarding the appropriate deadlines in the MDL case.  To be clear, JLI seeks an extension only for resolution of these five subpoenas and not for discovery into King County itself.

Dated:  August 16, 2021

Respectfully submitted,

By: /s/ Renee D. Smith

Renee D. Smith (*pro hac vice*)
James F. Hurst (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2310

By: /s/ Peter A. Farrell

David M. Bernick (*pro hac vice*)
Peter A. Farrell (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Ave, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5959

By: /s/ Gregory P. Stone

Gregory P Stone, SBN 78329
Bethany W. Kristovich, SBN 241891
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:    (213) 683-9100

*Attorneys for Defendant Juul Labs, Inc.*

By: /s/ Sarah R. London

Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone:  (415) 956-1000

By: /s/ Dena C. Sharp

Dena C. Sharp
**GIRARD SHARP LLP**
601 California St., Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

By: /s/ Dean Kawamoto

Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone:  (206) 623-1900

By: /s/ Ellen Relkin

Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500

*Co-Lead Counsel for Plaintiffs*

11

By: */s/ John C. Massaro*        By: */s/ James Kramer*

**ARNOLD & PORTER KAYE SCHOLER LLP**

John C. Massaro (admitted pro hac vice)
Jason A. Ross (admitted pro hac vice)
601 Massachusetts Ave., N.W.
Washington D.C.  20001
Telephone:  (202) 942-5000
Facsimile:  (202) 942-5999
john.massaro@arnoldporter.com
Jason.ross@arnoldporter.com

*Attorneys for Defendants Altria Group, Inc.
and Philip Morris USA Inc.*

**ORRICK HERRINGTON & SUTCLIFFE LLP**

James Kramer
Roland Chang
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone: (415) 773-5700

jkramer@orrick.com
rdchang@orrick.com
*Attorneys for Defendant James Monsees*

By: */s/ Eugene Illovsky*        By: */s/ Michael J. Guzman*

**BOERSCH & ILLOVSKY LLP**

Eugene Illovsky
Martha Boersch
Matthew Dirkes
1611 Telegraph Ave., Suite 806
Oakland, CA 94612
Telephone: (415) 500-6643
eugene@boersch-illovsky.com
martha@boersch-illovsky.com
matt@boersch-illovsky.com

*Attorneys for Defendant Adam Bowen*

**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.**

Mark C. Hansen
Michael J. Guzman
David L. Schwartz
Sumner Square, 1615 M St., N.W., Suite 400
Washington, DC 20036
Telephone: (202) 326-7910
mguzman@kellogghansen.com

*Attorneys for Defendants Nicholas
Pritzker, Riaz Valani, and Hoyoung Huh*

12

By: /s/ Mitchell B. Malachowski

**TYSON & MENDES, LLP**

James E. Sell
Mitchell B. Malachowski
Stephen Budica
April M. Cristal
523 4th Street, Suite 100
San Rafael, CA 94901
Telephone: (628) 253-5070
jsell@tysonmendes.com
mmalachowski@tysonmendes.com
sbudica@tysonmendes.com
acristal@tysonmendes.com

*Attorneys for Defendants Mother Murphy's
Labs, Inc., and Alternative Ingredients, I*

By: /s/ Robert Scher

**FOLEY & LARDNER LLP**

Robert Scher
Peter N. Wang
Graham D. Welch
Dyana K. Mardon
90 Park Avenue
New York, NY 10016-1314
Telephone: (212) 682-7474
Facsimile: (212) 687-2329
rscher@foley.com
pwang@foley.com
gwelch@foley.com
dmardon@foley.com

*Attorneys for Defendants Tobacco
Technology, Inc., and Eliquitech, Inc.*

By: /s/ Michael L. O'Donnell

**WHEELER TRIGG O'DONNELL LLP**

Michael L. O'Donnell
James E. Hooper
Marissa Ronk
370 17th Street, Ste. 4500
Denver, CO 80202
Telephone: (303) 244-1850
Odonnell@wtotrial.com
hooper@wtotrial.com
Ronk@wtotrial.com

*Attorneys for Defendant McLane Company,
Inc.*

By: /s/ Christopher J. Esbrook

**ESBROOK LAW LLC**

Christopher J. Esbrook
David F. Pustilnik
Michael S. Kozlowski
77 W. Wacker, Suite 4500
Chicago, IL 60601
Telephone: (312) 319-7681
christopher.esbrook@esbrooklaw.com
david.pustilnik@esbrooklaw.com
michael.kozlowski@esbrooklaw.com

*Attorneys for Defendants Eby-Brown
Company, LLC, Circle K Stores, and 7-
Eleven, Inc., Speedway, and Walgreen Co.*

By: */s/ Donald F. Zimmer, Jr.*

**KING & SPALDING LLP**

Donald F. Zimmer, Jr.
Quyen L. Ta
Jennifer T. Stewart
50 California St., Suite 3300
San Francisco, CA 94111
Telephone:      (415) 318-1200
fzimmer@kslaw.com
qta@kslaw.com
jstewart@kslaw.com

*Attorneys for Defendant Walmart Inc.*

By: */s/ Charles C. Correll Jr.*

**KING & SPALDING LLP**

Andrew T. Bayman (Admitted *pro hac vice*)
1180 Peachtree Street, Suite 1600
Atlanta, GA 30309
Telephone: (404) 572-4600
abayman@kslaw.com

and

Charles C. Correll, Jr.
Matthew J. Blaschke
Alessandra M. Givens
50 California St., Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
ccorrell@kslaw.com
mblaschke@kslaw.com
agivens@kslaw.com

*Attorneys for Defendant Chevron Corporation*

By: */s/ David R. Singh*

**WEIL, GOTSHAL & MANGES LLP**

David R. Singh
Bambo Obaro
201 Redwood Shores Parkway, 6th Floor
Redwood Shores, CA 94065
Telephone: (650) 802-3083
david.singh@weil.com
bambo.obaro@weil.com

*Attorneys for Defendant Core-Mark Holding Company, Inc.*

**"**

# GZJ KDKV'35"

DENNIS J. HERRERA, State Bar #139669
City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERE, State Bar #173594
Chief of Complex & Affirmative Litigation
OWEN J. CLEMENTS, State Bar #141805
SARA J. EISENBERG, State Bar #269303
JAIME M. HULING DELAYE, State Bar #270784
Deputy City Attorneys
Fox Plaza
1390 Market Street, Sixth Floor
San Francisco, CA 94102
Telephone: 415/554-3957
jaime.hulingdelaye@sfcityatty.org

*Attorneys for Plaintiff The People of the State of California,*
*acting by and through San Francisco City Attorney Dennis J. Herrera*

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA and THE PEOPLE OF THE STATE OF CALIFORNIA, Acting by and through San Francisco City Attorney DENNIS J. HERRERA, <br><br> Plaintiffs, <br><br> vs. <br><br> PURDUE PHARMA L.P., et al., <br><br> Defendants. | Case No. 3:18-cv-07591-CRB <br><br> **JOINT STATUS UPDATE** <br><br> **Judges**: Hon. Charles R. Breyer and Jacqueline Scott Corley <br><br> **Courtroom**: Via Videoconference <br><br> **Hearing Date**: August 30, 2021 <br><br> **Hearing Time**: 8:30 a.m. |

The parties respectfully submit this Joint Status Update in advance of the Court's discovery conference scheduled for August 30, 2021 at 8:30 a.m.

## I. JOINT STATEMENT REGARDING SCHEDULE AND DISPUTE RESOLUTION

The parties jointly report on a number of case developments that have taken place since the last conference with the Court.

### A. Schedule

On June 15, 2021, the Court entered the Parties' Joint Stipulation and Amended Order to Modify Case Schedule. Doc. 572. The specific dates are reflected in the chart below:

| Event | Current Schedule |
|---|---|
| Custodial Productions Substantial Completion Deadline | June 4, 2021 |
| Document Production Substantial Completion Deadline | June 21, 2021 |
| Plaintiff's Expert Reports | October 5, 2021 |
| Close of Fact Discovery | November 12, 2021 |
| Defendants' Expert Reports | December 2, 2021 |
| Plaintiff's Expert Rebuttal Reports | December 23, 2021 |
| Close of Expert Discovery | January 14, 2022 |
| Motions for Summary Judgment and *Daubert* Motions | January 24, 2022 |
| Oppositions to Motions for Summary Judgment and *Daubert* Motions | February 25, 2022 |
| Replies in Support of Motions for Summary Judgment and *Daubert* Motions | March 11, 2022 |
| All Trial Materials Due | March 24, 2022 |
| Final Pretrial Conference | April 4, 2022 |
| Trial | April 25, 2022 |

### B. Update on Status of Settlement Among Stipulating Parties (Docs. 518-19, 562, 564, 570, 616, 624)

On January 26, 2021, the Court stayed the proceedings as to the Stipulating Defendants.[1] On August 9, 2021, the Stipulating Parties filed a Fourth Joint Notice Regarding Update on Status of Settlement explaining the mechanics and timeline for the settlement process. Doc. 616. The Court

---

[1] The Stipulating Defendants are distributors McKesson Corporation, AmerisourceBergen Drug Corporation and Cardinal Health, Inc. and manufacturer Johnson & Johnson, its subsidiary Janssen Pharmaceuticals Inc. f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica, Inc. and its former affiliate Noramco, Inc. (with Plaintiff, the "Stipulating Parties").

1   ordered the Stipulating Parties to promptly update the Court in the event the negotiations fail and, in

2   any case, to submit a further update to the Court on September 20, 2021.  Doc. 624.

3       On August 20, 2021, Non-Stayed Defendants filed a Motion to Stay, asking the Court to stay

4   the entire case until the proposed nationwide settlements are either finalized or they fail.  Doc. 627.

5       **C.    Discovery Order Issued Since Prior Conference (Doc. 608)**

6       Following the last status conference, the Court issued an order providing for the following:

7   (i) "Plaintiff and Walgreens shall meet and confer regarding new custodians by July 23, 2021";

8   (ii) "Allergan shall respond to Plaintiff's letter regarding the number of opioids sold by Allergan that

9   entered San Francisco by July 28, 2021"; (iii) "Walgreens shall produce 500 hardcopy prescriptions

10  per year from the 12 previously agreed to stores from 2010 through 2019 by August 16, 2021"; and

11  (iv) "Plaintiff shall complete its production of additional Crime Data Warehouse documents by

12  August 27, 2021."  Doc. 608.

13      **D.    Discovery Motions**

14      The parties have briefed six disputes pursuant to the revised resolution protocol outlined in

15  Discovery Order No. 2.  Doc. 382.  The disputes are outlined in the chart below.

| Moving Party | Responding Party | Dispute (as Described by Moving Party) | Doc. |
|---|---|---|---|
| Walgreens | Plaintiff | Plaintiff's Production of Treatment and Dispensing Data | 622 |
| Plaintiff | Walgreens | Walgreens' Custodial Productions | 623 |
| Plaintiff | Walgreens | Walgreens' Internal Investigations Database & Other Narrow Issues | 626 |
| Plaintiff | Allergan Defendants | Allergan Defendants' Responses to Plaintiff's Marketing Interrogatories | 628 |
| Plaintiff | Teva/Actavis Defendants | Teva Defendants' Responses to Plaintiff's Interrogatories | 629 |
| Plaintiff | Allergan Defendants & Teva/Actavis Defendants | Allergan Defendants' and Teva/Actavis Defendants' Responses to Plaintiff's Interrogatories Re: Sales Data | 630 |

## II.     PLAINTIFF'S STATEMENT

### A.     Plaintiff Productions and Depositions

Plaintiff completed its production of police investigation files on August 10, well in advance of the August 24 deadline. *See* Doc. 608. Those documents were in addition to the 3.9 million other pages of information and voluminous databases Plaintiff has produced. Plaintiff also has substantially completed its privilege and redaction log and served it on all Defendants. Plaintiff will respond to the purported challenges Defendants make to the privilege log. Plaintiff notes that out of more than 10,000 entries, Defendants have, to date, challenged just over 400.

Defendants incorrectly suggest that they await information regarding "databases for incident reports from the San Francisco Sheriff's Department." But Plaintiff has already explained several times that the Sheriff's Department has no incident report database analogous to the Police Department's Crime Data Warehouse.

Finally, Defendants' representations regarding dozens of inquiries following Dr. Fouts' and Dr. Geier's depositions are misleading. Nevertheless, Plaintiff is meeting and conferring with Walgreens about these issues.

### B.     Defendants' Discovery Deficiencies and Other Issues Requiring the Court's Attention

Plaintiff has addressed Defendants' discovery deficiencies in the recently filed letter disputes, as well as in past status reports, and will not repeat them all here. In light of the number of filed disputes, Plaintiff acknowledges that the Court may not be able to entertain argument on each of the briefed issues at the upcoming status conference and welcomes the opportunity to appear at a subsequent hearing (scheduled at the Court's convenience) to address remaining issues should the Court find it helpful.

A select few additional issues, including those that have become evident only recently, require emphasis and are described below.

#### 1.     Endo/Par

Plaintiff has previously advised the Court of problems with Endo's perpetual "discovery" of "new" data sources, such as the missing Call Data messages and missing Materials Dropped Data

that were only produced after Plaintiff established their existence using Endo's own documents. *See, e.g.*, Docs. 550-551, 571, 602. Plaintiff has also apprised this Court about Endo's serious discovery violations, such as those identified in *Staubus, et al. v. Purdue Pharma, et al.*, Case No. C-41916 (Sullivan Cnty., Tenn. Cir. Ct. Apr. 6, 2021) (Doc. 551-4), where Endo **and its counsel**, Arnold & Porter Kaye Scholer ("APKS"), were found to have engaged in discovery abuses so severe that default judgement was warranted. Unfortunately, both concerns persist.

### a. Failure to Timely Produce Relevant and Responsive Custodial Documents

Since the last Joint Status Update, Endo has produced a steady stream of new documents with little or no explanation for why the files are being produced now, years after the MDL production should have been completed, and two months after the substantial completion date ordered in this case. In the last three weeks, the Endo Defendants have made at least 11 productions consisting of at least 21 volumes of documents. While still in the process of reviewing the tens of thousands of newly produced documents, Plaintiff has already determined that the productions contain core evidence that should have been produced long ago. For example, Endo produced a "smoking gun" document in this case on August 5, 2021, from custodian Linda Kitlinski, the day after her 2019 deposition testimony was read into the record *at trial* in the New York Opioids case on August 4, 2021. Endo claims that the document was only identified as potentially responsive to the San Francisco litigation on June 7, 2021, but its relevance on a national level is self-evident. The document confirms that Ms. Kitlinski believed Endo was improperly manipulating its "medical education" and "independent grant" programs to promote Endo's products. That is exactly the opposite of what Ms. Kitlinski testified to at her 2019 deposition, however. The New York court has issued two Orders to Show Cause in response, and Endo and APKS once again face potential sanctions for discovery abuses, including terminating sanctions.

Endo's conduct is also impeding Plaintiff from preparing its case. Last week, for example, Plaintiff was forced to postpone the deposition of San Francisco custodian, Bobbie Sue Brown, which was noticed for August 12, 2021, and was to be the first Endo deposition taken in the case. While Endo previously represented to Plaintiff that the production of Ms. Brown's custodial file was

1 substantially complete on February 26, 2021, on the evening of August 10, 2021, less than two days

2 before Ms. Brown's deposition, Endo produced 26,256 custodial documents relating to Endo's

3 Clinical Affairs team, of which Ms. Brown was a member and all of whom reported to Ms. Kitlinski.

4 At least 2,388 of those documents specifically mention Ms. Brown, and approximately 1,179 are

5 newly produced emails for which Ms. Brown was a recipient or sender.[2]

6        On August 11, 2021, Plaintiff asked Endo to (1) confirm production of Ms. Brown's

7 production is now complete, and (2) provide a selection of new dates for her deposition.  Endo has

8 yet to respond to either request.  Instead, Endo's counsel replied that they "will not present Ms.

9 Brown subject to any threat by Plaintiff to 'keep the deposition open'. . . ."  Plaintiff is taking all

10 available steps to ensure Ms. Brown's deposition is taken on a complete record, but given the events

11 described herein and a looming discovery deadline, Plaintiff should not be prevented from moving

12 forward with Ms. Brown's deposition or foreclosed from seeking further relief should good cause

13 support it.

14                          **b.**     **Additional Missing Data**

15        Although Plaintiff raised each of these issues with Endo on or before July 29, 2021, Endo

16 provided no response until August 20, 2021, at 8:43 p.m. PT.  In most cases, however, Endo has

17 only responded that it is still investigating, either stating that they "expect" to provide an update by

18 September 24, 2021 (only eleven days before Plaintiff's expert reports are due on October 5, 2021)

19 with no firm production date, or providing no guidance at all on when these investigations will be

20 complete.  While Endo initially set up a weekly call with Plaintiff to update it on the status of its

21

22

---

23    [2]    Endo asserts that the August 10, 2021 production contains 31 documents from Ms. Brown's

24 custodial file.  Not so, according to Endo's own definition of "custodial file."  Endo's APKS counsel previously told Plaintiff's counsel that to capture the entire custodial file for any custodian, one must search, not only the custodian fields of the metadata, but also all of the email fields, such as the to,

25 from and cc fields.  As noted above, there are approximately 1,179 custodial emails in the August 10, 2021 production.  Even if that were not the case, Ms. Brown's custodial file production should

26 have been completed months ago and the 26,256 produced documents directly relate to Ms. Brown's Clinical Affairs team and, therefore, are potentially relevant, as the Kitlinski memo demonstrates.

27 Furthermore, Endo's recent statements indicate it may not be adhering to its own instructions regarding collection of a "custodial file," which potentially calls the completeness of other custodial

28 productions into question.

1  search for missing data, counsel for Endo has canceled the last three weekly calls on short notice.

2  Plaintiff believes earlier court-ordered deadlines should be imposed for each outstanding issue.

3        1.    <u>Compliance Documents</u>.  For months, Plaintiff has pressed Endo for more

4  information regarding the location of compliance documents such as Reports of Suspected Diversion

5  and other methods for tracking suspicious orders, including whether suspected diversion incidents

6  may be tracked in two additional CRM systems, Engage and Navigator.[3]  Shockingly, Endo stated

7  for the first time in its August 20, 2021, letter that its "production of **hard copy documents held by**

8  **the Endo Compliance Department is ongoing**," and that it will produce additional responsive hard

9  copy documents "**_as soon as practicable_**."  (Emphasis supplied.)  Endo also reported that its

10  investigation of the additional CRM sources is "ongoing."  Endo has not provided a date by which

11  these core and long-overdue materials will be produced or any explanation of why these documents

12  were not produced long ago.

13        2.    <u>SpeakerNet Data File</u>.  Plaintiff initially raised inconsistencies in Endo's SpeakerNet

14  Data File on May 28, 2021.  On July 9, and again during the parties' August 5, 2021,

15  videoconference, Plaintiff further advised that Endo's documents indicate that SpeakerNet was used

16  since at least September 2008 to track "approved honoraria" for speakers.  But the SpeakerNet data

17  files produced contain no information on speaker payments.  On August 20, 2021, Endo told

18  Plaintiff that its "investigation of available speaker data . . . from SpeakerNet **continues**," and that

19  Endo now "expects to make one or more additional productions of speaker data in the **coming**

20  **weeks**."  (Emphasis supplied.).[4]  As for Par, counsel represented that they are still investigating

21  potential sources of payments to Health Care Providers ("HCP"), such as in the JDE and Porzio

22  databases, but provided no estimated date of production.

23

24

---

25  [3]   Endo's production of compliance documents was so concerning that Plaintiff filed a discovery
26  motion on the matter on May 7, 2021, Doc. 551, which this Court denied based on Endo's representations that it had complied with its discovery obligations and because the Court found Plaintiff had not identified specific deficiencies.  Doc. 561.

27  [4]   On August 23, 2021, the day of this filing, Endo altered its position and now does not plan to
28  complete its "investigation" of SpeakerNet data until September 24, 2021.

3.    <u>Clinical Trial Payments</u>.  On July 29, 2021, Plaintiff inquired about missing payment data relating to clinical trial before 2015.  On August 20, 2021, Endo pointed to sources where data from 2013 and 2015 may be exist, which Plaintiff is evaluating.  However, Endo responded that prior to 2013 it did not maintain a centralized HCP database, and that such payments were tracked manually.   Endo should produce all available payment information whether maintained electronically or manually.

4.    <u>Third-Party Vendors</u>.  Plaintiff has inquired about documents relating to Endo's third-party vendors identified in Endo's production, including Cadent, EHC Communications, and Impact Communications.  Plaintiff received a production relating to Cadent, which it is evaluating.  On August 20, 2021, Endo stated that it and its counsel are "***currently investigating*** the extent of available data from SpeakerNet relating to Opana ER speaker programs," including "whether there is any centralized source for speaker-related data during the time that Endo retained EHC Communications" or data relating to Impact Communications, both of which they now admit were involved as third-party vendors.  (Emphasis supplied.)  Endo provided no date for which its investigation will be concluded, however.

5.    <u>Other Potential Sources of Responsive HCP Data</u>.  On July 29, 2021, and during the parties' August 5, 2021, videoconference, Plaintiff identified and asked Endo to investigate the following potential sources of responsive information referenced in Endo's documents:  Aggregate Spend Portal; SpendTrax; CFS Sunshine Act Compliance Database; CFS (DrugDev); Touchpoint; TKL; and SNBL; TFS, Inc.  On August 20, 2021, Endo confirmed that these sources may contain additional responsive information, but that they are still investigating and do not expect to provide any "additional information" about these sources until ***September 24, 2021***.  An earlier date should be ordered, considering Plaintiff's expert reports are due only eleven days later, on October 5, 2021.

6.    <u>Representations by Publication</u>.  Endo represented to this Court that it would search for information responsive to Interrogatory Nos. 1-4, which resulted in the production of the missing Call Data messages and missing Materials Dropped Data in response to Interrogatory Nos. 1 and 2.  But it appears Endo took no steps to identify information responsive to Interrogatory Nos. 3 and 4,

which seek information relating to representations disseminated by ***publication***. While Endo stated on August 20, 2021, that it would amend its responses, it gave no date by which it would do so.

7. <u>Missing Medical Science Liaison Interaction and Materials Dropped Data</u>. Plaintiff still has no data for Medical Science Liaison Interactions pre-2008, 2010, or 2014-2017. Plaintiff also has yet to receive Materials Dropped Data for 2012. Endo has also not updated its responses to identify documents it contends contain other responsive information.

## 2. Walgreens

The Court ordered Walgreens to complete its production of hard copy prescriptions and electronic notes by August 16. *See, e.g.*, Doc. 608 ("Walgreens shall produce 500 hardcopy prescriptions per year from the 12 previously agreed to stores from 2010 through 2019 by **August 16, 2021**."). Walgreens did not meet the deadline for the 5,000 hard copy prescriptions. In a production letter dated Monday August 16, Walgreens stated that it had "substantially completed its production of hard copy notes." Plaintiff's own analysis showed that, as of August 16 (and as of the time of writing), Walgreens' production was only 30% complete. After repeated requests, Walgreens finally confirmed on Sunday (the day before this statement was filed) that, while it represented to Plaintiff and the Court that its production was substantially complete, Walgreens had in fact produced just 1,503 out of the 5,000 hard copy prescriptions it was ordered to produce. *See* Doc. 578 ("Walgreens shall produce . . . 500 hardcopy prescriptions per year from the same 12 stores dating back to 2010."); Doc. 592 ("Walgreens shall complete production of its due diligence records by **August 16, 2021.**"); Doc. 608 ("Walgreens shall produce 500 hardcopy prescriptions per year from the 12 previously agreed to stores from 2010 through 2019 by **August 16, 2021.**").

It also remains unclear when – or if – Walgreens intends to comply with the Court's orders to produce 5,000 prescriptions. On Sunday, Walgreens indicated it expected to produce an additional 390 hard copies on Monday, which would bring it to roughly 38% completion a week after the

1   deadline.  But Walgreens will not provide an estimate for when it will complete the production, and

2   in fact suggested it may never produce 5,000 prescriptions.[5]

3          The electronic notes production is also concerning.  Walgreens previously represented to

4   Plaintiff and the Court that there were "roughly **half a dozen** electronic notes fields" that should be

5   evaluated because they may contain evidence of pharmacist due diligence.  May 10 Hr'g Tr. at

6   19:22.  Plaintiff relied on these representations in its submissions about deadlines and scheduling.

7   Walgreens now contends, however, that there are nearly *ten times* as many relevant fields as initially

8   represented (52 different fields, to be specific).  To facilitate Plaintiff's timely analysis, Plaintiff has

9   asked Walgreens to provide a description of each field (with a concise explanation of how it

10  contends each could be used to document pharmacist due diligence).

11         Finally, Walgreens made minor amendments to interrogatory responses March 31 and May 7.

12  Notably, Walgreens provided no substantive response to an interrogatory asking Walgreens to

13  identify its employees responsible for compliance in California.

14                     **3.      Allergan and Teva**

15         The parties have engaged in extensive meet and confers with regard to Allergan Defendants'

16  deficient responses and amended responses to Plaintiff's Interrogatory Nos. 1-4, which seek

17  information on marketing materials and publications (including internet sites) disseminated into San

18  Francisco, and dates and mode of dissemination.  This information is vital to Plaintiff's statutory

19  claims for violations under the False Advertising Law, Cal. Bus. & Prof. Code §17500, *et. seq.*, and

20  the Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et. seq.*  After filing a dispute letter,

21  Defendants have now agreed to provide second amended responses by September 14, 2021.  Several

22  issues, however, remain outstanding with respect to Plaintiff's marketing interrogatories.  The parties

23  have briefed these issues for the Court.

24         Plaintiff continues to meet and confer with Teva regarding its interrogatory responses not

25  addressed in joint dispute letters submitted separately with the court.  *See* Docs 629, 630.  Teva has

26

27  _____
    [5]    A significant number of the hard copy prescriptions that have been produced lack the required
28  metadata to facilitate the association of the hard copies to Walgreens' dispensing data.  Plaintiff will
    meet and confer with Walgreens about this issue.

1  agreed to supplement regarding certain interrogatory responses, but has yet to provide a date by

2  which it will respond.

3  **III.    DEFENDANTS' STATEMENT**

4          **A.       Status of Party Discovery**

5                  **1.       Defendants' Discovery Requests**

6          Following the Court's April 15, 2021 Order for Plaintiff to produce Crime Data Warehouse

7  ("CDW") narratives (Doc. 530), Plaintiff made multiple productions of CDW documents, which

8  were complete on June 10.  On June 17, following review of those productions, Defendants followed

9  up to narrow their prior requests for police department investigation files in response to Defendants'

10 discovery requests to a small percentage of incidents listed in the CDW for which Plaintiff produced

11 the CDW incident reports.  Plaintiff has informed Defendants that it has identified only three

12 responsive investigation files within the narrower set of files requested by Defendants.  Defendants

13 are evaluating the production now.

14         Defendants have also enquired about equivalent databases for incident reports from the San

15 Francisco Sheriff's Department and additional information regarding San Francisco Emergency

16 Medical Services ("EMS") incidents.  Plaintiff has represented that there is no such database for the

17 Sheriff's Department, but as of the date of this status report has not responded to Defendants'

18 questions about EMS incidents.

19         Following the depositions of Dr. Geier and Dr. Fouts, Defendants raised numerous questions

20 regarding substantial discovery gaps brought to light in their depositions.  Plaintiff responded to

21 Defendants' questions about Dr. Fouts' testimony (though Plaintiff's responses require further

22 follow-up).  But Plaintiff largely refused to answer Defendants' questions arising from Dr. Geier's

23 deposition, instead asserting that the volume of questions and requests were "incompatible with the

24 limitations the Court has imposed [sic] discovery in this case."  The parties met and conferred on

25 August 19.

26         Defendants also submitted hundreds of privilege challenges to Plaintiff on August 11, noting

27 what appear to be systemic overbroad and unsubstantiated privilege claims throughout Plaintiff's

28 privilege logs.  Plaintiff has not responded to these challenges.

1   Defendants are continuing to evaluate the extent of Plaintiff's discovery deficiencies, and the

2   parties are meeting and conferring and hope to resolve the issues without this Court's intervention.

3   Defendants are also moving forward as quickly as they can in pursuing depositions and asked for

4   deposition dates for several more of Plaintiff's custodians since the last status conference, but

5   continue to be hamstrung by Plaintiff's ongoing delays in producing the requisite documents and

6   data Defendants need in order to do so.

7                    **2.        Plaintiff's Discovery Requests**

8   Defendants have produced millions of documents in the MDL, which are deemed produced

9   in this case.  In addition, Defendants have made additional productions specific to this case.

10   In advance of the last status conference, **Walgreens** completed its custodial productions,

11   resulting in a production of approximately 50,000 custodial documents, on top of the more than

12   380,000 documents Walgreens has produced in the MDL.  On May 17, Walgreens completed its

13   production of hard copy refusals to fill and Target Drug Good Faith Dispensing checklists resulting

14   in a total hard copy production of over 35,000 documents and over 135,000 pages.[6]

15   On August 13, Walgreens completed its production of electronic due diligence records

16   resulting in a production of over 31 million records.  On August 16, Walgreens substantially

17   completed its production of hard copy prescriptions.  Walgreens will make an additional production

18   of hard copy prescriptions on August 23 and a follow up production approximately one week later.

19   As Walgreens explained in previous status reports, the August 16 deadline was unrealistic to

20   complete this production, and Walgreens has not been able to locate many of the hard copy

21   prescriptions in the sample of 5,000, which dates back over a decade.[7]  Walgreens is conducting

22   additional reviews to determine whether any more of the sample prescriptions can be found.

23   In its section of this status report, Plaintiff complains that Walgreens produced *too many*

24   electronic "notes" fields, and challenges Walgreens' previous representations about those fields.  As

25

26   ───────────────
     [6]    Walgreens has also updated its Interrogatory responses a couple times at Plaintiff's request.

27   [7]    Walgreens produced 31,507,812 records across all of its "notes" productions in San Francisco.
         Walgreens is currently missing hard copies for 3,107 prescriptions, representing less than 0.01% of
28       the total records produced to date.

Walgreens previously explained, Walgreens produced data from seven tables in its dispensing data that include free-text notes fields. In an abundance of caution, Walgreens also produced other fields from the same database tables that house those free-text notes fields, because they may also demonstrate diligence, though they do not contain free-text "notes."[8] Walgreens explained this to Plaintiff in written correspondence on August 12 before completing its electronic notes production. At 11 pm the night the parties exchanged drafts of this status report, Walgreens received a request from Plaintiff for additional information about its "notes" production, including descriptions of some of the data fields. Walgreens produced descriptions of most if not all of those fields several years ago (which Plaintiff acknowledged in its correspondence to Walgreens but failed to mention to the Court). Descriptions of certain of the remaining fields are self-explanatory (e.g., "patient_cmnt" and "prescriber_locations_comment). Walgreens will respond to Plaintiff's new request shortly to provide additional information.

The **Endo** and **Par** Defendants have produced over 5.5 million documents, including over 233,000 documents in this matter specifically. Consistent with the Court's Order dated July 2, 2021 (Doc. 592), by July 21, 2021, Endo completed its investigation of Endo's Commercial Data Warehouse, the SIF2008-2012 database, and the SIF2007 Backup (in each case as defined in the June 30, 2021 Status Report (Doc. 590)) for any additional database backups responsive to Plaintiff's Interrogatory Nos. 1-4, and produced additional data. Specifically, as of July 21, 2021 Endo had produced:

- Call Data containing available information in "message description", "message name", and "reaction description" fields located in and extracted from Endo's Commercial Data Warehouse (produced July 16, 2021);

- Call Data containing additional fields of data for the period 2008 to 2012 (inclusive) entered into Endo's former StayinFront customer relationship management ("CRM") database ("SIF2008-2012") (produced July 16, 2021);

---

[8] These additional fields include drop down indicators such as the relationship between the patient and the person picking up the prescription, and whether a patient has an allergy or other health condition.

- Call Data from a 2007 backup of its StayinFront CRM database ("SIF2007 Backup") that was located on media maintained by a former eDiscovery vendor Endo used in a prior government investigation involving Lidoderm ("Lidoderm Vendor Media") (produced July 21, 2021);

- Materials dropped information associated with calls between 1/2/2013 and 10/24/2014) (produced July 21, 2021).[9]

In addition, the Endo and Par Defendants continue to search data sources for additional documents responsive to pending document requests. On August 10, 2021, Endo produced data located in the same SIF2008-2012 file described above. Although not responsive to Interrogatory Nos. 1-4, this production contained information about healthcare providers ("HCPs") who were identified as being excluded from promotion for certain products ("Excluded Products" production).[10] It is likely that additional documents and data responsive to the Plaintiff's document requests will be located as a result of these and other efforts and that additional productions will be made.

Plaintiff identifies seven specific categories of what it characterizes as "Additional Missing Data," all of which are addressed in Endo's meet-and-confer correspondence dated August 20, 2021 or within this status report. By September 24, 2021, Endo expects to complete its investigation of available speaker data, including from SpeakerNet, and any other potential structured data sources of

---

[9]    As stated in the July 20, 2021 Status Report to this Court, Endo has conducted an exhaustive investigation of the Endo Commercial Data Warehouse in its effort to locate materials dropped data for the remainder of the time period raised by Plaintiff as missing information in previous productions. Nevertheless, it is possible that in the future, Endo will locate additional data points that will allow Endo to perform additional SQL searches of the Endo Commercial Data Warehouse, and in such event, Endo will perform such searches.

[10]    Endo notified Plaintiff that this production would be made during the parties' July 14, 2021 Zoom status update conference. Endo also advised Plaintiff that it expected to produce this additional data after July 21, 2021 to the extent it is relevant and responsive to Plaintiff's discovery requests.

1    HCP payment data.  The Endo and Par Defendants have otherwise completed the investigations

2    about which Plaintiff inquires as set forth in counsel's August 20, 2021 correspondence.[11]

3            The Endo and Par Defendants have engaged in a massive undertaking to identify and produce

4    documents from hundreds of custodians and dozens of non-custodial data sources over a 15+ year

5    time period.  And as reflected above, and in the extraordinary efforts previously reported to this

6    Court to identify and produce historical data, they also remain actively engaged in the process of

7    meeting and conferring with Plaintiff in this matter about all remaining inquiries in a good faith

8    effort to produce responsive materials.[12]

9

10   ---

[11]  Plaintiff asserts that "it appears Endo [previously] took no steps to identify information responsive to Interrogatory Nos. 3 and 4, which seek information relating to representations disseminated by ***publication***."  (Emphasis in original.)  This is incorrect.  As Endo previously explained, including to this Court (Doc. 551 at 6), Endo has produced promotional materials approved for national publication and identified these materials in its discovery responses, but has not identified a centralized repository of data tracking where or when Opana ER journal advertisements were published or otherwise disseminated.  Endo reiterated that on August 5, 2021 based on still further investigation.  Endo did locate documents that provide some information relating to the placement of Opana ER journal ads by EHC Communications for the period of 2007 through 2009; most of these documents had previously been produced, but Endo identified an additional five such documents that were produced on August 17, 2021.  Plaintiff indicated for the first time on August 5, 2021 its position that Endo's support of educational materials published or presented by independent third parties is also responsive to Interrogatory Nos. 3-4, relying on language in the interrogatories referring to materials that Endo "caused to be disseminated."  Endo had previously objected to that phrase as vague and ambiguous.  Nonetheless, information related to Endo's unrestricted grant support for independent third-parties can be located in Endo's Custodial Production, including in the documents produced from the custodial files of those "Endo National Custodians" whose titles indicate that they were in Medical Information, Medical Affairs, or Clinical Affairs, as well as from the documents produced from the custodial file of Bobbie Sue Brown.

Separately, Plaintiff also inquires about Medical Science Liaison ("MSL") interactions pre-2008, 2010 and 2014-2017.  Endo and its outside counsel, including Redgrave, have performed an extensive search for additional MSL interaction data.  To the extent MSL interaction data has been located in structured data sources, it has been produced.  For example, MSL interaction data for the period 2011 to 2013, which was located in Endo's Commercial Data Warehouse, was produced on April 12, 2021.  Endo also produced located in custodial data concerning MSL interactions with HCPs from the period 2008 to 2009 on July 28, 2021.  This data was recently located in spreadsheets attached to emails located in the custodial file of a former IT employee who has no relationship to the subject matter of this litigation.  Documents reflecting other interactions with HCPs occurring after 2013 have also been produced.  Endo will supply CCSF with Bates numbers.  To the extent additional responsive documents are identified, Endo will supplement its production.

[12]  Endo also notes for the Court's awareness that in another opioid matter filed by the City of Chicago, Endo has moved for the appointment of a Special Master to oversee an expedited discovery audit process at its expense, including to assess any alleged deficiencies with respect to their responses to discovery in that matter and related opioid litigation matters and to recommend appropriate relief.  This proposal is not a concession or admission that any prior actions or decisions

1    Notwithstanding the Endo and Par Defendants' enormous investment of time, effort, and
2    resources in these discovery efforts, Plaintiff asserts that certain "concerns persist" regarding the
3    Endo and Par Defendants' discovery efforts.  Plaintiff references the *Staubus* case; but this Court
4    should continue to evaluate the discovery record on the basis of what has occurred in this case.  The
5    record here shows that the Endo and Par Defendants have been transparent about the custodial and
6    non-custodial files collected, the search terms applied, and the parameters of the productions,
7    including through detailed exhibits appended to discovery responses that this Court has previously
8    reviewed.

9    Plaintiff also references an email recently produced that was authored by Linda Kitlinski.
10   Ms. Kitlinski's custodial documents were initially collected from Endo's systems in 2014, and
11   Arnold & Porter is informed that the records relating to the email in question indicate that the
12   contract review attorney that reviewed the email coded it as not responsive (to a New York
13   subpoena) and not relevant (to the City of Chicago litigation).  It appears that the next time the email
14   was reviewed by anyone was in June 2021.  Records indicate that the email was reviewed by a
15   different contract review attorney on June 7, 2021.  Arnold & Porter is informed that the contract
16   attorney coded the document as responsive but possibly privileged.  Because the document was
17   identified as possibly privileged, it underwent a further privilege review.  As part of the process, it
18   was determined not to be privileged and was produced in this matter on August 5, 2021.

19   Finally, Plaintiff notes that certain additional documents were produced prior to the
20   scheduled deposition of Bobbie Sue Brown.  Those documents were identified as a result of searches
21   not specific to this matter, which resulted in 31 additional documents from Ms. Brown's custodial
22   files, all of which were made available as quickly as possible and identified for Plaintiff by Bates
23   number prior to Ms. Brown's deposition.  Plaintiff nonetheless took down the deposition.  At

24

---

25   were not reasonable at the time taken, nor that any responses or objections were not well taken or
26   appropriate; but rather a continued effort to proactively address any concerns.  The proposed order of
     appointment permits the "voluntary participation of [parties from cases pending in other
27   jurisdictions] in the investigation and dispute resolution process overseen by the Special Master."  If
     such Special Master is appointed, CCSF will be invited to participate.  The City of Chicago has
28   indicated its intent to oppose the appointment of the Special Master.

1    Plaintiff's request, Endo is working to reschedule Ms. Brown's deposition and, this week, expects to

2    provide dates for her availability.[13]

3         **Allergan** has deemed produced in this case documents gathered and produced—without

4    geographic limitation—in other opioid cases.  It has also made productions specifically for this case,

5    most recently on March 24, 2021, which included its privilege log.  Allergan's production is

6    substantially complete.  Allergan's position regarding its Interrogatory responses at issue is set out in

7    full in the discovery briefing that is being filed with the Court ahead of the August 24, 2021 hearing.

8    Doc Nos. 628, 630.  Allergan confirms that it has agreed to provide second supplemental responses

9    to Plaintiff's interrogatories, to the extent agreed or ordered, by September 14, 2021.

10        The **Teva** Defendants have produced over 3.2 million documents available to Plaintiff, and

11   have completed the production of documents for the additional agreed regional custodians.

12        **B.    Status of Other Third-Party Discovery**

13        The California Department of Justice ("CA DOJ") produced its CURES data on April 28.

14   On May 14, DOJ made a supplemental production of CURES data correcting issues identified by

15   Walgreens.  Walgreens recently notified Plaintiff and the CA DOJ that it intends to seek re-

16   identification of certain prescribers, including all of Plaintiff's prescribers, contained in the CURES

17   data that CA DOJ produced.  The parties and CA DOJ met and conferred about this issue on July 14.

18   CA DOJ indicated it was not willing to identify Plaintiff's prescribers in the CURES data, even if

19   notice was properly provided, because of its "other" outstanding objections.  The parties asked

20   whether CA DOJ would agree to provide an overlay for the CURES data flagging which prescribers

21   are employed by Plaintiff, but not actually identifying them, in order to help Walgreens limit the

22   number of names it ultimately must seek for identification.  CA DOJ is considering the issue, and the

23   parties continue to go back and forth in attempts to narrow and refine the list of Plaintiff's

24   prescribers.

25

26

27   _____
     [13]   Plaintiff has not yet provided dates for the depositions of Dr. Philip Coffin and Dr. Joseph Pace,
     which were requested on August 4, 2021; and only on August 19, 2021 provided dates in mid-
28   September for Dr. Luke Rodda, which dates were requested on July 16, 2021.

1    In April 2020, Defendants served requests for production on Plaintiff for the production of

2    documents and data from all pertinent subdivisions of the City and County of San Francisco. When

3    the City and County was dismissed as a plaintiff, Plaintiff took the position that certain of its

4    subdivisions were not within Plaintiff's custody and control, requiring third-party subpoenas.

5    Defendants therefore served subpoenas on the San Francisco departments and entities that Plaintiff

6    has deemed outside of its custody and control, including the Department of the Environment,

7    Department of Emergency Management, Board of Supervisors, Controller's Office, Mayor's Office,

8    District Attorney's Office, Department of Human Resources, Health Service System, and Human

9    Services Agency.[14] These subdivisions have responded to the subpoenas, and the parties are in the

10   process of meeting and conferring regarding those responses. The parties will submit disputes to the

11   Court as necessary.

12   Defendants are also pursuing third-party discovery from various state agencies, law

13   enforcement entities, and third-party pharmacies, and have subpoenaed the Medical Board of

14   California, the Dental Board of California, the California Board of Registered Nursing, and the

15   United States Drug Enforcement Administration. Certain of the third-party law enforcement

16   agencies (represented by one of the firms also representing Plaintiff) have objected to the subpoenas

17   and refused to produce documents, including on the basis that their municipality has an opioid-

18   related case pending in the MDL, but Defendants have sought a meet and confer to address the

19   issues without this Court's intervention. Defendants dispute this objection, which cannot deprive

20   Defendants of discovery regarding geographic areas Plaintiff has put at issue in this case.

21   Defendants have met and conferred with many of the other third-party law enforcement entities,

22   most of whom are searching for and producing documents in response to Defendants' subpoenas. A

23   number of the third-party pharmacies have also produced documents responsive to Defendants'

24   requests. Defendants have met and conferred with the Medical Board of California, the Dental

25   Board of California, the California Board of Registered Nursing, and the United States Drug

26   Enforcement Administration, and are negotiating the scope of their productions.

27   ───────────────

28   [14]  Defendants have also served subpoenas on the San Francisco Superior Court and the University of California San Francisco Hospital.

JOINT STATUS UPDATE - 3:18-cv-07591-CRB                                                                  - 17 -
4824-9307-1094.v1

1 | DATED: August 23, 2021

ROBBINS GELLER RUDMAN
    & DOWD LLP
AELISH M. BAIG
HADIYA K. DESHMUKH
TAEVA C. SHEFLER


                s/ Aelish M. Baig
               AELISH M. BAIG

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
aelishb@rgrdlaw.com
hdeshmukh@rgrdlaw.com
tshefler@rgrdlaw.com

DENNIS J. HERRERA
City Attorney
RONALD P. FLYNN
YVONNE R. MERE
OWEN J. CLEMENTS
SARA J. EISENBERG
JAIME M. HULING DELAYE
Deputy City Attorneys
Fox Plaza
1390 Market Street, Sixth Floor
San Francisco, CA  94102
Telephone:  415/554-3957
jaime.hulingdelaye@sfcityatty.org

ROBBINS GELLER RUDMAN
    & DOWD LLP
PAUL J. GELLER
MARK J. DEARMAN
DOROTHY P. ANTULLIS
NICOLLE B. BRITO
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
mdearman@rgrdlaw.com
dantullis@rgrdlaw.com
nbrito@rgrdlaw.com

1

2   ROBBINS GELLER RUDMAN
      & DOWD LLP
3   X. JAY ALVAREZ
    THOMAS E. EGLER
4   655 West Broadway, Suite 1900
    San Diego, CA 92101
5   Telephone: 619/231-1058
    619/231-7423 (fax)
6   jaya@rgrdlaw.com
    tome@rgrdlaw.com
7
    LIEFF, CABRASER, HEIMANN
8       & BERNSTEIN, LLP
    ELIZABETH J. CABRASER
9   RICHARD M. HEIMANN
    PAULINA DO AMARAL
10  KEVIN R. BUDNER
    MICHAEL LEVIN-GESUNDHEIT
11  275 Battery Street, 29th Floor
    San Francisco, CA 94111-3339
12  Telephone: 415/956-1000
    415/956-1008 (fax)
13  ecabraser@lchb.com
    rheimann@lchb.com
14  pdoamaral@lchb.com
    kbudner@lchb.com
15  mlevin@lchb.com

16  RENNE PUBLIC LAW GROUP
    LOUISE RENNE
17  350 Sansome Street, Suite 300
    San Francisco, CA 94104
18  Telephone: 415/848-7240
    415/848-7230 (fax)
19  lrenne@publiclawgroup.com

20  ANDRUS ANDERSON LLP
    JENNIE LEE ANDERSON
21  AUDREY SIEGEL
    155 Montgomery Street, Suite 900
22  San Francisco, CA 94104
    Telephone: 415/986-1400
23  415/986-1474 (fax)
    jennie@andrusanderson.com
24  audrey.siegel@andrusanderson.com

25  SANFORD HEISLER SHARP, LLP
    KEVIN SHARP
26  611 Commerce Street, Suite 3100
    Nashville, TN 37203
27  Telephone: 615/434-7000
    615/434-7020 (fax)
28  ksharp@sanfordheisler.com

SANFORD HEISLER SHARP, LLP
EDWARD CHAPIN
655 West Broadway, Suite 1700
San Diego, CA  92101
Telephone:  619/577-4253
619/577-4250 (fax)
echapin2@sanfordheisler.com

CASEY GERRY SCHENK FRANCAVILLA
     BLATT & PENFIELD LLP
DAVID S. CASEY, JR.
GAYLE M. BLATT
ALYSSA WILLIAMS
110 Laurel Street
San Diego, CA  92101-1486
Telephone:  619/238-1811
619/544-9232 (fax)
dcasey@cglaw.com
gmb@cglaw.com
awilliams@cglaw.com

WEITZ & LUXENBERG P.C.
ELLEN RELKIN
700 Broadway
New York, NY  10003
Telephone:  212/558-5500
212/344-5461 (fax)
erelkin@weitzlux.com

WEITZ & LUXENBERG P.C.
MELINDA DAVIS NOKES
1880 Century Park East
Los Angeles, CA  90067
Telephone:  310/247-0921
310/786-9927 (fax)
mnokes@weitzlux.com

WEITZ & LUXENBERG P.C.
PAUL F. NOVAK
TIFFANY R. ELLIS
3011 W. Grand Blvd, 24th Floor
Detroit, MI  48202
Telephone:  313/800-4170
646/293-7960 (fax)
pnovak@weitzlux.com
tellis@weitzlux.com

*Attorneys for Plaintiff The People of the State of California, acting by and through San Francisco City Attorney Dennis J. Herrera*

1 | DATED: August 23, 2021

2 |     s/ Sean O Morris           s/ Zachary Hill
       SEAN O. MORRIS              ZACHARY HILL

3 |

4 | Sean O. Morris (SBN 200368)           Zachary Hill (S.B. #275886)
John D. Lombardo (SBN 187142)       MORGAN, LEWIS & BOCKIUS LLP
Christopher Beeler (SBN 330496)       One Market, Spear Street Tower

5 | ARNOLD & PORTER                  San Francisco, CA  94105-1596
  KAYE SCHOLER LLP              Telephone: (415) 442-1000

6 | 777 South Figueroa Street, 44th Floor    zachary.hill@morganlewis.com
Los Angeles, CA  90017-5844

7 | Telephone: (213) 243-4000            Eric W. Sitarchuk*
Facsimile: (213) 243-4199             Rebecca J. Hillyer*

8 | sean.morris@arnoldporter.com        MORGAN, LEWIS & BOCKIUS LLP
john.lombardo@arnoldporter.com       eric.sitarchuk@morganlewis.com

9 |                                    rebecca.hillyer@morganlewis.com
*Attorneys for Defendants Endo*      1701 Market Street

10 | *Pharmaceuticals Inc., Endo Health*    Philadelphia, PA  19103-2921
*Solutions Inc., Par Pharmaceutical, Inc.,*   Telephone: +1.215.963.5000

11 | *and Par Pharmaceutical Companies, Inc.*   Facsimile: +1.215.963-5001

12 |                                    Wendy West Feinstein (*pro hac vice*)
                                   MORGAN, LEWIS & BOCKIUS LLP

13 |                                    One Oxford Centre, 32nd Floor
                                   Pittsburgh, PA  15219-6401

14 |                                    Telephone: (412) 560-7455

15 |                                    wendy.feinstein@morganlewis.com

16 |                                    *Attorneys for Defendants*
                                   *Teva Pharmaceuticals USA, Inc., Cephalon,*

17 |                                    *Inc., Actavis LLC, Watson Laboratories, Inc.,*
                                   *and Actavis Pharma, Inc. f/k/a Watson*

18 |                                    *Pharma, Inc.*

19 |                                    *\*Denotes national counsel, pro hac vice*
                                   *forthcoming*

20 |

21 |           s/ Karl Stampfl              s/ Charles J. Stevens

22 | Donna Welch, P.C. (*pro hac vice*)      Charles J. Stevens (SBN 106981)
Timothy W. Knapp, P.C. (*pro hac vice*)    cstevens@gibsondunn.com

23 | Karl Stampfl (*pro hac vice*)          Joshua D. Dick (SBN 268853)
KIRKLAND & ELLIS LLP           jdick@gibsondunn.com

24 | 300 North LaSalle                Kelsey J. Helland (SBN 298888)
Chicago, IL  60654               khelland@gibsondunn.com

25 | Telephone: (312) 862-2000         GIBSON DUNN & CRUTCHER LLP
Facsimile: (312) 862-2200          555 Mission Street, Suite 3000

26 | donna.welch@kirkland.com         San Francisco, CA  94105
tknapp@kirkland.com              Telephone: 415.393.8200

27 | karl.stampfl@kirkland.com          Facsimile: 415.393.8306

28 |

Zachary W. Byer (S.B. #301382)
KIRKLAND & ELLIS LLP
555 South Flower Street
Los Angeles, CA  90071
Telephone: (213) 680-8400
zachary.byer@kirkland.com

Jennifer G. Levy, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington, DC  20004
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
jennifer.levy@kirkland.com

*Attorneys for Defendants*
*Allergan Finance, LLC f/k/a Actavis, Inc.*
*f/k/a Watson Pharmaceuticals, Inc.,*
*Allergan Sales, LLC and Allergan USA, Inc.*
*and specially appearing defendant Allergan*
*plc f/k/a Actavis plc*

Kaspar Stoffelmayr
(*pro hac vice* forthcoming)
kaspar.stoffelmayr@bartlitbeck.com
Katherine M. Swift
(*pro hac vice* forthcoming)
kate.swift@bartlitbeck.com

BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL  60654
Telephone: 312.494.4400
Facsimile: 312.494.4440

Alex Harris
(*pro hac vice* forthcoming)
alex.harris@bartlitbeck.com
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO  80202
Telephone: 303.592.3100
Facsimile: 303.592.3140

*Attorneys for Defendant*
*Walgreens Co.*

s/ Katy E. Koski
James W. Matthews (*pro hac vice*)
Ana M. Francisco (*pro hac vice*)
Katy E. Koski (*pro hac vice*)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA  02199-7610
Telephone: (617) 342-4000
Facsimile: (617) 342-4000
jmatthews@foley.com
francisco@foley.com
kkoski@foley.com
Alan R. Ouellette (CA Bar. No. 272745)
FOLEY & LARDNER LLP
555 California Street, Suite 1700
San Francisco, CA  94104-1520
Telephone: (415) 434-4484
Facsimile: (415) 434-4507
aouellette@foley.com

*Attorneys for Defendant*
*Anda, Inc.*

1

## ATTESTATION

2      I, Aelish M. Baig, am the ECF User whose ID and password are being used to file this Joint

3  Status Update.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that Defendants have

4  concurred in this filing.

5  DATED: August 23, 2021

6

7                                              s/ Aelish M. Baig
                                           AELISH M. BAIG

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    <u>CERTIFICATE OF SERVICE</u>

2          I hereby certify under penalty of perjury that on August 23, 2021, I authorized the electronic

3    filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

4    notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

5    hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

6    non-CM/ECF participants indicated on the attached Manual Notice List.

7                                                        S/ Aelish M. Baig
                                                        AELISH M. BAIG
8
                                                        ROBBINS GELLER RUDMAN
9                                                          & DOWD LLP
                                                        Post Montgomery Center
10                                                       One Montgomery Street, Suite 1800
                                                        San Francisco, CA 94104
11                                                       Telephone: 415/288-4545
                                                        415/288-4534 (fax)
12                                                       E-mail: aelishb@rgrdlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4824-9307-1094.v1

## Mailing Information for a Case 3:18-cv-07591-CRB City and County of San Francisco et al v. Purdue Pharma L.P. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael K. Acquah**
  macquah@hueston.com,docketing@hueston.com,mgreen@hueston.com

- **Scott Manzoor Ahmad**
  SAhmad@winston.com

- **X. Jay Alvarez**
  JayA@rgrdlaw.com,e_file_SD@rgrdlaw.com,mwaligurski@rgrdlaw.com

- **Jennie Lee Anderson**
  jennie@andrusanderson.com,leland.belew@andrusanderson.com,miguel.perez@andrusanderson.com,evelyn.rodas@andrusanderson.com,audrey.siegel@andrusanders

- **Dorothy P. Antullis**
  dantullis@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Aelish Marie Baig**
  AelishB@rgrdlaw.com,panderson@rgrdlaw.com,AYates@rgrdlaw.com,e_file_sd@rgrdlaw.com,mkuwashima@rgrdlaw.com

- **Sarah Jane Bily**
  SBily@winston.com

- **Gayle M Blatt**
  gmb@cglaw.com

- **Steven J. Boranian**
  sboranian@reedsmith.com,drothschild@reedsmith.com

- **Nicolle B Brito**
  NBrito@rgrdlaw.com,jdennis@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Stephen Brody**
  sbrody@omm.com,steve-brody-4796@ecf.pacerpro.com

- **Kevin R. Budner**
  kbudner@lchb.com,mwillin@lchb.com,tlim@lchb.com,rtexier@lchb.com

- **Eric John Buhr**
  ebuhr@reedsmith.com,arochlin@reedsmith.com,aswenson@reedsmith.com

- **Zachary William Byer**
  zachary.byer@kirkland.com

- **Elizabeth J. Cabraser**
  ecabraser@lchb.com

- **Elizabeth Joan Cabraser**
  ecabraser@lchb.com,jremuszka@lchb.com

- **California DOJ**
  klwurster@gmail.com

- **David S. Casey , Jr**
  dcasey@cglaw.com,nancy@cglaw.com,camille@cglaw.com,sleonard@cglaw.com,jdavis@cglaw.com

- **Mark P. Chalos**
  mchalos@lchb.com

- **Edward D. Chapin**
  echapin2@sanfordheisler.com,fsalazar@sanfordheisler.com,jalvarez@sanfordheisler.com

- **Isaac D. Chaput**
  ichaput@cov.com

- **Isaac Daniel Chaput**
  ichaput@cov.com,jhykan@cov.com,docketing@cov.com

- **Owen J. Clements**
  owen.clements@sfcityatty.org,martina.hassett@sfcityatty.org,catheryn.daly@sfcityatty.org

- **Justine Marise Daniels**
  jdaniels@omm.com,justine-daniels-2309@ecf.pacerpro.com

- **James M. Davis**
  jdavis@bholaw.com

- **Cari K. Dawson**
  cari.dawson@alston.com,kate.smith@alston.com

- **Mark Dearman**
  mdearman@rgrdlaw.com,dtack@rgrdlaw.com,e_file_sd@rgrdlaw.com,MDearman@ecf.courtdrive.com,e_file_fl@rgrdlaw.com

- **Mark J. Dearman**
  mdearman@rgrdlaw.com

- **Sharon Desh**
  sharon.desh@bartlitbeck.com

- **Hadiya Khan Deshmukh**
  hdeshmukh@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Joshua David Dick**
  jdick@gibsondunn.com,tmotichka@gibsondunn.com

- **Jaime Dorenbaum**
  jdorenbaum@foley.com,hpruitt@foley.com

- **Thomas Edward Egler**
  tome@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Sara Jennifer Eisenberg**
  sara.eisenberg@sfcityatty.org,john.cote@sfcityatty.org,martina.hassett@sfcityatty.org,yvonne.mere@sfcityatty.org,catheryn.daly@sfcityatty.org

- **Scott Austin Elder**
  scott.elder@alston.com

- **Tiffany Rose Ellis**
  tellis@weitzlux.com,slittman@weitzlux.com,nhryczyk@weitzlux.com

- **Brian M. Ercole**
  brian.ercole@morganlewis.com,peggy.martinez@morganlewis.com

- **Christopher Blair Essig**
  CEssig@swinston.com

- **Wendy West Feinstein**
  wendy.feinstein@morganlewis.com,tammy.miller@morganlewis.com,sarah.wasson@morganlewis.com,picalendaring@morganlewis.com,tamara.giulianelli@morganl

- **Padraic William Foran**
  pforan@hueston.com,docketing@hueston.com,eupton@hueston.com

- **Ana Maria Francisco**
  afrancisco@foley.com

- **Paul J. Geller**
  pgeller@rgrdlaw.com,swinkles@rgrdlaw.com,swinkles@ecf.courtdrive.com,e_file_fl@rgrdlaw.com,pgeller@ecf.courtdrive.com

- **Patricia Camille Guerra**
  camille@cglaw.com

- **August P. Gugelmann**
  august@smllp.law,august@ecf.courtdrive.com

- **Alex J. Harris**
  alex.harris@bartlitbeck.com,anne.doyle@bartlitbeck.com

- **Brent Allen Hawkins**
  brent.hawkins@morganlewis.com,julie.costello@morganlewis.com,CHCalendarDepartment@morganlewis.com

- **Richard Martin Heimann**
  rheimann@lchb.com

- **Gregory Heinen**
  gheinen@foley.com,greg-heinen-7499@ecf.pacerpro.com

- **Kelsey John Helland**
  khelland@gibsondunn.com,dgriffin@gibsondunn.com

- **Jenny Ann Hergenrother**
  jenny.mendelsohn@alston.com,jenny.hergenrother@alston.com

- **Dennis J. Herrera**
  cityattorney@sfcityatty.org,brittany.feitelberg@sfcityatty.org

- **Zachary Hill**
  zachary.hill@morganlewis.com,wendy.feinstein@morganlewis.com,rebecca.hillyer@morganlewis.com,evan.jacobs@morganlewis.com

- **Karen O'Brien Hourigan**
  khourigan@redgravellp.com,sloving@redgravellp.com

- **John Charles Hueston**
  jhueston@hueston.com,lhiles@hueston.com

- **Jaime Marie Huling Delaye**
  jaime.hulingdelaye@sfcityatty.org,martina.hassett@sfcityatty.org,sarah.gutierrez@sfcityatty.org,catheryn.daly@sfcityatty.org

- **Traci Janelle Irvin**
  traci.irvin@ropesgray.com,courtalert@ropesgray.com

- **Daniel G. Jarcho**
  daniel.jarcho@alston.com

- **Sten A. Jernudd**
  sten.jernudd@bartlitbeck.com

- **Sarah Barr Johansen**
  sjohansen@reedsmith.com,AHenderson@reedsmith.com

- **Moez Mansoor Kaba**
  mkaba@hueston.com,rmassing@hueston.com,docketing@hueston.com,eupton@hueston.com

- **Jeremy T Kamras**
  jeremy.kamras@arnoldporter.com,nicholas.zebrowski@arnoldporter.com,ecf-45a1d8277e87@ecf.pacerpro.com,ashley.gomez@arnoldporter.com,SFCalendar@aporter.com

- **Timothy William Knapp**
  tknapp@kirkland.com

- **Katy E Koski**
  kkoski@foley.com

- **Amy Jean Laurendeau**
  alaurendeau@omm.com,amy-laurendeau-9969@ecf.pacerpro.com,sstewart@omm.com

- **Michael Ian Levin-Gesundheit**
  mlevin@lchb.com

- **Jennifer Gardner Levy**
  jennifer.levy@kirkland.com

- **Charles Coleman Lifland**
  clifland@omm.com,charles-lifland-4890@ecf.pacerpro.com

- **John David Lombardo**
  John.Lombardo@arnoldporter.com,edocketscalendaring@arnoldporter.com,maondca@arnoldporter.com,ecf-eef1531ec3db@ecf.pacerpro.com,William.Costley@arnoldporter.com

- **Amy Lucas**
  alucas@omm.com,amy-lucas-1835@ecf.pacerpro.com

- **Enu A Mainigi**
  emainigi@wc.com

- **Miriam Ellora Marks**
  mmarks@lchb.com

- **James W Matthews**
  jmatthews@foley.com

- **Shannon Elise McClure**
  smcclure@reedsmith.com,reed-smith-2312@ecf.pacerpro.com,shannon-mcclure-1157@ecf.pacerpro.com,eselfridge@reedsmith.com

- **Colleen Marie McNamara**
  CMcNamara@wc.com

- **Yvonne Rosil Mere**
  yvonne.mere@sfcityatty.org,martina.hassett@sfcityatty.org

- **Andrew Miller**
  amiller@sanfordheisler.com

- **Sean OLeary Morris**
  sean.morris@arnoldporter.com,edocketscalendaring@arnoldporter.com,vincent.esparza@arnoldporter.com,stacie.james@arnoldporter.com,rebecca.mcnew@arnoldpor

- **Melinda Davis Nokes**
  mnokes@weitzlux.com,lschultz@weitzlux.com,tellis@weitzlux.com,rcerci@weitzlux.com,jfarrell@weitzlux.com,dsavours@weitzlux.com

- **Paul F. Novak**
  pnovak@weitzlux.com,cgarcia@weitzlux.com,nhryczyk@weitzlux.com

- **Alan Ouellette**
  aouellette@foley.com,llanglois@foley.com,wdelvalle@foley.com,alan-ouellette-5627@ecf.pacerpro.com

- **Andreas Michael Petasis**
  apetasis@hueston.com,docketing@hueston.com,sjones@hueston.com

- **Michael P. Piggins**
  mpiggins@weitzlux.com

- **Christian James Pistilli**
  cpistilli@cov.com

- **Jacob Henry Polin**
  jpolin@lchb.com

- **Luke Samuel Porter**
  lporter@reedsmith.com,gchiu@reedsmith.com,kjkelly@reedsmith.com

- **Louise Hornbeck Renne**
  lrenne@publiclawgroup.com,kbeaton@publiclawgroup.com,RPLG-docket@publiclawgroup.com

- **Jonathan Charles Sandler**
  jsandler@bhfs.com,pherron@bhfs.com

- **Molly Ellen Selway**
  Molly.Selway@doj.ca.gov

- **Nathan E. Shafroth**
  nshafroth@cov.com,ktrempy@cov.com,echiulos@cov.com,rlu@cov.com,ncutright@cov.com,rvantassell@cov.com,docketing@cov.com,isaac-chaput-8316@ecf.pacerpro.com

- **Taeva Cantor Shefler**
  TShefler@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jordan Tyler Shewmaker**
  jshewmaker@jonesday.com

- **Audrey Claire Siegel**
  audrey.siegel@andrusanderson.com

- **Reid Smith**
  RFSmith@winston.com

- **Elizabeth Anne Sperling**
  elizabeth.sperling@alston.com,Jennifer.lathrop@alston.com

- **Karl Anton Stampfl**
  karl.stampfl@kirkland.com

- **Charles Joseph Stevens**
  cstevens@gibsondunn.com,smaruschak@gibsondunn.com

- **Michael Fraser Stoer**
  mstoer@jonesday.com,dprzywara@jonesday.com,AtlantaDocket@jonesday.com

- **Kaspar J. Stoffelmayr**
  kaspar.stoffelmayr@bartlit-beck.com

- **Sabrina Heron Strong**
  sstrong@omm.com,sabrina-strong-4823@ecf.pacerpro.com

- **Edward W. Swanson**
  ed@smllp.law,AmyMcGugian@ecf.courtdrive.com,ed@ecf.courtdrive.com,britt@ecf.courtdrive.com

- **Katherine Marquess Swift**
  kate.swift@bartlitbeck.com

- **Russell E Taylor**
  rtaylor@fbm.com,grenteria@fbm.com,calendar@fbm.com

- **Nicole R. Trama**
  Nicole.Trama@doj.ca.gov

- **Rocky C. Tsai**
  rocky.tsai@ropesgray.com,CourtAlert@RopesGray.com

- **Richard Allen VanDuzer**
  rvanduzer@fbm.com,jamante@fbm.com,calendar@fbm.com

- **Amy Vanni**
  avanni@mccarter.com

- **Daniel Nathan Vinson**
  dvinson@hueston.com,ddelgrande@hueston.com

- **Neelum Jane Wadhwani**
  nwadhwani@wc.com,CardinalWVParalegals@wc.com

- **Donna Marie Welch**
  dwelch@kirkland.com

- **Graham D Welch**
  gwelch@foley.com

- **Alyssa M Williams**
  awilliams@cglaw.com

- **Sonya Diane Winner**
  swinner@cov.com,docketing@cov.com,calsbury@cov.com

- **Carl Brandon Wisoff**
  bwisoff@fbm.com,calendar@fbm.com,svillalobos@fbm.com

- **Keith Lee Wurster**
  keith.wurster@doj.ca.gov,klwurster@gmail.com,lindsey.cannan@doj.ca.gov

- **Douglas R. Young**
  dyoung@fbm.com,calendar@fbm.com

- **Paulina do Amaral**
  pdoamaral@lchb.com,catkins@lchb.com,fwhite@lchb.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Jennifer          Machlin Cecil
Winston & Strawn LLP
101 California Street, 35th Floor
San Francisco, CA 94111

Kaitlyn           L. Coverstone
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

Paul              Laprairie
Andrus Anderson1 LLP
155 Montgomery Street, 900
San Francisco, CA 94104
```

# EXHIBIT 14

**IN THE U.S. DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| APPLE INC., | |
| *Plaintiff,* | C.A. No. 22-1377-MN-JLH |
| v. | |
| MASIMO CORPORATION and SOUND UNITED, LLC, | **JURY TRIAL DEMANDED** |
| *Defendants.* | |
| MASIMO CORPORATION, | |
| *Counter-Claimant,* | |
| v. | |
| APPLE INC. | |
| *Counter-Defendant.* | |
| APPLE INC., | |
| *Plaintiff,* | C.A. No. 22-1378-MN-JLH |
| v. | |
| MASIMO CORPORATION and SOUND UNITED, LLC, | **JURY TRIAL DEMANDED** |
| *Defendants.* | |
| MASIMO CORPORATION and CERCACOR LABORATORIES, INC., | |
| *Counter-Claimants,* | |
| v. | |
| APPLE INC. | |
| *Counter-Defendant.* | |

**DISCLOSURES OF COUNTER-CLAIMANTS
MASIMO CORPORATION AND CERCACOR LABORATORIES, INC.
PURSUANT TO PARAGRAPH 7(A) OF THE SCHEDULING ORDER**

Pursuant to Paragraph 7(a) of the Scheduling Order, Counter-Claimants Masimo Corporation and Cercacor Laboratories, Inc. (collectively, "Masimo") hereby make the following disclosures to Plaintiff and Counter-Defendant Apple Inc. ("Plaintiff" or "Apple").

## A.     Identification of Asserted Patents

- U.S. Patent No. 10,912,501 (the "'501 Patent");

- U.S. Patent No. 10,912,502 (the "'502 Patent");

- U.S. Patent No. 10,945,648 (the "'648 Patent");

- U.S. Patent No. 10,687,743 (the "'743 Patent");

- U.S. Patent No. 10,687,745 (the "'745 Patent");

- U.S. Patent No. 10,722,159 (the "'159 Patent");

- U.S. Patent No. 7,761,127 (the "'127 Patent");

- U.S. Patent No. 8,190,223 (the "'223 Patent");

- U.S. Patent No. 10,736,507 (the "'507 Patent"); and

- U.S. Patent No. 10,984,911 (the "'911 Patent").

## B.     Identification of Accused Products

- Apple Watch including Series 6, 7, 8, and Ultra

    o '501 Patent;

    o '502 Patent;

    o '648 Patent;

- o    '743 Patent;

- o    '745 Patent;

- o    '159 Patent;

- o    '127 Patent;

- o    '223 Patent; and

- o    '911 Patent.

- Apple Watch including Series 6, 7, 8, and Ultra, together with a compatible iPhone

  - o    '507 Patent;

  - o    '223 Patent;

  - o    '743 Patent;

  - o    '745 Patent; and

  - o    '159 Patent.

## C.    Identification of Patent Damages Model

Masimo seeks lost profits.  Masimo seeks a reasonable royalty for any sales for which it is not entitled to recover lost profits.

### 1.    Lost Profits

But for Apple's infringement, Apple would have purchased pulse oximetry sensor modules from Masimo to incorporate into Apple's infringing Apple Watches.

When Masimo designed its W1 health watch, Masimo developed a pulse-

oximetry sensor module as a component of that watch. That module contains the necessary hardware and software to perform light-based monitoring to calculate parameters such as pulse rate and blood oxygen. The module also includes components to perform ECG measurements. Besides designing the module for its own products, Masimo designed its module so that it could be used in third-party wrist-worn sensing products either as is or customized to the customer's specifications.

Additionally, Masimo has suffered lost profits on service revenue. Had Apple incorporated Masimo's sensor module into the Apple Watch, consumers who purchased an Apple Watch with a Masimo module would have purchased monthly services and applications, including continuous monitoring, insights into health trends, assessments of overall wellness and sleep quality health, health data sharing, in-depth health reports, data storage, and health coaching.

## 2. **Reasonable Royalty**

For any infringing sale for which Masimo cannot establish its lost profits, Masimo is entitled to a reasonable royalty. The royalty would be calculated based on the result of a hypothetical negotiation conducted at the time infringement began.

The royalty would depend on several factors, including that Masimo does not regularly license its technology independently from the purchase of an OEM module from Masimo, Masimo would have considered Apple a competitor in the health-

watch market, Masimo seeks to sell its sensor modules to other companies as an OEM, Masimo's medical-grade technology could expand Apple's market, and Masimo's technology would generate a recurring monthly-service-revenue stream. Thus, by licensing Apple, Masimo would be providing a tremendous opportunity to Apple while increasing competition to its own W1 and Freedom watches, as well as competition to any third party that purchased a sensor module from Masimo.

**D.    File Histories**

Masimo is concurrently producing copies of the file histories of the above identified patents.

Respectfully submitted,

May 15, 2023                                                 PHILLIPS MCLAUGHLIN & HALL, P.A.

Of Counsel:                                                  By: */s/ John C. Phillips, Jr.*
                                                             John C. Phillips, Jr. (No. 110)
Joseph R. Re                                                 Megan C. Haney (No. 5016)
Stephen C. Jensen                                            1200 North Broom Street
Stephen W. Larson                                            Wilmington, DE 19806
Benjamin A. Katzenellenbogen                                 (302) 655-4200 Telephone
Jared C. Bunker                                              (302) 655-4210 Fax
Douglas B. Wentzel                                           jcp@pmhdelaw.com
Knobbe, Martens, Olson & Bear, LLP                           mch@pmhdelaw.com
2040 Main Street, 14th Floor
Irvine, CA  92614                                            *Counsel for Defendants*
(949) 760-0404 Telephone                                     *Masimo Corporation and Sound United,*
(949) 760-9502 Facsimile                                     *LLC  and  Counter-Claimants  Masimo*
joe.re@knobbe.com                                            *Corporation and Cercacor Laboratories,*
steve.jensen@knobbe.com                                      *Inc.*
stephen.larson@knobbe.com
ben.katzenellenbogen@knobbe.com

jared.bunker@knobbe.com
douglas.wentzel@knobbe.com

Brian Horne
Knobbe, Martens, Olson & Bear, LLP
1925 Century Park East, Suite 600
Los Angeles, CA 90067
(310) 551-3450 Telephone
(310) 551-3458 Facsimile
brian.horne@knobbe.com

Adam Powell
Knobbe, Martens, Olson & Bear, LLP
3579 Valley Centre Drive, Suite 300
San Diego, CA 92130
(858) 707-4000 Telephone
(858) 707-4001 Facsimile
adam.powell@knobbe.com

# CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2023, a true and correct copy of the foregoing document was served on the following counsel of record at the addresses and in the manner indicated:

*VIA ELECTRONIC MAIL:*

| | |
|---|---|
| David E. Moore<br>Bindu A. Palapura<br>Hercules Plaza, 6th Floor<br>1313 N. Market Street<br>Wilmington, DE 19801<br>dmoore@potteranderson.com<br>bpalapura@potteranderson.com | John M. Desmarais<br>Kerri-Ann Limbeek<br>Cosmin Maier<br>Jordan N. Malz<br>Benjamin N. Luehrs<br>Joze Welsh<br>Jamie L. Kringstein<br>DESMARAIS LLP<br>230 Park Avenue<br>New York, NY 10169<br>jdesmarais@desmaraisllp.com<br>klimbeek@desmaraisllp.com<br>cmaier@desmaraisllp.com<br>jmalz@desmaraisllp.com<br>bluehrs@desmaraisllp.com<br>jwelsh@desmaraisllp.com<br>jkringstein@desmaraisllp.com |
| Peter C. Magic<br>DESMARAIS LLP<br>101 California Street<br>San Francisco, CA 94111<br>pmagic@desmaraisllp.com | Jennifer Milici<br>Dominic Vote<br>Leon B. Greenfield<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>1875 Pennsylvania Avenue, NW<br>Washington DC 20006<br>jennifer.milici@wilmerhale.com<br>dominic.vote@wilmerhale.com<br>leon.greenfield@wilmerhale.com |
| Mark A. Ford<br>Wilmer Cutler Pickering Hale and Dorr LLP | |

| 60 State Street<br>Boston, MA 02109<br>mark.ford@wilmerhale.com | |
|---|---|

May 15, 2023

*/s/ Megan C. Haney*
Megan C. Haney (No. 5016)

57609531

# EXHIBIT 15

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 16

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-K**

**(Mark One)**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended January 1, 2022**
**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**
**Commission File Number 001-33642**

**MASIMO CORPORATION**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| DE | 33-0368882 |
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification Number)** |
| 52 Discovery        Irvine,        CA | 92618 |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(949)   297-7000**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class: | Trading symbol: | Name of each exchange on which registered: |
|---|---|---|
| Common Stock, par value $0.001 | MASI | The Nasdaq Stock Market, LLC |

**Securities registered pursuant to Section 12(g) of the Act:**
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   ☒ Yes   ☐ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   ☐ Yes   ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   ☒ Yes   ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   ☒ Yes   ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.   ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.   ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.)   ☐ Yes   ☒ No

The aggregate market value of the voting stock held by non-affiliates of the registrant, based upon the closing sale price of the common stock on July 3, 2021, the last business day of the registrant's most recently completed second fiscal quarter, as reported on the Nasdaq Global Select Market, was approximately $10.9 billion. Shares of stock held by officers, directors and 5 percent or more stockholders have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes. At January 29, 2022, the registrant had 55,364,690 shares of common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Items 10, 11, 12, 13 and 14 of Part III of this Annual Report on Form 10-K incorporate information by reference from the registrant's proxy statement for the registrant's 2022 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission within 120 days after the close of the fiscal year covered by this annual report on Form 10-K.

Table of Contents

**MASIMO CORPORATION**
**FISCAL YEAR 2021 FORM 10-K ANNUAL REPORT**
**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| | **PART I** | |
| Item 1 | Business | 1 |
| Item 1A | Risk Factors | 36 |
| Item 1B | Unresolved Staff Comments | 64 |
| Item 2 | Properties | 65 |
| Item 3 | Legal Proceedings | 65 |
| Item 4 | Mine Safety Disclosures | 65 |
| | **PART II** | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 66 |
| Item 6 | Reserved | 68 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 69 |
| Item 7A | Quantitative and Qualitative Disclosures about Market Risk | 78 |
| Item 8 | Financial Statements and Supplementary Data | 79 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 79 |
| Item 9A | Controls and Procedures | 79 |
| Item 9B | Other Information | 79 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 80 |
| | **PART III** | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 80 |
| Item 11 | Executive Compensation | 80 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 80 |
| Item 13 | Certain Relationships and Related Transactions and Director Independence | 80 |
| Item 14 | Principal Accounting Fees and Services | 80 |
| | **PART IV** | |
| Item 15 | Exhibits and Financial Statement Schedules | 81 |
| Item 16 | Form 10-K Summary | 84 |
| Signatures | | 85 |

Table of Contents

**ITEM 7.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read this discussion together with the financial statements, related notes and other financial information included in this Annual Report on Form 10-K. The following discussion may contain predictions, estimates and other forward-looking statements that involve a number of risks and uncertainties, including those discussed under Item 1A—"Risk Factors" and elsewhere in this Annual Report on Form 10-K. These risks could cause our actual results to differ materially from any future performance suggested below.*

### Executive Overview

We are a global medical technology company that develops, manufactures and markets a variety of noninvasive monitoring technologies and hospital automation™ solutions. Our mission is to improve patient outcomes and reduce the cost of patient care. Our patient monitoring solutions generally incorporate a monitor or circuit board, proprietary single-patient use or reusable sensors, software and/or cables. We provide our products to hospitals, emergency medical service (EMS) providers, home care providers, long-term care facilities, physician offices, veterinarians and consumers through our direct sales force, distributors and original equipment manufacturers (OEM) partners. We were incorporated in California in May 1989 and reincorporated in Delaware in May 1996.

Our core business is Measure-through Motion and Low Perfusion™ pulse oximetry, known as Masimo Signal Extraction Technology® (SET®) pulse oximetry. Our product offerings have expanded significantly over the years to also include noninvasive monitoring of blood constituents with an optical signature, optical regional oximetry monitoring, electrical brain function monitoring, acoustic respiration monitoring and exhaled gas monitoring. In addition, we have developed the Root® patient monitoring and connectivity platform, the Radical-7® and Rad-97® bedside and portable patient monitors and the Radius-7® wearable wireless patient monitor. We have also developed hospital automation™ and connectivity solutions, such as the Masimo Patient SafetyNet™ supplemental remote patient surveillance and monitoring system, which currently allows up to 200 patients to be monitored and viewed simultaneously and remotely through a PC-based monitor or by care providers through their pagers, voice-over-IP phones or smartphones; Iris® and Iris® Gateway, which allow the transfer of data from Masimo and third-party devices to hospital electronic medical records; and UniView™, which provides an integrated display of real-time data from Masimo and third-party devices. Please see Part I, Item 1 of this Annual Report on Form 10-K for additional information related to our business, products and technologies.

### COVID-19 Pandemic

The COVID-19 pandemic has created significant uncertainty in the U.S. and around the globe, resulting in both challenges and opportunities for our business. We are committed to being as transparent as possible with our investors, employees, customers, suppliers and business partners as we collectively work to respond to this crisis. In response to this situation, we have implemented a number of precautionary measures at our facilities, including requiring certain personnel to work remotely from home and enacting social distancing, requiring face masks and mandatory screening for symptoms associated with COVID-19 for critical personnel that are required to report to our facilities to work. We have introduced new products, such as Masimo SafetyNet™ and Masimo SafetyNet-Open™ and Masimo SafetyNet Alert™, to help combat the COVID-19 pandemic, and continue to make charitable pledges to various global health organizations to support global COVID-19 relief efforts.

Given the uncertainties related to the COVID-19 pandemic, we cannot predict the extent to which the fluctuations in product demand we have experienced will continue or any resulting changes in our product mix, as well as the associated gross margin impact from those fluctuations in boards and instruments sales. In addition, the fluctuations in demand could result in potential reductions in future demand if our customers have over purchased our products and need to consume their excess inventory before purchasing additional products. Furthermore, we continue to be exposed to potential disruptions to our manufacturing operations, disruptions in the manufacturing supply chain of critical components and in our workforce as circumstances surrounding the global impact of the COVID-19 pandemic continue to change. Please see *"Risks Related to Our Revenues"* and *"Risks Related to our Business and Operations"* in Part I, Item 1A of this Annual Report on Form 10-K for additional information on potential negative impacts to us resulting from the COVID-19 pandemic.

### Stock Repurchase Program

In October 2021, our Board approved a stock repurchase program, authorizing us to purchase up to 3.0 million shares of our common stock over a period of up to three years (2021 Repurchase Program). The 2021 Repurchase Program may be carried out at the discretion of a committee comprised of our CEO and CFO through open market purchases, one or more Rule 10b5-1 trading plans, block trades and in privately negotiated transactions. For additional information regarding our current and prior stock repurchase programs, see Part II, Item 5 and Note 17 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

*Cercacor*

Cercacor Laboratories, Inc. (Cercacor) is an independent entity spun off from us to our stockholders in 1998. Joe Kiani, our Chairman and Chief Executive Officer (CEO), is also the Chairman and CEO of Cercacor. We are a party to a cross-licensing agreement with Cercacor, which was amended and restated effective January 1, 2007 (the Cross-Licensing Agreement), which governs each party's rights to certain intellectual property held by the two companies. See Note 3 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K for additional information related to Cercacor.

*Results of Operations*

The following table sets forth, for the periods indicated, our results of operations expressed as U.S. Dollar amounts and as a percentage of revenue (dollars in thousands).

| | Year Ended January 1, 2022 | | | Year Ended January 2, 2021 | | |
|---|---|---|---|---|---|---|
| | Amount | | % of Revenue | Amount | | % of Revenue |
| Product revenue | $ | 1,239,153 | 100.0 % | $ | 1,143,744 | 100.0 % |
| Cost of goods sold | | 430,806 | 34.8 | | 400,679 | 35.0 |
| Gross profit | | 808,347 | 65.2 | | 743,065 | 65.0 |
| Operating expenses: | | | | | | |
| Selling, general and administrative | | 395,291 | 31.9 | | 369,057 | 32.3 |
| Research and development | | 137,234 | 11.1 | | 118,659 | 10.4 |
| Litigation awards, settlements/or defense costs | | — | — | | (474) | — |
| Total operating expenses | | 532,525 | 43.0 | | 487,242 | 42.6 |
| Operating income | | 275,822 | 22.3 | | 255,823 | 22.4 |
| Non-operating (loss) income | | (1,442) | (0.1) | | 7,913 | 0.7 |
| Income before provision for income taxes | | 274,380 | 22.1 | | 263,736 | 23.1 |
| Provision for income taxes | | 44,733 | 3.6 | | 23,454 | 2.1 |
| Net income | $ | 229,647 | 18.5 % | $ | 240,282 | 21.0 % |

*Comparison of the Year ended January 1, 2022 to the Year ended January 2, 2021*

*Revenue.* Product revenue increased $95.4 million, or 8.3%, to $1,239.2 million for the year ended January 1, 2022, from $1,143.7 million for the year ended January 2, 2021. The following table details our total product revenues by the geographic area to which the products were shipped for the years ended January 1, 2022 and January 2, 2021 (dollars in thousands):

| | Year Ended January 1, 2022 | | | Year Ended January 2, 2021 | | | Increase/ (Decrease) | | Percentage Change |
|---|---|---|---|---|---|---|---|---|---|
| United States (U.S.) | $ | 822,410 | 66.4 % | $ | 763,069 | 66.7 % | $ | 59,341 | 7.8 % |
| Europe, Middle East and Africa | | 251,839 | 20.3 | | 238,681 | 20.9 | | 13,158 | 5.5 |
| Asia and Australia | | 123,595 | 10.0 | | 103,756 | 9.1 | | 19,839 | 19.1 |
| North and South America (excluding U.S.) | | 41,309 | 3.3 | | 38,238 | 3.3 | | 3,071 | 8.0 |
| Product revenue | $ | 1,239,153 | 100.0 % | $ | 1,143,744 | 100.0 % | $ | 95,409 | 8.3 % |

This increase was primarily due to higher revenue from consumables, parameters and services, as well as the impact of approximately $8.2 million of favorable foreign exchange rate movements from the prior year that increased the U.S. Dollar translation of foreign sales that were denominated in various foreign currencies. During the year ended January 1, 2022, we shipped approximately 289,000 noninvasive technology boards and monitors.

Product revenue generated through our direct and distribution sales channels increased $140.3 million, or 14.6%, to $1,099.1 million for the year ended January 1, 2022, compared to $958.8 million for the year ended January 2, 2021. Revenues from our OEM channel decreased $44.9 million, or 24.3%, to $140.1 million for the year ended January 1, 2022 as compared to $185.0 million for the year ended January 2, 2021.

*Gross Profit.* Gross profit consists of product revenue less cost of goods sold. Our gross profit for the years ended January 1, 2022 and January 2, 2021 were as follows (dollars in thousands):

| Gross Profit | | | | | |
|---|---|---|---|---|---|
| Year Ended January 1, 2022 | Percentage of Revenues | Year Ended January 2, 2021 | Percentage of Revenues | Increase/ (Decrease) | Percentage Change |
| $808,347 | 65.2% | $743,065 | 65.0% | $65,282 | 8.8% |

Cost of goods sold includes labor, material, overhead and other similar costs related to the production, supply, distribution and support of our products. Cost of goods sold increased $30.1 million to $430.8 million for the year ended January 1, 2022, from $400.7 million for the year ended January 2, 2021, primarily due to higher material, manufacturing and distribution costs associated with the mix of products sold.

Gross profit as a percentage of revenues increased to 65.2% for the year ended January 1, 2022 from 65.0% for the year ended January 2, 2021, primarily due to an increase in product revenue and favorable revenue mix.

*Selling, General and Administrative.* Selling, general and administrative expenses consist primarily of salaries, stock-based compensation and related expenses for sales, marketing and administrative personnel, sales commissions, advertising and promotion costs, professional fees related to legal, accounting and other outside services, public company costs and other corporate expenses. Selling, general and administrative expenses for the years ended January 1, 2022 and January 2, 2021 were as follows (dollars in thousands):

| Selling, General and Administrative | | | | | |
|---|---|---|---|---|---|
| Year Ended January 1, 2022 | Percentage of Revenues | Year Ended January 2, 2021 | Percentage of Revenues | Increase/ (Decrease) | Percentage Change |
| $395,291 | 31.9% | $369,057 | 32.3% | $26,234 | 7.1% |

Selling, general and administrative expenses increased $26.2 million, or 7.1%, to $395.3 million for the year ended January 1, 2022 from $369.1 million for the year ended January 2, 2021. This increase was primarily attributable to higher compensation and other employee-related costs of approximately $20.4 million, higher legal and professional fees of approximately $16.7 million, higher occupancy and other office-related costs of approximately $5.2 million and higher travel costs of approximately $2.1 million, which were partially offset by a reduction in advertising and marketing-related expenses of approximately $19.2 million, and a reduction in contributions of approximately $0.9 million.

*Research and Development.* Research and development expenses consist primarily of salaries, stock-based compensation and related expenses for engineers and other personnel engaged in the design and development of our products. These expenses also include third-party fees paid to consultants, prototype and engineering supply expenses and the costs of clinical trials. Research and development expenses for the years ended January 1, 2022 and January 2, 2021 were as follows (dollars in thousands):

| Research and Development | | | | | |
|---|---|---|---|---|---|
| Year Ended January 1, 2022 | Percentage of Revenues | Year Ended January 2, 2021 | Percentage of Revenues | Increase/ (Decrease) | Percentage Change |
| $137,234 | 11.1% | $118,659 | 10.4% | $18,575 | 15.7% |

Research and development expenses increased $18.6 million, or 15.7%, to $137.2 million for the year ended January 1, 2022 from $118.7 million for the year ended January 2, 2021, primarily due to higher compensation-related costs of approximately $12.3 million, higher engineering project costs of approximately $3.9 million and higher occupancy and office fees of $2.6 million, which were partially offset by lower professional fees of approximately $0.7 million.

*Non-operating (Loss) Income.* Non-operating (loss) income consists primarily of interest income, interest expense and foreign exchange gains and losses. Non-operating (loss) income for the years ended January 1, 2022 and January 2, 2021 were as follows (dollars in thousands):

| Non-operating (Loss) Income | | | | | |
|---|---|---|---|---|---|
| Year Ended January 1, 2022 | Percentage of Revenues | Year Ended January 2, 2021 | Percentage of Revenues | Increase/ (Decrease) | Percentage Change |
| $(1,442) | (0.1)% | $7,913 | 0.7% | $(9,355) | (118.2)% |

Non-operating (loss) was $1.4 million for the year ended January 1, 2022, as compared to $7.9 million of non-operating income for the year ended January 2, 2021. This net decrease of approximately $9.4 million was primarily due to approximately

$4.6 million in lower interest income and approximately $4.5 million of net realized and unrealized loss on foreign currency denominated transactions during the year ended January 1, 2022.

*Provision for Income Taxes.* Our provision for income taxes for the years ended January 1, 2022 and January 2, 2021 were as follows (dollars in thousands):

| | Provision for Income Taxes | | | | | |
|---|---|---|---|---|---|---|
| Year Ended January 1, 2022 | Percentage of Revenues | Year Ended January 2, 2021 | Percentage of Revenues | Increase/ (Decrease) | Percentage Change |
| $44,733 | 3.6% | $23,454 | 2.1% | $21,279 | 90.7% |

Our provision for income taxes was $44.7 million for the year ended January 1, 2022 compared to $23.5 million for the year ended January 2, 2021. Our effective tax rate was 16.3% for the year ended January 1, 2022 compared to 8.9% for the year ended January 2, 2021. This increase in our effective tax rate for the year ended January 1, 2022 resulted primarily from an decrease in the amount of excess tax benefits realized from stock-based compensation pursuant to Accounting Standards Update (ASU) No. 2016-09, *Compensation—Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting* (ASU 2016-09), of approximately $13.7 million compared to the year ended January 2, 2021.

We have made no provision for U.S. income taxes or foreign withholding taxes on approximately $180.6 million in accumulated earnings from our foreign subsidiaries as we expect that such amounts will continue to be indefinitely reinvested in operations outside the U.S. Our effective tax rate was lower than the U.S. federal statutory rate primarily due to a portion of our earnings being generated from countries other than the U.S., where such earnings are generally subject to lower tax rates than the U.S., excess tax benefits from U.S. stock-based compensation and research and development tax credits. While we expect our worldwide consolidated effective tax rate will continue to be lower than the U.S. federal statutory rate, our actual future effective income tax rate will depend on various factors, including the geographic composition of our pre-tax income, the amount of excess tax benefits realized from U.S. stock-based compensation, the amount of our research and development tax credits, the deductibility of executive compensation, changes in tax laws, changes in deferred tax asset valuation allowances and the recognition and derecognition of tax benefits associated with uncertain tax positions.

### *Comparison of the Year ended January 2, 2021 to the Year ended December 28, 2019*

For a discussion regarding our financial condition and results of operations for the year ended January 2, 2021 as compared to the year ended December 28, 2019, refer to the discussion under the heading "Comparison of the Year ended January 2, 2021 to the Year ended December 28, 2019" in Item 7, which should be read in conjunction with Item 6, in each case, of our Annual Report on Form 10-K for the year ended January 2, 2021, filed with the Securities and Exchange Commission on February 23, 2021.

### *Liquidity and Capital Resources*

*Sources of Cash.* Our principal sources of liquidity consist of our existing cash and cash equivalent balances, future funds expected to be generated from operations and available borrowing capacity under our Credit Facility. As of January 1, 2022, we had approximately $970.7 million in working capital, of which approximately $745.3 million was cash and cash equivalents. In addition to net working capital, we had approximately $148.3 million of available borrowing capacity (net of outstanding letters of credit) under our Credit Facility as compared to approximately $867.3 million in working capital and approximately $641.4 million in cash and cash equivalents at January 2, 2021.

We currently maintain a Credit Facility with JPMorgan Chase Bank, N.A. (as Administrative Agent and a Lender, and Bank of the West, as a Lender, collectively, the Initial Lenders). The Credit Facility provides for up to $150.0 million of unsecured borrowings, with an option, subject to certain conditions, for us to increase the aggregate borrowing capacity to up to $550.0 million in the future with the Initial Lenders and additional Lenders, as required. The Credit Facility also provides for a sublimit of up to $25.0 million for the issuance of letters of credit and a sublimit of $75.0 million for borrowings in specified foreign currencies. Proceeds from the Credit Facility are expected to be used for general corporate, capital investment and expenditures and working capital needs. For additional information regarding the Credit Facility, see Note 15 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

In managing our day-to-day liquidity and capital structure, we generally do not rely on foreign earnings as a source of funds. As of January 1, 2022, we had cash totaling $102.6 million held outside the U.S., of which approximately $59.8 million is accessible without additional tax cost and approximately $42.8 million was accessible at an incremental estimated tax cost of up to $0.4 million. We currently have sufficient funds on-hand and cash held outside the U.S. that is available without additional tax cost to fund our global operations. In the event funds that are treated as permanently reinvested are repatriated, we may be required to accrue and pay additional U.S. taxes to repatriate these funds.

72

Table of Contents

*Uses of Cash.* Our cash requirements depend on numerous factors, including but not limited to market acceptance of our technologies, our continued ability to commercialize new products and to create or improve our technologies and applications, expansion of our global footprint through acquisitions and/or strategic investments in technologies or technology companies, investments in property and equipment, the renewal of our Credit Facility, the impact of disruptions to the manufacturing industry supply chain for key components resulting from the COVID-19 pandemic, inflation, repurchases of our stock under our authorized stock repurchase program, costs related to our domestic and international regulatory requirements and other long-term commitment and contingencies. For further details regarding our commitment and contingencies, see Note 21 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

Despite these investment requirements and potential expenditures, we anticipate that our existing cash and cash equivalents, amounts available under our Credit Facility and cash provided by operations will be sufficient to meet our working capital requirements, capital expenditures and other operational funding needs for the next 12 months and beyond.

In connection with the proposed acquisition of Sound United announced on February 15, 2022, we received a debt commitment letter in the amount of $800 million and we expect to secure this financing in the event the proposed acquisition closes. We intend to fund this acquisition through a combination of cash on hand and borrowings under a new credit facility. The acquisition is expected to close in the middle of 2022.

*Cash Flows*

The following table summarizes our cash flows (in thousands):

| | Year Ended | |
| --- | --- | --- |
| | January 1, 2022 | January 2, 2021 |
| Net cash provided by (used in): | | |
| Operating activities | $ 264,754 | $ 210,963 |
| Investing activities | (37,529) | (82,787) |
| Financing activities | (122,404) | (54,307) |
| Effect of foreign currency exchange rates on cash | (1,448) | 3,060 |
| Increase in cash, cash equivalents, and restricted cash | $ 103,373 | $ 76,929 |

*Operating Activities.* Cash provided by operating activities for the year ended January 1, 2022 was $264.8 million and was primarily driven by net income of $229.6 million. This was increased by non-cash activities, including stock-based compensation of $44.6 million, and depreciation and amortization of $35.6 million, partially offset by a deferred income tax benefit of $15.1 million. Additional increases in operating cash resulted from decreases in inventory, accounts payable, accrued liabilities, deferred revenue and other contract-related liabilities, other current assets and income tax payable of $13.5 million, $11.0 million, $7.8 million, $7.1 million, $6.9 million and $6.4 million, respectively, primarily due to the timing of payments. Additional increases to net income were changes in operating assets, including an increase in accounts receivable, lease receivables, and deferred cost and other contract assets of $60.8 million, $16.1 million and $6.9 million, respectively.

Cash provided by operating activities for the year ended January 2, 2021 was $211.0 million and was primarily driven by net income of $240.3 million. This was increased by non-cash activities, including stock-based compensation of $42.2 million and depreciation and amortization of $29.3 million, partially offset by a deferred income tax benefit of $5.0 million. Additional increases in operating cash resulted from increases in accrued compensation, deferred revenue and other contract-related liabilities, accrued liabilities and accounts payable of $15.5 million, $10.9 million, $9.4 million and $7.6 million, respectively, primarily due to the timing of payments. Partially offsetting this was $94.4 million of purchases of inventory to both increase finished goods days on hand as well as secure raw material supply to ensure we are able to support higher customer demand during the COVID-19 pandemic, and to support product launches. Additional reductions to net income including were changes in operating assets, including an increase in other current assets of $30.0 million, primarily due to the timing of various tax payments and refunds, and an increase in lease receivables of $7.7 million.

*Investing Activities.* Cash used in investing activities for the year ended January 1, 2022 was $37.5 million, consisting primarily of $25.5 million for purchases of property and equipment, $9.4 million for intangible assets related to capitalized patent and trademark costs and $2.6 million related to the acquisition of a strategic investment.

Cash used in investing activities for the year ended January 2, 2021 was $82.8 million, consisting primarily of $120.0 million for maturities of short-term investments, $112.7 million of business combinations, $72.5 million for purchases of property and

equipment, of which $16.4 million related to the purchase of a building, $7.4 million for intangible assets related to capitalized patent and trademark costs and $6.8 million related to the acquisition of a strategic investment.

*Financing Activities.* Cash used in financing activities for the year ended January 1, 2022 was $122.4 million, resulting primarily from cash paid for common stock repurchase transactions that settled during the year of $128.9 million, which were partially offset by proceeds from the issuance of common stock (upon exercise of options) of $23.2 million.

Cash used in financing activities for the year ended January 2, 2021 was $54.3 million, resulting primarily from cash paid for common stock repurchase transactions that settled during the year of $110.5 million, which were partially offset by proceeds from the issuance of common stock (upon exercise of options) of $58.4 million.

### *Critical Accounting Estimates*

Our financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires management to make estimates and judgements that affect the reported amounts of net revenues, expenses, assets and liabilities. These estimates and judgements are based on historical experience and on various other factors that are believed to be reasonable under the circumstances, and form the basis for making management's most difficult, subjective or complex judgments, often as a result of the need to make estimates about the effects of matters that are inherently uncertain. Although we regularly evaluate these estimates and assumptions, changes in judgments and uncertainties relating to these estimates could potentially result in materially different results under different assumptions and conditions. If these estimates differ significantly from actual results, the impact to the consolidated financial statements may be material. We believe that the critical accounting policies that are the most significant for purposes of fully understanding and evaluating our reported financial results include the following:

#### *Revenue Recognition, Deferred Revenue and Other Contract Liabilities*

We derive the majority of our product revenue from four primary sources: (i) direct sales under deferred equipment agreements with end-user hospitals where we provide up-front monitoring equipment at no up-front charge in exchange for a multi-year sensor purchase commitment; (ii) other direct sales of noninvasive monitoring solutions to end-user hospitals, emergency medical response organizations and other direct customers; (iii) sales of noninvasive monitoring solutions to distributors who then typically resell to end-user hospitals, emergency medical response organizations and other customers; and (iv) sales of integrated circuit boards to OEM customers who incorporate our embedded software technology into their multiparameter monitoring devices. Subject to customer credit considerations, the majority of such sales are made on open account using industry standard payment terms based on the geography within which the specific customer is located.

We generally recognize revenue following a single, principles-based five-step model to be applied to all contracts with customers and generally provide for the recognition of revenue in an amount that reflects the consideration to which we expect to be entitled, net of allowances for estimated returns, discounts or sales incentives, as well as taxes collected from customers that are remitted to government authorities, when control over the promised goods or services are transferred to the customer. Revenue related to equipment supplied under sales-type lease arrangements is recognized once control over the equipment is transferred to the customer, while revenue related to equipment supplied under operating-type lease arrangements is generally recognized on a straight-line basis over the term of the lease.

While the majority of our sales transactions contain standard business terms and conditions, there are some transactions that contain non-standard business terms and conditions. As a result, contract interpretation and analysis is required to determine the appropriate accounting, including: (i) the amount of the total consideration, including variable consideration, (ii) whether the arrangement contains an embedded lease, and if so, whether such embedded lease is a sales-type lease or an operating lease, (iii) the identification of the distinct performance obligations contained within the arrangement, (iv) how the arrangement consideration should be allocated to each performance obligation when multiple performance obligations exist, including the determination of standalone selling price, and (v) when to recognize revenue on the performance obligations. Changes in judgments on these assumptions and estimates could materially impact the timing of revenue recognition.

We enter into agreements to sell our monitoring solutions and services, sometimes as part of arrangements with multiple performance obligations that include various combinations of distinct product sales, equipment leases and services. In the case of contracts with multiple performance obligations, the authoritative guidance provides that the total consideration be allocated to each performance obligation on the basis of relative standalone selling prices. When a standalone selling price is not readily observable, we estimate the standalone selling price by considering multiple factors including, but not limited to, features and functionality of the product, geographies, type of customer, contractual prices pursuant to Group Purchasing Organization (GPO) contracts, our pricing and discount practices, and other market conditions.

Sales under deferred equipment agreements are generally structured such that we agree to provide certain monitoring-related equipment, software, installation, training and/or warranty support at no up-front charge in exchange for the customer's commitment to purchase sensors over the term of the agreement, which generally ranges from three to six years. We allocate contract consideration under deferred equipment agreements containing fixed annual sensor purchase commitments to the underlying lease and non-lease components at contract inception. In determining whether any underlying lease components are related to a sales-type lease or an operating lease, we evaluate the customer's rights and ability to control the use of the underlying equipment throughout the contract term, including any equipment substitution rights retained by us, as well as our expectations surrounding potential contract/lease extensions or renewals and the customer's likelihood to exercise any purchase options. Revenue allocable to non-lease components is generally recognized as such non-lease components are satisfied. Revenue allocable to lease components under sales-type lease arrangements is generally recognized when control over the equipment is transferred to the customer. Revenue allocable to lease components under operating lease arrangements is generally recognized over the term of the operating lease. We generally do not expect to derive any significant value in excess of such asset's unamortized book value from equipment underlying our operating leases arrangements.

Revenue from direct sales of our products to end-user hospitals, emergency medical response organizations, other direct customers, distributors and OEM customers is generally recognized by us when control of such products transfer to the customer based upon the terms of the contract or underlying purchase order. Revenue related to OEM rainbow® parameter software licenses is recognized by us upon the OEM's shipment of its product to its customer, as reported to us by the OEM.

We provide certain customers with various sales incentives that may take the form of discounts or rebates. We estimate and provide allowances for these programs as a reduction to revenue at the time of sale. In general, customers do not have a right of return for credit or refund. However, we allow returns under certain circumstances. At the end of each period, we estimate and accrue for these returns as a reduction to revenue. We estimate the revenue constraints related to these forms of variable consideration based on various factors, including expected purchasing volumes, prior sales and returns history, and specific contractual terms and limitations.

*Inventory*

Inventories are stated at the lower of cost or net realizable value. Cost is determined using a standard cost method, which approximates FIFO (first-in, first-out). Inventory valuation reserves are recorded for materials that have become obsolete or are no longer used in current production and for inventory that has a net realizable value less than the carrying value in inventory. We generally purchase raw materials in quantities that we anticipate will be fully used within one year. However, changes in operating strategy and customer demand, and frequent unpredictable fluctuations in market values for such materials, can limit our ability to effectively utilize all of the raw materials purchased and sold through resulting finished goods to customers for a profit. We regularly monitor potential inventory excess, obsolescence and lower market values compared to standard costs and, when necessary, reduce the carrying amount of our inventory to its market value.

We determine any required inventory valuation adjustments based on an evaluation of the expected future use of our inventory on an item by item basis. We apply historical obsolescence rates to estimate the loss on inventory expected to have a recovery value below cost. Our historical obsolescence rates are developed from our company specific experience for major categories of inventory, which are then applied to excess inventory on an item by item basis. We also record other specific inventory valuation adjustments when we become aware of other unique events that result in a known recovery value below cost. For inventory items that have been written down, the reduced value becomes the new cost basis. If our assumptions, judgements or estimates prove to be too low, our future earnings will be affected when any related additional inventory losses are recorded.

*Stock-Based Compensation*

Our stock-based compensation awards are currently comprised of stock options, restricted stock units (RSUs) and performance share units (PSUs), all of which are equity-classified awards. For equity-classified awards granted on or after January 1, 2006, we estimate the fair value of the award on the date of grant and expense stock-based compensation over the requisite service period. In the case of PSUs, the amount of expense recognized is also dependent upon the achievement of certain performance criteria. The fair value of RSU and PSU awards is the closing price of our common stock on the grant date. To calculate the fair value of stock option awards, we use the Black-Scholes option pricing model, which, in addition to the closing price of our stock on the grant date and the option strike price, requires the input of subjective assumptions. These assumptions include the estimated length of time employees will retain their stock options before exercising them (the expected term), the estimated volatility of our stock price over the expected term and the dividend yield on our common stock. We estimate expected term based on both our specific historical option exercise experience, as well as expected term information available from a peer group of companies with similar vesting schedules. The estimated volatility is based on both the historical and implied volatilities of our share price.

Changes in the types and quantity of equity awards, as well as the fair market value of our stock may impact the cost of future stock option grants. In general, to the extent that the fair market value of our stock increases, the overall cost of granting these options will also increase. Any changes in the assumptions, judgments and estimates mentioned above could cause our actual stock-based compensation expense to vary, resulting in changes to future earnings. For further details regarding our stock-based compensation see Note 18 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

*Accounting for Income Taxes*

We account for income taxes using the asset and liability method, under which we recognize deferred tax assets and liabilities for the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and for net operating loss and tax credit carryforwards. A tax position that meets a more-likely-than-not recognition threshold is recognized in the first reporting period that it becomes more-likely-than-not such tax position will be sustained upon examination. A tax position that meets this more-likely-than-not recognition threshold is recorded at the largest amount of tax benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. Previously recognized income tax positions that fail to meet the recognition threshold in a subsequent period are derecognized in that period. Differences between actual results and our assumptions, or changes in our assumptions in future periods, are recorded in the period they become known. We record potential accrued interest and penalties related to unrecognized tax benefits in income tax expense.

As a multinational corporation, we are subject to complex tax laws and regulations in various jurisdictions. The application of tax laws and regulations is subject to legal and factual interpretation, judgment and uncertainty. Tax laws themselves are subject to change as a result of changes in fiscal policy, changes in legislation, evolution of regulations and court rulings. We have concluded all U.S. federal income tax matters for years through 2017 and all material state, local and foreign income tax matters for years through 2014. Given the foregoing, our actual liability for U.S. or foreign taxes may be materially different from our estimates, which could result in the need to record additional liabilities or potentially to reverse previously recorded tax liabilities.

Deferred tax assets (DTA) and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. A valuation allowance is recorded against any deferred tax assets when, in the judgment of management, it is more likely than not that all or part of a deferred tax asset will not be realized. In assessing the need for a valuation allowance, we consider all positive and negative evidence, including recent financial performance, scheduled reversals of temporary differences, projected future taxable income, availability of taxable income in carryback periods and tax planning strategies.

Income taxes are highly susceptible to changes from period to period, requiring management to make assumptions about our future income over the lives of our DTAs and the impact of changes in valuation allowances. Any difference in the assumptions, judgments and estimates mentioned above could results in changes to our results of operations.

*Litigation Costs and Contingencies*

We record a charge equal to at least the minimum estimated liability for a loss contingency or litigation settlement when both of the following conditions are met: (i) information available prior to issuance of the financial statements indicates that it is probable that a liability had been incurred at the date of the financial statements and (ii) the range of loss can be reasonably estimated. The determination of whether a loss contingency or litigation settlement is probable or reasonably possible involves a significant amount of management judgment, as does the estimation of the range of loss given the nature of contingencies. Liabilities related to litigation settlements with multiple elements are recorded based on the fair value of each element. Legal and other litigation related expenses are recognized as the services are provided. We record insurance and other indemnity recoveries for litigation expenses when both of the following conditions are met: (i) the recovery is probable and (ii) collectability is reasonably assured. The insurance recoveries recorded are only to the extent the litigation costs have been incurred and recognized in the financial statements; however, it is reasonably possible that the actual recovery may be significantly different from our estimates. There are many uncertainties associated with any litigation, and we cannot provide assurance that any actions or other third-party claims against us will be resolved without costly litigation or substantial settlement charges. If any of those events were to occur, our business, financial condition and results of operations could be materially and adversely affected.

*Business Combinations*

We account for business combinations using the acquisition method of accounting, which requires that once control is obtained, all the assets acquired, liabilities assumed and noncontrolling interest in the acquired entity, if applicable, are recorded at their respective fair values at the date of acquisition. The determination of fair values of identifiable assets and liabilities requires estimates and the use of valuation techniques when market value is not readily available. For intangible assets acquired in a business combination, we typically use the income method. Significant estimates in valuing certain intangible assets include, but are not limited to, the amount and timing of future cash flows, growth rates, discount rates and useful lives. The excess of the purchase price over fair values of identifiable assets, liabilities, and noncontrolling interest in the acquired entity, if applicable, is recorded as goodwill. Should any of the assumptions, judgements or estimates associated with the valuation components change, the fair value of the assets acquired could vary.

***Recent Accounting Pronouncements***

For details regarding any recently adopted and recently issued accounting standards, see Note 2 to our accompanying consolidated financial statements included in Part IV, Item 15(a) of this Annual Report on Form 10-K.

# EXHIBIT 17

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 18

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 19

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 20

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| APPLE INC.,<br><br>   *Plaintiff*,<br><br>  v.<br><br>MASIMO CORPORATION and<br>SOUND UNITED, LLC,<br><br>   *Defendants*. | C.A. No. 22-1377-MN-JLH<br>C.A. No. 22-1378-MN-JLH<br><br>**JURY TRIAL DEMANDED** |
| MASIMO CORPORATION and<br>CERCACOR LABORATORIES, INC.,<br><br>   *Counter-Claimants*,<br><br>  v.<br><br>APPLE INC.<br><br>   *Counter-Defendant*. |  |

## PLAINTIFF APPLE INC.'S FIRST SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANTS' AND COUNTERCLAIMANTS' THIRD SET OF INTERROGATORIES (NO. 23)

Pursuant to Rules 26 and 33 of the of the Federal Rules of Civil Procedure, Plaintiff Apple Inc. ("Apple") hereby supplements its response to Defendant and Counterclaimant Masimo Corporation's ("Masimo"), Defendant Sound United, LLC's ("Sound United"), and Counterclaimant Cercacor Laboratories, Inc.'s ("Cercacor") (jointly, "Defendants and Counterclaimants") Third Set of Interrogatories to Apple (No. 23). Apple's discovery and investigation in connection with this action are continuing. As a result, Apple's objections and responses are limited to information obtained and reviewed to date and are given without prejudice

1

to Apple's right to supplement or amend these objections and responses to the extent allowed by the Federal Rules of Civil Procedure, the Local Rules of this Court, and any applicable scheduling orders as discovery and Apple's investigation in the action proceeds.  Apple hereby incorporates the general objections set forth in Apple's Response to Defendants' Third Set of Interrogatories (Nos. 19-23), which Apple served on July 5, 2023.

## GENERAL OBJECTIONS

Apple makes the following General Objections to Defendants' and Counterclaimants' Third Set of Interrogatories, which apply to each interrogatory regardless of whether the General Objections are specifically incorporated into the specific objections and responses below.  Apple incorporates by reference the General Objections set forth in its Objections and Responses to Defendants' Second Set of Interrogatories, which apply to each request regardless of whether the General Objections are specifically incorporated into the specific objections and responses below.  Apple further objects as follows:

1.      Apple objects to each interrogatory, definition, and instruction as overbroad, unduly burdensome, and calling for information that is neither relevant to any party's claim or defense, nor proportional to the needs of the case.  Specifically, Apple objects to each request to the extent it seeks discovery (1) not specific to any product relevant to this matter and/or (2) regarding acts (*e.g.*, making, using, selling, and offering for sale, of any product) outside of the United States.  To the extent Defendants and Counterclaimants request discovery not specific to a relevant product and/or outside of the United States, each such request is overbroad, unduly burdensome, and irrelevant as calling for discovery outside the relevant temporal or geographic scope of this matter.

2.      Apple objects to each interrogatory as overbroad, unduly burdensome, and calling for information that is neither relevant to any party's claim or defense, nor proportional to the

2

needs of the case, to the extent it calls for information beyond any other temporal limitations of this case.  To the extent Masimo requests discovery for purposes of its patent infringement counterclaims, pursuant to 35 U.S.C. § 286, "no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint . . . for infringement in the action." Counterclaimants filed their counterclaims in this action on December 12, 2022, so Counterclaimants cannot recover for any alleged infringement prior to December 12, 2016.  To the extent Masimo requests discovery prior to December 12, 2016, each such request is overbroad, unduly burdensome, and irrelevant to the extent it calls for discovery outside the relevant temporal scope of this case.  Furthermore, to the extent Masimo requests discovery for purposes of its antitrust, false advertising, and/or unfair competition counterclaims (Counterclaims I through VI), Apple objects to any request for discovery prior to December 12, 2020, on the grounds that such request is overbroad, unduly burdensome, and irrelevant to the extent it calls for discovery outside the relevant temporal scope of this case.

3.    Apple's willingness to provide any document or information in response to an interrogatory shall not be interpreted as an admission that such document or information exists, that it is relevant to a claim or defense in this action, or that it is admissible for any purpose.  Apple does not waive its right to object to the admissibility of any document or information produced by any party on any ground.

## OBJECTIONS AND RESPONSES

## INTERROGATORY NO. 23:

To the extent not already identified in Your response to Masimo's Interrogatory Nos. 17-19, identify all of Your defenses to Masimo's claims in its Counterclaims at the same level of detail that will be required when you file your Answer to Masimo's Counterclaims.

**RESPONSE TO INTERROGATORY NO. 23:**

Apple incorporates by reference its General Objections.  In addition, Apple further objects to this interrogatory as premature to the extent it calls for a recitation of affirmative defenses before Apple's answer to the Counterclaims is due, and before any final ruling on Apple's pending motions to dismiss.  To the extent the interrogatory seeks identification of "defenses" beside the affirmative defenses that would be listed in Apple's answer to the Counterclaims, Apple objects on the grounds that the request is unduly burdensome and overly broad.  In addition, the request would be vague in that Apple is not in a position to rebut arguments and evidence Counterclaimants have not yet advanced.  Such a request is premature before the completion of fact and expert discovery. Apple further objects to this interrogatory as premature to the extent it calls for information in advance of the disclosure timeline required by the Federal Rules.

Based on its investigation to date, and subject to and without waiver of the forgoing general and specific objections, and to the extent that this interrogatory can be understood, Apple responds as follows:

Apple incorporates by reference its responses to Interrogatories Nos. 17-22 as if fully set forth herein.

Each counterclaim fails to state a claim upon which relief can be granted.

Each counterclaim fails because Counterclaimants cannot meet their burden of proof with respect to one or more essential elements, either because of failure of proof, or estoppel, or both.

Counterclaimants lack standing to assert each counterclaim due to lack of injury-in-fact.

Masimo lacks standing to assert its counterclaims under the Sherman Act (Counterclaims I and II) for lack of antitrust injury.

To the extent they arise from Apple's assertion of patent claims against Masimo, Masimo's claims under the Sherman Act and California UCL (Counterclaim VI) are barred by the Noerr-Pennington doctrine and all other immunities provided by the First Amendment and by the United States patent laws.

To the extent they arise from Apple's review of and approval of any app for the Apple App Store, Masimo's claims under the Sherman Act and California UCL are barred because Apple does not have an antitrust duty to deal, and in any event, would fail because Apple's alleged conduct is supported by valid business justifications, including without limitation Apple's interest in ensuring that apps meet quality, reliability, and consumer protection standards.  Furthermore, Masimo cannot establish any of Apple's conduct harmed Masimo or Cercacor, given that the Masimo and Cercacor apps are currently available on the app store, and during a hearing on June 15, 2023, Masimo admitted that it never provided any confidential information to Apple as part of the App Store review.

To the extent they arise from any alleged misappropriation of Masimo's alleged trade secrets or alleged infringement or theft of any Masimo intellectual property or technology, Masimo's claims under the Sherman Act and California UCL are barred (1) because such conduct does not have the requisite exclusionary effect, and (2) by the doctrines of res judicata and claim splitting.

To the extent they arise from alleged false or misleading advertising, Masimo's claims under the Sherman Act and California UCL fail because the challenged advertising is supported by valid business justifications.

Masimo's counterclaim under the California UCL fails because it cannot show entitlement to any form of relief available under that law.

The counterclaims for patent infringement fail for the additional reason that Apple has not infringed and does not infringe any claim of the Masimo Asserted Patents, either directly or indirectly, literally or under the doctrine of equivalents.

The counterclaims for patent infringement fail for the additional reason that the claims of the Masimo Asserted Patents are invalid for failing to comply with one or more of the conditions for patentability as set forth in Title 35 of the United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112.

The counterclaims for patent infringement fail for the additional reason that Apple has not willfully infringed any of the Masimo Asserted Patents.

The counterclaims for patent infringement fail for the additional reason that the counterclaims are barred in whole or in part by the doctrine of waiver, acquiescence, estoppel, implied license, patent misuse, and/or unclean hands.

The counterclaims for patent infringement fail for the additional reason that Masimo's counterclaims are barred in whole or in part by the doctrine of prosecution laches.

The counterclaims for patent infringement fail for the additional reason that the Masimo Asserted Patents are unenforceable.

The counterclaims for patent infringement fail for the additional reason that the counterclaims are barred by 28 U.S.C. § 1498 to the extent that they relate to use or manufacture of the invention of the Masimo Asserted Patents by or for the United States.

The counterclaims for patent infringement fail for the additional reason that Counterclaimants are precluded from recovering any damages for any alleged infringement that occurred more than six years prior to the commencement of this counterclaim action.

The counterclaims for patent infringement fail for the additional reason that Counterclaimants are precluded from recovering damages, in whole or in part, by 35 U.S.C. § 287, due to a failure to mark by Counterclaimants and/or any predecessors in interest or any licensees to the Masimo Asserted Patents or failure to give proper notice that Apple's actions allegedly infringe the Asserted Patents.  Counterclaimants' claims for relief are further barred, in whole or in part, under 35 U.S.C. § 288.

The counterclaims for patent infringement fail for the additional reason that the claims for injunctive relief are barred because Counterclaimants fail to meet the requirements for obtaining injunctive relief and by the doctrine of laches.

The counterclaims and Defendants' inequitable conduct defenses fail for at least the reasons set forth in Apple's briefing in support of its motions to dismiss (No. 22-1377, D.I. 54, 55, 88; No. 22-1378, D.I. 39, 40, 76).

Apple reserves the right to assert any additional defenses as they become known during the course of this action.

Apple will further respond to this interrogatory after it provides its answer to the Counterclaims in accordance with Rule 12(a) of the Federal Rules of Civil Procedure at which point Apple will plead its defenses to the counterclaims for patent infringement.

In addition to the foregoing, Apple reserves all affirmative defenses under Fed. R. Civ. P. 8(c) and any other defenses, at law or in equity, that may now exist or in the future be available based on discovery and further factual investigation.

The foregoing list shall not be construed as an admission by Apple that it bears the burden of proof on any aspect of these or any other defenses.

Apple reserves its right to supplement or amend its response to this interrogatory as discovery and its investigations in this action proceed in accordance with the Court's schedule.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 23 (AUGUST 2, 2023):**

Apple hereby incorporates its July 5, 2023 objections and responses as if fully set forth herein.  Based on its investigation to date, and subject to and without waiver of its general and specific objections, Apple further responds as follows:

The counterclaims for patent infringement fail for the additional reason that the Masimo Asserted Patents are unenforceable for inequitable conduct, as explained below:

**Factual Background Regarding Individuals Who Committed Inequitable Conduct on Behalf of Masimo and Cercacor**

Masimo is a litigious company that has inequitably obtained patents and attempted to sue its way to the top.  Founded in 1989, Masimo has prosecuted scores of patents for assertion against competitors.  As discussed in detail below and pertinent to this case, Masimo named inventors, such as Joe Kiani, and Masimo attorneys of record for prosecuting patents, such as Stephen Jensen, Harnik Shukla, and Jarom Kesler, committed inequitable conduct to deceive the USPTO into issuing the '223, '507, '743, '159, and '911 patents that Masimo now asserts against Apple in this case.  These individuals committed inequitable conduct by, among other things, intentionally withholding material references and/or intentionally "burying" material references in voluminous information disclosure statements that contained hundreds of irrelevant citations.  Indeed, Mr. Jensen—the same lawyer involved in the prosecution of and this litigation regarding the '223, '507, '743, '159, and '911—has been found by the Federal Circuit to have engaged in inequitable conduct in connection with a prior patent prosecution for Masimo.  *See Mallinckrodt, Inc. v. Masimo Corp.*, 147 F. App'x 158 (Fed. Cir. 2005).

Masimo has repeatedly relied on patent litigation to expand its technological and economic footprint.  For example, in the early 2000s, Masimo sued Nellcor Puritan Bennet, Inc. ("Nellcor") for patent infringement with respect to Nellcor's pulse oximeter products and used that lawsuit as leverage for a settlement that enabled Masimo to go public.  Masimo subsequently sued Philips Electronics North America Corporation ("Philips") for patent infringement and then used that lawsuit to leverage a settlement that forced Phillips to combine its products with those of Masimo. Overall, Masimo has commenced or otherwise been a party to over 15 patent infringement cases since 2000, including this instant case against Apple.

Masimo was founded by one of the named inventors of the '223 patent, Joe Kiani.  Since founding Masimo, Kiani has continuously served as its president, Chief Executive Officer, and Chairman of the Board—positions he holds to this day.  Mr. Kiani also is president, CEO, and sits on the Board of Directors of Cercacor.  As a putative inventor, CEO, and director of both Masimo and Cercacor, Kiani has actively monitored both the specific activities of its many competitors, including Nellcor, as well as broader technical advancements by others in the field of pulse oximetry.  Mr. Kiani thus has deep knowledge of prior art as discussed further herein—knowledge that Masimo has nefariously exploited in prosecuting and litigating patents, including the patents asserted against Apple here.

Knobbe Martens is an intellectual property law firm that engages in both patent prosecution and patent litigation as part of its mantra of providing "complete patent services" in one law firm (https://www.knobbe.com/services/practice-areas/patents, last accessed August 2, 2023).  For at least the past 25 years, Knobbe Martens has provided both patent prosecution and patent litigation services to Masimo.  Since 1994, Knobbe Martens has prosecuted on Masimo's behalf over 800 patent applications and litigated on Masimo's behalf over 15 patent infringement cases, including

against Nellcor and Phillips.  In many instances, the same Knobbe Martens attorneys that have been substantively involved in Masimo's patent litigations have also been substantively involved in Masimo's patent prosecutions, and vice versa.

Stephen Jensen is a partner at Knobbe Martens.  Mr. Jensen has been a lawyer at Knobbe Martens since 1990 and a partner since 1994.  Since 1994, Mr. Jensen has been Masimo's primary outside patent attorney, has continuously represented Masimo, and has served as Masimo's client liaison.  Over the course of this period, Mr. Jensen has represented Masimo in both patent prosecutions and patent litigations.  As Masimo's client liaison, Mr. Jensen has ultimate responsibility for and control over Knobbe Martens' legal work for Masimo.

Mr. Jensen has prosecuted numerous patent applications on Masimo's behalf.  Mr. Jensen began prosecuting patents for Masimo starting around 1994.  Today, the USPTO affirmatively lists Mr. Jensen as an attorney of record for prosecuting numerous Masimo patents, ***including each of the patents that Masimo has asserted against Apple in this case***.

Mr. Jensen also has litigated numerous patents on Masimo's behalf and typically leads Masimo's litigation teams.  Since Masimo's first patent litigation in 1999, Mr. Jensen has represented Masimo in at least the following patent litigations:

- *Mallinckrodt, Inc. v. Masimo Corp.*, Case No. 2-000cv06506 (C.D. Cal.)

- *Masimo Corp. v. Mallinckrodt Inc.*, Case Nos. 8-01-cv-00638 & 2-01- cv-07292 (C.D. Cal.);

- *Nellcor Puritan, et al. v. Masimo Corp.*, Case Nos. 8-02-cv-01133 & 2-03-cv-00603 (C.D. Cal.);

- *Masimo Corp. v. Jay*, Case No. 8-07-cv-01163 (C.D. Cal.);

- *Masimo Corp. v. Philips Electronics Northern America Corp.*, Case Nos. 1-09-cv-00080, 1-11-cv-00742, and 1-16-cv-00137 (D. Del.);

- *Hygia Health Services, Inc. v. Masimo Corp.*, Case No. 2-09-cv-00885 (N.D. Al.);

- *Essential Medical Devices, Inc. v. Masimo Corp.*, Case No. 1-11-cv-00734 (D. Del.);

- *Dominion Assets LLC v. Masimo Corp.*, Case Nos. 5-12-cv-02773, 5-14-cv-3002 (N.D. Cal.);

- *Masimo Corp. v. Mindray DS USA, Inc.*, Case Nos. 8-12-cv-02206 (C.D. Cal.), 2-15-cv-00457 (D.N.J.) and 2-15-cv-06900 (D.N.J.);

- *Masimo Corp. v. Shenzhen Mindray Bio-Medical Tech. Co.*, 12-cv-02206 (C.D. Cal.);

- *Masimo Corp. v. Nova Biomedical Corp.*, Jams International Arbitration, Reference No. 1220045324;

- *Christian Lewis v. Sheila D. Moore*, No. 15-13979 (11th Cir.), appeal from District Court No. 2:13-cv-00733-KOB;

- *Shandong Lihong Technology Limited Corp. v. Masimo Corp.*, Superior Court of the State of California, County of Orange, Case No. 30-2018-01002779-CU-BT-CJC;

- *Silkeen LLC v. Masimo Corp.*, C.A. No. 1:17-cv-01030-RGA (D. Del);

- *U.S. Ex. Rel Ruhe, Serwitz, and Catala v. Masimo Corp.*, 2:10-cv-08169-CJC-VBK (C.D. Cal);

- *Physicians Healthsource, Inc. et al. v. Masimo Corp.*, Case No. 8:14-cv-00001 JVS (ADSx) (C.D. Cal);

- *Masimo Corp. v. James Welch*, Case No. 30-2013-00659172 (Superior Ct. of Cal., Orange County);

- *Masimo Corp. v. Sotera Wireless, Inc.*, Case No. 3-19-cv-01100 (S.D. Cal.);

- *Masimo Corp. v. True Wearables, Inc.*, Case No. 8:18-cv-02001 (C.D. Cal.);

- *Masimo Corp. v. Apple, Inc.*, Case No. 8:20-cv-00048 (C.D. Cal.); and

- *Certain Light-Based Physiological Measurement Devices and Components Thereof*, Case No. 337-TA-1276 (ITC).

11

Many of Masimo's patent infringement cases have included claims by and against Masimo's direct competitors concerning products that are material prior art to the patents that Masimo now asserted against Apple in this case.  For example, one of Masimo's longstanding direct competitors has been Nellcor, which has sold prior art pulse oximeter products, including Nellcor NPB-195, N-395, and OxiMax N-595 products.  Indeed, Mr. Jensen was Masimo's lead counsel in the litigation that Masimo filed against Nellcor as well as in the *inter partes review* proceedings that Masimo filed against Nellcor's patents.

Mr. Jensen is one of several Knobbe Martens attorneys who has litigated the same Masimo patents for which he has been an attorney of record for prosecution.  As discussed further herein, Mr. Jensen has been listed by the USPTO as an attorney of record for at least the '223, '507, '743, '159, and '911 patents—the same patents that Masimo now asserts through Mr. Jensen and other Knobbe Martens lawyers against Apple in this case.

Mr. Jensen has publicly declared that "[n]o other lawyer at my firm has the same history and breadth of understanding of Masimo's and Cercacor's technology, their legal strategies, their principles and their legal goals."  Knobbe Martens publicizes that it and Masimo "have grown up together," with Mr. Jensen playing significant roles in Masimo's development over time. (https://www.law.com/therecorder/almID/1202724129923/, last accessed August 2, 2023).

Masimo and Knobbe Martens' 30-year relationship, however, goes well beyond legal representation—it also extends to a series of intertwined business relationships in which commingling between Massimo and Knobbe Martens personnel has been the norm.  For example, Mr. Jensen has personally worked in numerous in-house positions at Masimo itself, including as Masimo's Senior Vice President of OEM Business, Business Development, and General Counsel. In that capacity, Mr. Jensen has "directly managed Masimo's OEM business."

(https://www.knobbe.com/attorneys/steve-jensen, last accessed August 2, 2023).  Mr. Jensen is also one of four members of the Board of Directors of the Masimo Foundation for Ethics, Innovation and Competition in Healthcare.

Mr. Jensen also has intertwined, commingled relationships with Cercacor.  Since 2013, Mr. Jensen has served (along with Joe Kiani) as one of the six directors on Cercacor's Board of Directors.  In that capacity, Mr. Jensen has been deeply involved in Cercacor's highest levels of governance and owed an affirmative fiduciary duty to Cercacor.  Indeed, Mr. Jensen's intertwined, commingled relationships with Masimo have been so extensive that the United States International Trade Commission recently required Mr. Jensen to resign his position as a member of Cercacor's Board of Directors as a condition for him to have access to Apple's confidential information in the parties' pending ITC case.

Through his work as a patent prosecutor and litigator on behalf of Masimo and Cercacor, as well as his senior in-house positions at Masimo and Cercacor themselves, Mr. Jensen has obtained deep knowledge of prior art, as discussed further herein.  Mr. Jensen, however, has repeatedly elevated his loyalties to Masimo and Cercacor over his duties of disclosure to the USPTO through the commission of inequitable conduct.  Indeed, Mr. Jensen has previously been found to have committed inequitable conduct at the Federal Circuit.  *See, e.g., Mallinckrodt, Inc. v. Masimo Corp.*, 147 F. App'x 158 (Fed. Cir. 2005).

Harom Shukla and Jarom Kesler are partners of Mr. Jensen at Knobbe Martens who also are attorneys of record for prosecuting one or more of the patents that Masimo has asserted against Apple in this case.  Like Mr. Jensen, both Mr. Shukla and Mr. Kesler had knowledge of prior art based on their work at Knobbe Martens doing patent prosecution and litigation work for Masimo.

As Masimo's primary outside patent attorney and client liaison, Mr. Jensen had ultimate responsibility for and control over Knobbe Martens' legal work for Masimo.

Masimo and Cercacor's claims of infringement for the '223 patent and the '507 patent are unenforceable due to inequitable conduct because the specific individuals identified above and below withheld from the USPTO prior art references that it knew were material to patentability with the specific intent to deceive the USPTO. Those individuals had extensive knowledge of these withheld references because they cited them in other parallel patent proceedings while withholding them from the USPTO in connection with the prosecutions of the '223 and '507 patents. This misconduct evidenced an intent to mislead and deceive the USPTO in order to improperly procure the '223 and '507 patents.

Masimo and Cercacor's claims of infringement for the '743 patent, the '159 patent, and the '911 patent are also unenforceable due to inequitable conduct because the specific individuals identified above and below repeatedly engaged in a pattern of burying highly material prior art among voluminous submissions of irrelevant and marginally relevant prior art with the specific intent to deceive the USPTO. Indeed, those individuals repeatedly buried material prior art references in Information Disclosure Statements that included over a thousand other references, including numerous clearly irrelevant references. This repeated pattern of misconduct evidenced an intent to mislead and deceive the USPTO in order to improperly procure the '743, '159 and '911 patents. *See, e.g., Pact XPP Schweiz AG v. Intel Corp.*, Case No. 1:19-cv-01006-JDW, 2023 WL 2631503 (D. Del. Mar. 23, 2023).

### <u>'223 Patent — Withholding of Material Prior Art</u>

The '223 patent is unenforceable due to inequitable conduct occurring during its prosecution, including, among other misconduct, Joe Kiani and Stephen Jensen's withholding

14

from the USPTO of key prior art that each of those individuals knew was material to patentability. Kiani and Jensen had extensive knowledge of this prior art at the relevant time, as confirmed by the public record, including testimony, litigations, and publicly available documents.  These actions constitute fraud through omission because they violated the duty of disclosure owed by each of those individuals to the USPTO.  These actions were all done with a specific intent to deceive the USPTO, which would not have issued the '223 patent if it had been made properly aware of the withheld prior art.

As discussed below, Joe Kiani and Stephen Jensen are among the individuals who owed a duty of disclosure to the USPTO during the prosecution of the '223 patent and committed inequitable conduct by breaching that duty of disclosure.

Furthermore, Masimo and Knobbe Martens have an extensive 30-year relationship with overlapping members.  For example, Jensen not only is a partner at Knobbe Martens, the law firm that prosecuted these patents, but also has served as Masimo's General Counsel and Senior Vice President of Original Equipment Manufacture (OEM) Business and Business Development and Jensen promotes himself as serving on the Board of Directors of Masimo affiliate Cercacor Corporation.  (*See* https://www.knobbe.com/attorneys/steve-jensen, last accessed August 2, 2023). As another example, Jensen has been reported saying "I've represented [Masimo] since 1993 when they were a small group of engineers out of a very small office . . . I've represented them since almost the beginning."   (*See*  https://www.ocbj.com/manufacturing/knobbe-partners-prep-for-masimo-case/, last accessed August 2, 2023).  Furthermore, Jensen and Knobbe Martens have been prosecuting Kiani and Masimo's patent applications since 1993 such that Masimo has "changed [Jensen's] personal and professional life immensely."   (*See* https://www.investors.com/news/management/leaders-and-success/masimo-ceo-four-guiding-

15

principles-turn-startup-success/, last accessed August 2, 2023).  On information and belief, Kiani and others at Masimo selected the law firm Knobbe Martens to prosecute the '223 patent and other Masimo patents to exploit the 30-year commingled relationship that Masimo has with Knobbe Martens, which ensured total control over the prosecution process, including which material prior art to intentionally withhold from the USPTO to improperly obtain patents including the '223 patent.

Joe Kiani

Kiani is a named inventor on the '223 patent, a founder and Chief Executive Officer and Chairman of the Board of Masimo, and Chief Executive Officer and Chairman of the Board of Directors of Cercacor.  Kiani had a duty to disclose information material to the patentability of the '223 patent to the USPTO during prosecution of the '223 patent at least because he is a named inventor on the '223 patent.

| (12) **United States Patent** | (10) **Patent No.:** | **US 8,190,223 B2** |
|---|---|---|
| Al-Ali et al. | (45) **Date of Patent:** | **May 29, 2012** |

| (54) | **NONINVASIVE MULTI-PARAMETER PATIENT MONITOR** | | |
|---|---|---|---|
| (75) | Inventors: | **Ammar Al-Ali**, Tustin, CA (US); **Joe Kiani**, Laguna Niguel, CA (US); **Mohamed Diab**, Mission Viejo, CA (US); **Greg Olsen**, Irvine, CA (US); **Roger Wu**, Irvine, CA (US); **Rick Fishel**, Orange, CA (US) | |

| | | | |
|---|---|---|---|
| 4,157,708 | A | 6/1979 | Imura |
| 4,167,331 | A | 9/1979 | Nielsen |
| 4,266,554 | A | 5/1981 | Hamaguri |
| 4,267,844 | A | 5/1981 | Yamanishi |
| 4,446,871 | A | 5/1984 | Imura |
| 4,531,527 | A | 7/1985 | Reinhold, Jr. et al. |
| 4,586,513 | A | 5/1986 | Hamaguri |
| 4,621,643 | A | 11/1986 | Newe al. |
| | | (Continued) | |

('223 patent, cover page)

16

| **UTILITY APPLICATION** | Attorney Docket No.: MLR.012A<br>First Named Inventor: Ammar Al-Ali<br>Title: NONINVASIVE MULTI-PARAMETER PATIENT MONITOR<br>Express Mail Label No.: EV 307965144 US |
|---|---|
| **Direct all correspondence to Customer No.: 20995** | Date: March 1, 2006<br>Page 1 |

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450



The following enclosures are transmitted herewith to be filed in the patent application of:

**INVENTORS LIST:**

1. Ammar Al-Ali
2. Joe E. Kiani
3. Mohamed Diab
4. Greg Olsen
5. Roger Wu
6. Rick Fishel

('223 Patent Prosecution, March 1, 2006 Application).

Indeed, Kiani submitted a signed declaration of inventorship under oath and subject to a penalty of perjury in which he "acknowledge[d] the duty to disclose information which is material to patentability as defined in Title 37, Code of Federal Regulations, § 1.56":

**DECLARATION - USA PATENT APPLICATION**

As a below named inventor, I hereby declare that:

My residence, mailing address and citizenship are as stated below next to my name;

I believe I am an original, first and joint inventor of the subject matter which is claimed and for which a patent is sought on the invention entitled NONINVASIVE MULTI-PARAMETER PATIENT MONITOR; the specification of which was filed on March 1, 2006 as Application Serial No. 11/367,033.

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above;

I acknowledge the duty to disclose information which is material to patentability as defined in Title 37, Code of Federal Regulations, § 1.56;

17

*      *      *

      I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful, false statements may jeopardize the validity of the application or any patent issued thereon.

*      *      *

Full name of second inventor: Joe Kiani

Inventor's signature _____

Date _____ 5/22/06

Residence:  35 Brindisi, Laguna Niguel, CA 92677

Citizenship:  United States

Mailing Address:  Same as above

('223 Patent Prosecution, June 15, 2006 Oath).

<u>Stephen Jensen</u>

      Stephen Jensen had a duty to disclose information material to the patentability of the '223 patent to the USPTO during prosecution of the '223 patent.  As a partner at the law firm of Knobbe Martens, Mr. Jensen was Masimo's primary outside counsel and an attorney of record for prosecution of the '223 patent who was substantively involved in the preparation and prosecution of the application that resulted in the '223 patent.

      For example, the USPTO expressly lists Mr. Jensen as an attorney of record for prosecution of the '223 patent.

      In addition to his own role as an attorney of record for prosecuting the '223 patent, Mr. Jensen—as Masimo's primary outside patent attorney and client liaison—was the Knobbe Martens partner who had ultimate responsibility for and control over Knobbe Martens' legal work for Masimo, including prosecution of the '223 patent.  As such, Mr. Jensen had the incentive to, and

18

as discussed below did in fact, prioritize his longstanding loyalties to Masimo over his duties of disclosure to the PTO to facilitate issuance of the '223 patent by committing inequitable conduct.

During prosecution of the '223 patent, Masimo, including named inventor Kiani and its prosecution attorney of record and client liaison Jensen, as well as other Masimo agents substantively involved in the prosecution of the '223 patent, withheld from the USPTO known prior art that is material to the patentability of the '223 patent—including material information regarding the Nellcor NPB-195, N-395, and OxiMax N-595 patient monitors—with specific intent to deceive the USPTO.

The Nellcor NPB-195, N-395, and OxiMax N-595 are related products in Nellcor's line of patient monitors.  For each patient monitor, Nellcor publicly released detailed documents describing the products' operation and functionality, such as Operator's Manuals.  (*See* NPB-195 Operator's Manual, N-395 Operator's Manual, OxiMax N-595 Operator's Manual).

Each of the technical documents describing the Nellcor NPB-195, N-395, and OxiMax N-595 products is material prior art to the '223 patent and anticipates under 35 U.S.C. § 102 and/or renders obvious under 35 U.S.C. § 103, standing alone or combined with a person of ordinary skill in the art, at least claims 15, 21, 27, and 28 of the '223 patent, and otherwise contains disclosure material to the invalidity of the asserted claims of the '223 patent.

Particularly, the NPB-195 Operator's Manual describing the Nellcor NPB-195 is material prior art to the '223 patent, anticipates under 35 U.S.C. § 102 and/or renders obvious under 35 U.S.C. § 103, standing alone or combined with a person of ordinary skill in the art, at least claims 15, 21, 27, and 28 of the '223 patent, and otherwise contains disclosures material to the invalidity of the asserted claims of the '223 patent.

For example, claim 27 of the '223 patent requires "a user input button, the activation of which replaces the display of the measured value of the first blood parameter with the measured value of the second blood parameter," where an amendment in this limitation led at least in part to the allowance of claim 27 of the '223 patent during reexamination.  Under the apparent constructions advanced in Masimo's infringement contentions, the NPB-195 Operator's Manual teaches replacing the display of a pulse rate with a blood oxygen measurement value when a user input, such as a "softkey" button, is pressed.  (*See* NPB-195 Operator's Manual at 24, 29-30, 87-89).  Moreover, the NPB-195 Operator's Manual alone, under the apparent constructions advanced in Masimo's infringement contentions, teaches every limitation of at least claims 15, 21, 27, and 28 of the '223 patent, and otherwise contains disclosures material to the invalidity of the asserted claims of the '223 patent.

Additionally, the OxiMax N-595 Operator's Manual describing the Nellcor OxiMax N-595 is material prior art to the '223 patent, anticipate under 35 U.S.C. § 102 and/or render obvious under 35 U.S.C. § 103, standing alone or combined with a person of ordinary skill in the art, at least claims 15, 21, 27, and 28 of the '223 patent, and otherwise contains disclosures material to the invalidity of the asserted claims of the '223 patent.

For example, claim 27 of the '223 patent requires "a user input button, the activation of which replaces the display of the measured value of the first blood parameter with the measured value of the second blood parameter."  Under the apparent constructions advanced in Masimo's infringement contentions, the OxiMax N-595 Operator's Manual teaches replacing the display of a blood oxygen measurement value with a pulse rate when a user input, such as a "softkey" button, is pressed.  (*See* OxiMax N-595 Operator's Manual at 10-11, 32, 34-36, 80-86).  Moreover, the OxiMax N-595 Operator's Manual alone, under the apparent constructions advanced in Masimo's

infringement contentions, teaches every limitation of at least claims 15, 21, 27, and 28 of the '223 patent, and otherwise contains disclosures material to the invalidity of the asserted claims of the '223 patent.

Additionally, the N-395 Operator's Manual describing the Nellcor N-395 is material prior art to the '223 patent and anticipates under 35 U.S.C. § 102 and/or renders obvious under 35 U.S.C. § 103, standing alone or combined with a person of ordinary skill in the art, at least claims 15, 21, 27, and 28 of the '223 patent, and otherwise contains disclosure material to the invalidity of the asserted claims of the '223 patent.

For example, claim 27 of the '223 patent requires "a user input button, the activation of which replaces the display of the measured value of the first blood parameter with the measured value of the second blood parameter."  Under the apparent constructions advanced in Masimo's infringement contentions, and for the same reasons as those described above with respect to the NPB-195 Operator's Manual and the OxiMax N-595 Operator's Manual, the N-395 Operator's Manual teaches replacing the display of a blood oxygen measurement value with a pulse rate when a user input, such as a "softkey" button, is pressed.  (*See* N-395 Operator's Manual at 30 (as seen with the NPB-195 and OxiMax N-595 Operator's Manuals, showing a Pleth View and a Blip View, where as an example under the apparent constructions advanced in Masimo's infringement contentions, the display of a blood oxygen measurement value in the Pleth View is replaced with a pulse rate in the Blip View), 31 (as seen with the NPB-195 and OxiMax N-595 Operator's Manuals, explaining that a user can select between the Pleth View and Blip View by pressing a softkey), 41, 44-45).

21

As such, the examiners for the '223 patent would not have allowed the '223 patent's claims if Kiani and Jensen did not withhold the documentation describing any of the Nellcor NPB-195, N-395, and OxiMax N-595 products from the USPTO.

During prosecution, Masimo, including named inventor Kiani and its prosecution attorney of record and client liaison Jensen, as well as other Masimo agents substantively involved in the prosecution of the '223 patent, knowingly withheld material documentation describing the Nellcor NPB-195, N-395, and OxiMax N-595 products from the USPTO.  These were not merely peripheral references of which Kiani and Jensen merely had incidental awareness.  Instead, at the same time that Kiani and Jensen withheld documentation describing the Nellcor NPB-195, OxiMax N-395, and N-595 products, Kiani and Jensen actively knew from multiple sources about material documentation describing the Nellcor NPB-195, N-395, and OxiMax N-595 products.

For example, in the time directly leading up to the prosecution of the '223 patent, Masimo and Nellcor were adverse parties in numerous litigations regarding Nellcor's pulse oximeter products.  On October 8, 1999, Masimo sued Mallinckrodt Inc. and Nellcor Puritan Bennett, Inc. for patent infringement in the United States District Court for the Central District of California in Civil Action No. 8:99-cv-01245-AHS-AJW.   In that litigation, Masimo was represented by Stephen Jensen, among other attorneys from Knobbe Martens.  In that case, Masimo alleged that Nellcor's "N-395 stand-alone pulse oximeter" infringed Masimo's patent.  *Masimo Corp. v. Mallinckrodt Inc.*, 18 F. App'x 852, 853–54 (Fed. Cir. 2001); *see also Mallinckrodt, Inc. v. Masimo Corp.*, 147 F. App'x 158, 164 (Fed. Cir. 2005) ("In 2000, Masimo sued Nellcor for infringement of claims 16 and 28 of U.S. Patent No. 6,036,642, asserting that Nellcor's N–395 and MP–404 pulse oximeters met all of the asserted claim limitations.").

22

Given Kiani's role as CEO of Masimo and Jensen's role as attorney of record in a litigation concerning the N-395 product, which went up on appeal to the Federal Circuit, on information and belief, at least Kiani and Jensen knew about documentation describing at least the Nellcor N-395 product.

Additionally, on November 17, 1999, Mallinckrodt Inc. and Nellcor Puritan Bennett, Inc. sued Masimo, and on December 8, 1999, Masimo counter-sued Mallinckrodt and Nellcor, for patent infringement in the United States District Court for the Central District of California in Civil Action No. 2:00-cv-06506-MRP-AJW.   In that litigation, Masimo was represented by Stephen Jensen, among other attorneys from Knobbe Martens.   Masimo's CEO Joe Kiani was directly involved in that litigation having signed multiple declarations on behalf of Masimo.   *See, e.g.*, *Mallinckrodt, Inc. v. Masimo Corp.*, No. 2:00-cv-06506-MRP-AJW, D.I. 265 (June 30, 2003 Declaration of Joe Kiani) & D.I. 389 (Jan. 20, 2004 Declaration of Joe Kiani).   On August 4, 2004, the court entered Final Judgment where the court adjudged and decreed that Nellcor's manufacture, sale, offer to sell, use or importation of products including the N-395 and OxiMax N-595 monitors infringed several of Masimo's asserted patents.   *See Mallinckrodt, Inc. v. Masimo Corp.*, No. 2:00-cv-06506-MRP-AJW, D.I. 632 (Aug. 4, 2004) (Final Judgment).   Masimo then appealed aspects of the Court's decision in *Mallinckrodt, Inc. v. Masimo Corp.*, No. 2:00-cv-06506-MRP-AJW, after which the Federal Circuit ruled in Masimo's favor on multiple issues.   *See Mallinckrodt, Inc. v. Masimo Corp.*, 147 F. App'x 158, 162 (Fed. Cir. 2005).   In a press release regarding the Federal Circuit's decision, Masimo reported that "[t]he products found to infringe are Nellcor's O4 (Oxismart XL), O5 and O5ci (Oximax) technologies.   **Oxismart XL and Oximax technology are found in certain Nellcor pulse oximetry products, such as the N-595, N-395**, N-550 and NPB40 pulse oximeters."   (*See* https://www.masimo.com/company/news/news-media/2005/#news-

1bcc85f5-3a5a-401d-8e4d-2a3c09fbade3, last accessed August 2, 2023) (emphasis added). That press release quoted Founder and CEO of Masimo Joe Kiani who provided comments about the case and, thus, knew about the Nellcor products accused in that case, including the N-395 and OxiMax N-595. Given Kiani and Jensen's involvement in that litigation, as well as the stage of that case proceeding through trial, on information and belief, Kiani and Jensen knew about the material documentation describing the Nellcor NPB-195, N-395, and OxiMax N-595 products.

Additionally, Nellcor Puritan Bennett, Inc. and Mallinckrodt Inc. became involved in another litigation with Masimo on December 10, 2002, when Nellcor and Mallinckrodt sued Masimo for patent infringement in United States District Court for the Central District of California in Civil Action No. 2:03-cv-00603-MR-AJ. That litigation ended—along with still pending claims that were remanded in the *Mallinckrodt, Inc. v. Masimo Corp.*, No. 2:00-cv-06506-MRP-AJW litigation following the Federal Circuit's ruling—on January 17, 2006, when Masimo and Nellcor entered into a settlement agreement that was signed by Joe Kiani on behalf of Masimo, further evidencing his awareness and knowledge of the Nellcor products and the material documents describing them. (*See* https://www.sec.gov/Archives/edgar/data/937556/000119312507082880/dex1030.htm, last accessed August 2, 2023).

At all relevant times, including during the prosecution of the '223 patent, Masimo, including Kiani and Jensen regarded Nellcor as Masimo's leading competitor in the pulse oximetry market. Indeed, on April 30, 2002, Kiani provided extensive testimony before the United States Senate regarding Nellcor. Among other things, Kiani testified that "our primary competitor, Tyco-Nellcor, [is] one of the largest companies in the world and already ha[s] 90% of the pulse oximetry market" and was "Masimo's leading and large[st] competitor."

(https://www.judiciary.senate.gov/imo/media/doc/kiani_testimony_04_30_02.pdf, last accessed August 2, 2023).  Thus, on information and belief, Masimo, including Kiani and Jensen, were well aware of the Nellcor pulse oximetry products and at least their publicly available substantive supporting documentation, such as the Operator's Manuals, including, for example, the Operator's Manuals for the NPB-195, N-395, and OxiMax N-595.

Unsurprisingly, Masimo, including named inventor Kiani, actively monitored the competing pulse oximeter product offerings of its primary and leading competitor Nellcor.  Indeed, during his April 30, 2002 testimony before the United States Senate, Kiani repeatedly testified about Nellcor and its products, including Nellcor's N-395 product, which evidences his awareness of the Nellcor N-395 product and the Nellcor broader family of pulse oximetry products, including the closely related NPB-195 and OxiMax N-595.  (*See* https://www.judiciary.senate.gov/imo/media/doc/kiani_testimony_04_30_02.pdf, last accessed August 2, 2023 (Kiani testifying regarding clear similarities between a Masimo pulse oximeter and Nellcor N-395, stating "[Nellcor] also told us that they would not let Masimo start the 'breakthrough technology' process until Tyco-Nellcor introduced its N-395, which Tyco-Nellcor had assured Premier would be equivalent to Masimo SET")).  Moreover, Masimo and Kiani recognized and followed product comparisons between the Masimo pulse oximeters and the Nellcor N-395 and N-595.  (*See* https://www.masimo.com/company/news/news-media/2002/#news-234b74e6-4b58-4964-96c1-b39eafcb4ee6, last accessed August 2, 2023 (10/18/2002 article on which Kiani commented that provides a product comparison between the "clinical performance of Masimo SET pulse oximetry compared to the Tyco-Nellcor N-395 and N-595")).  Further, Masimo testified that Kiani conducted detailed tests of another competitor's product, thereby corroborating the fact that Kiani must have also tested and been well-aware of

the competing products of Masimo's primary competitor, Nellcor.  *See Masimo Corp. v. Philips Elec. N. Am. Corp.*, No. CV 09-80-LPS, 2015 WL 2379485, at *20 (D. Del. May 18, 2015) ("Masimo presented evidence that its engineering team and Mr. Kiani tested PureSAT and confirmed it does not measure through motion (Tr. at 522–25, 635–36).").  Thus, on information and belief, Masimo and Kiani were themselves also studying and comparing the Nellcor pulse oximetry products, including the NPB-195, and N-395, and OxiMax N-595 products and their supporting documentation such as Operator's Manuals, when developing their own pulse oximetry products, and were well-aware of the materiality of each of these products and documents.

As discussed herein, on information and belief, Kiani, Jensen, and others at Masimo knew about Nellcor's pulse oximeters, including the Nellcor NPB-195, N-395, and OxiMax N-595 products, and the documentation describing those products, and knew of their materiality, yet specifically intended to, and did, withhold those material references from the USPTO during prosecution of the '223 patent.  On information and belief, Kiani, Jensen, and other Masimo agents substantively involved in the prosecution of the '223 patent specifically intended to, and did, allow the examiners of the '223 patent to issue claims they would not have if Kiani, Jensen, and others at Masimo had disclosed any of the documentation describing the Nellcor NPB-195, N-395, or OxiMax N-595 products.  Masimo is now asserting at least one of these claims against Apple.

None of the information disclosure statements submitted to the USPTO during prosecution of the '223 patent from March 2006 to April 2013 disclosed material technical features of the Nellcor NPB-195, N-395, or OxiMax N-595 products or Nellcor's material technical documentation describing the Nellcor NPB-195, N-395, or OxiMax N-595.

Named inventor Kiani and attorneys of record for the prosecution of the '223 patent including Jensen, however, had extensive knowledge of Nellcor and the withheld documentation

26

describing the Nellcor NPB-195, N-395, and OxiMax N-595 products during the prosecution of the '223 patent.  Kiani founded Masimo in 1989.  At all relevant times, including during the prosecution of the '223 patent, Kiani was the Chief Executive Officer and Chairman of the Board of Masimo.  And as discussed above, Jensen was an attorney of record for Masimo in patent infringement litigation against Nellcor that concerned Nellcor products including the N-395 and OxiMax N-595.

On information and belief, Kiani, Jensen, and others at Masimo thus had deep knowledge of the materiality of each of the NPB-195, N-395, and OxiMax N-595 products and each of the material supporting documents publicly released for these products, particularly the Operator's Manuals, and their applicability as material prior art references.  Despite this knowledge, Kiani, Jensen, and others at Masimo concealed those material prior art products and documents from the USPTO during prosecution of the '223 patent.  On information and belief, they did so because they knew that identifying this information to the USPTO would have resulted in the USPTO rejecting the claims and not issuing the '223 patent—i.e., they each specifically intended to deceive the USPTO into issuing the '223 patent.  The single most reasonable inference from this conduct is that they intended to deceive the USPTO into improperly allowing the '223 patent.

Accordingly, the '223 patent is unenforceable due to inequitable conduct.

The effect of this misconduct by Kiani, Jensen, and others at Masimo is not limited to the '223 patent.  All subsequent "child" or other related patents that are based on the same specification or relevant portions thereof are tainted by Masimo's inequitable conduct and, therefore, are also unenforceable under the doctrine of infectious unenforceability.

**’507 Patent — Withholding of Material Prior Art**

The ’507 patent is unenforceable due to inequitable conduct occurring during its prosecution, including, among other misconduct, Harnik Shukla, Jarom Kesler, and Stephen Jensen’s withholding from the USPTO of key prior art that each of those individuals knew was material to patentability.  Harnik Shukla, Jarom Kesler, and Stephen Jensen had extensive knowledge of this prior art at the relevant time and had disclosed it in another patent prosecution that took place in parallel with the prosecution of the ’507 patent.  These actions constitute fraud through omission because they violated the duty of disclosure owed by each of those individuals to the USPTO.  These actions were all done with a specific intent to deceive the USPTO, which would not have issued the ’507 patent if it had been made properly aware of the withheld prior art.

As discussed below, Harnik Shukla, Jarom Kesler, and Stephen Jensen are among the individuals who owed a duty of disclosure to the USPTO during the prosecution of the ’507 patent and committed inequitable conduct by breaching that duty of disclosure.  Each of these individuals was an attorney of record for prosecuting the application that resulted in the ’507 patent.

Furthermore, Masimo and Knobbe Martens have an extensive 30-year relationship with overlapping members.  For example, Jensen not only is a partner at Knobbe Martens, the law firm that prosecuted these patents, but also has served as Masimo’s General Counsel and Senior Vice President of Original Equipment Manufacture (OEM) Business and Business Development and Jensen promotes himself as serving on the Board of Directors of Masimo affiliate Cercacor Corporation.  (*See* https://www.knobbe.com/attorneys/steve-jensen, last accessed August 2, 2023).  As another example, Jensen has been reported saying “I’ve represented [Masimo] since 1993 when they were a small group of engineers out of a very small office. . . I’ve represented them since almost the beginning.”  (*See*  https://www.ocbj.com/manufacturing/knobbe-partners-prep-for-

28

masimo-case/, last accessed August 2, 2023).  Furthermore, Jensen and Knobbe Martens have been

prosecuting Kiani and Masimo's patent applications since 1993 such that Masimo has "changed

[Jensen's] personal and professional life immensely." (*See*

https://www.investors.com/news/management/leaders-and-success/masimo-ceo-four-guiding-

principles-turn-startup-success/, last accessed August 2, 2023).  On information and belief, Kiani

and others at Masimo selected the law firm Knobbe Martens to prosecute the '507 patent, the '745

patent, and other Masimo patents to exploit the 30-year commingled relationship that Masimo had

with Knobbe Martens, which ensured total control over the prosecution process, including which

material prior art to intentionally withhold from the USPTO to improperly obtain patents including

the '507 patent.

<u>Harnik Shukla</u>

Harnik Shukla had a duty to disclose information material to the patentability of the '507

patent to the USPTO during prosecution of the '507 patent.  Mr. Shukla is a partner at the law firm

of Knobbe Martens and an attorney of record for prosecution of the '507 patent who prepared and

prosecuted the application that resulted in the '507 patent.

For example, Mr. Shukla prepared, signed, and filed Masimo's September 30, 2019

Information Disclosure Statement that failed to disclose known material prior art during the

prosecution of the '507 patent:

Docket No.: MAS.925C1                                    **Customer No. 64735**

**INFORMATION DISCLOSURE STATEMENT**

| | | |
|---|---|---|
| First Inventor | : | Bilal Muhsin |
| App. No. | : | 15/880071 |
| Filed | : | January 25, 2018 |
| For | : | PHYSIOLOGICAL MONITOR WITH MOBILE COMPUTING DEVICE CONNECTIVITY |
| Examiner | : | Fardanesh, Marjan |
| Art Unit | : | 3791 |
| Conf. No. | : | 4417 |

**Mail Stop Amendment**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

**References and Listing**

     Pursuant to 37 CFR 1.56, an Information Disclosure Statement listing references is provided herewith.  Copies of any listed foreign and non-patent literature references are being submitted.

**No Disclaimers**

     To the extent that anything in the Information Disclosure Statement or the listed references could be construed as a disclaimer of any subject matter supported by the present application, Applicant hereby rescinds and retracts such disclaimer.

**Timing of Disclosure**

     This Information Disclosure Statement is being filed after receipt of a First Office Action, but before the mailing date of a Final Action and before the mailing date of a Notice of Allowance.

     This Statement is accompanied by the fees set forth in 37 CFR 1.17(p).  The Commissioner is hereby authorized to charge any additional fees which may be required or to credit any overpayment to Account No. 11-1410.

**Application No.:  15/880071**
**Filing Date:       January 25, 2018**

                                             Respectfully submitted,

                                             KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated:  September 30, 2019          By:/Harnik Shukla/_____
                                             Harnik Shukla
                                             Registration No. 73,097
                                             Registered Practitioner
                                             Customer No. 64735
                                             (949) 721-5278

31422815

('507 Prosecution, September 30, 2019 Information Disclosure Statement transmitted September 30, 2019).

In addition, the USPTO expressly lists Mr. Shukla as an attorney of record for prosecution of the '507 patent.

Jarom Kesler

Jarom Kesler had a duty to disclose information material to the patentability of the '507 patent to the USPTO during prosecution of the '507 patent. Mr. Kesler is a partner at the law firm of Knobbe Martens and an attorney of record for prosecution of the '507 patent who was substantively involved in the preparation and prosecution of the application that resulted in the '507 patent.

For example, the USPTO expressly lists Mr. Kesler as an attorney of record for prosecution of the '507 patent.

Stephen Jensen

Stephen Jensen had a duty to disclose information material to the patentability of the '507 patent to the USPTO during prosecution of the '507 patent. As a partner at the law firm of Knobbe Martens, Mr. Jensen was Masimo's primary outside counsel and an attorney of record for prosecution of the '507 patent who was substantively involved in the preparation and prosecution of the application that resulted in the '507 patent.

For example, the USPTO expressly lists Mr. Jensen as an attorney of record for prosecution of the '507 patent.

In addition to his own role as an attorney of record for prosecuting the '507 patent, Mr. Jensen—as Masimo's primary outside patent attorney and client liaison—was the Knobbe Martens partner who had ultimate responsibility for and control over Knobbe Martens' legal work for

31

Masimo, including prosecution of the '507 patent.  As such, Mr. Jensen had the incentive to, and as discussed below, did in fact prioritize his longstanding loyalties to Masimo over his duties of disclosure to the PTO to facilitate issuance of the '507 patent by committing inequitable conduct.

Mr. Kiani and others at Masimo selected the law firm of Knobbe Martens to prosecute the '507 patent to ensure that the firm with which Masimo had a 30-year commingled relationship would control the prosecution process, including which material prior art to withhold from the USPTO.

During prosecution of the '507 patent, Masimo, including through its prosecution attorneys of record Shukla, Kesler, and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '507 patent, withheld from the USPTO known prior art material to the patentability of the '507 patent—including Mendelson et al., "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," Proceedings of the 28th IEEE EM BS Annual International Conference, August 30-September 3, 2006 ("Mendelson IEEE")—with specific intent to deceive the USPTO.

Mendelson IEEE is prior art to the '507 patent and anticipates under 35 U.S.C. § 102 and/or renders obvious under 35 U.S.C. § 103, standing alone or combined with a person of ordinary skill in the art, at least claims 13, 14, 17, and 19 of the '507 patent.  As shown in the attached exemplary claim chart, Mendelson IEEE discloses every element of at least claims 13, 14, 17, and 19 of the '507 patent and otherwise contains disclosures material to the invalidity of the asserted claims of the '507 patent.

For example, the '507 patent claims "[a] computer-implemented method of informing a user of mobile measurement of oxygen saturation" utilizing an "optical sensor," a "processing board," and "an application." '507 patent at claim 13.

Mendelson IEEE similarly discloses "a wireless wearable pulse oximeter developed based on a small forehead mounted sensor" that includes a processor and "wireless communication capabilities to transfer arterial oxygen saturation (SpO2), heart rate (HR), body acceleration, and posture information to a PDA" and "[a] dedicated National Instruments LabVIEW program [which] was developed to control all interactions between the PDA and the wearable unit via a graphical user interface (GUI)." Mendelson IEEE at 1-3.

The '507 patent also claims "generating a graphical user interface having a plurality of display portions" and "displaying, in at least one portion of the plurality of display portions, a representation of a physiological parameter of a plurality of physiological parameters comprising at least the SpO2 measurement values" and "displaying, in a different portion of the plurality of portions, a plurality of user inputs configured to allow the user to interact with at least one of the plurality of display portions or the application." '507 patent at claim 13.

Mendelson IEEE similarly discloses that "[t]he stream of data received from the wearable unit is distributed to various locations on the PDA's graphical display.  The most prominent portion of the GUI display is the scrolling PPG waveform, shown in Fig. 3.  Numerical SpO2 and HR values are displayed is separate indicator windows" and similarly that "[t]he user interacts with the wearable system using a simple GUI . . . [which] allows easy activation of various functions." Mendelson IEEE at 3.

As such, the examiners for the '507 patent would not have allowed the '507 patent's claims if Shukla, Kesler, and Jensen did not withhold Mendelson IEEE from the USPTO.

During prosecution, Masimo, including through its prosecution attorneys of record Shukla, Kesler, Jensen, as well as other Masimo agents substantively involved in the prosecution of the '507 patent, knowingly withheld Mendelson IEEE from the USPTO.  This was not merely a

peripheral reference for which those individuals merely had incidental awareness.  Instead, at the same time that Shukla, Kesler, and Jensen withheld Mendelson IEEE, those individuals knew about and indeed affirmatively cited Mendelson IEEE in the parallel prosecution of U.S. Patent No. 10,687,745 ("the '745 patent").  As discussed further below, Shukla, Kesler, and Jensen and as well as other Masimo agents substantively involved in the prosecution of the '507 patent, also prepared, prosecuted, and otherwise were substantively involved in preparing and prosecuting the '745 patent, which was prosecuted on an expedited basis from filing to issuance all while the prosecution of the '507 patent was ongoing.  Indeed, Shukla, Kesler, and Jensen were responsible for prosecuting both the '507 patent and the '745 patent.  Shukla, Kesler, Jensen and others at Masimo thus knew about Mendelson IEEE and its materiality yet specifically intended to, and did, withhold this material reference from the USPTO examiners of the '507 patent.  Shukla, Kesler, Jensen, and others at Masimo specifically intended to, and did, allow the examiners of the '507 patent to issue claims they would not have if these individuals and others at Masimo had disclosed Mendelson IEEE to them.  Masimo is now asserting at least one of these claims against Apple.

From January 2018 to August 2020, Masimo submitted two information disclosure statements to the USPTO when prosecuting the '507 patent that identified only 12 references.  Those information disclosure statements did not disclose or even mention Mendelson IEEE.

On April 23, 2020, however, Masimo cited Mendelson IEEE in an Information Disclosure Statement in its parallel prosecution of the '745 patent.  Shukla, Kesler, and Jensen thus were aware of Mendelson IEEE during the time that they were prosecuting the '507 patent.

Shukla was aware of Mendelson IEEE during the prosecution of the '507 patent.  Shukla was an attorney of record for prosecution of the '745 patent who was substantively involved in the preparation and prosecution of the application resulting in the '745 patent.

34

Kesler was aware of Mendelson IEEE during the prosecution of the '507 patent. Kesler was an attorney of record for prosecution of the '745 patent who prepared and prosecuted the application resulting in the '745 patent.

Among other things, Kesler signed and filed documents submitted by Masimo during the prosecution of the '745 patent, including the April 23, 2020 Information Disclosure Statement that affirmatively cited Mendelson IEEE:

<div style="border">

### INFORMATION DISCLOSURE STATEMENT
### AND NOTICE OF CONCURRENT LITIGATION

| | | |
|---|---|---|
| Inventor | : | Ammar Al-Ali |
| App. No. | : | 16/835,772 |
| Filed | : | March 31, 2020 |
| For | : | PHYSIOLOGICAL MONITORING DEVICES, SYSTEMS, AND METHODS |
| Examiner | : | FARDANESH, MARJAN |
| Art Unit | : | 3791 |
| Conf. No. | : | 2365 |

</div>

\*        \*        \*

**Timing of Disclosure**

This Information Disclosure Statement is being filed before the receipt of a First Office Action on the merits, and presumably no fee is required. If a First Office Action on the merits was mailed before the mailing date of this Statement, the Commissioner is authorized to charge the fee set forth in 37 CFR 1.17(p) to Deposit Account No. 11-1410.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: April 23, 2020                         By:    /Jarom Kesler/
                                              Jarom D. Kesler
                                              Registration No. 57,046
                                              Registered Practitioner
                                              (949) 760-0404

\*        \*        \*

35

| | 1303 | Mendelson et al., "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," Proceedings of the 28th IEEE EMBS Annual International Conference, August 30-September 3, 2006, pp. 912-915. |
|---|---|---|

('745 Prosecution, April 23, 2020 Information Disclosure Statement).

Jensen was aware of Mendelson IEEE during the prosecution of the '507 patent. From January 2018 to August 2020, Jensen also was an attorney of record for prosecution of the '745 patent who was substantively involved in the preparation and prosecution of the application that resulted in the '745 patent.

As Masimo's primary outside patent attorney and client liaison, Mr. Jensen also had ultimate responsibility for and control over this prosecution.

At least Shukla, Kesler, and Jensen thus had deep knowledge of Mendelson IEEE and its applicability as a prior art reference. Despite this knowledge, Shukla, Kesler, Jensen, and others at Masimo concealed Mendelson IEEE from the USPTO during prosecution of the '507 patent. On information and belief, they did so because they knew that identifying this information to the USPTO would have resulted in the USPTO rejecting the claims and not issuing the '507 patent— i.e., they each specifically intended to deceive the USPTO into issuing the '507 patent. The single most reasonable inference from this conduct is that they intended to deceive the USPTO into improperly allowing the '507 patent.

Accordingly, the '507 patent is unenforceable due to inequitable conduct.

The effect of Shukla, Kesler, and Jensen's conduct is not limited to the '507 patent. All subsequent "child" or other related patents that are based on the same specification or relevant portions thereof are tainted by Masimo's inequitable conduct and, therefore, are also unenforceable under the doctrine of infectious unenforceability.

36

## **'743 Patent — Burying of Material Prior Art**

The '743 patent is unenforceable due to inequitable conduct occurring during its prosecution, including, among other misconduct, Jarom Kesler and Stephen Jensen burying key prior art references that each of those individuals knew were material to patentability. Specifically, during prosecution of the '743 patent, Jarom Kesler and Stephen Jensen intentionally buried known, highly material prior art among voluminous submissions of less relevant and even clearly irrelevant prior art. Jarom Kesler and Stephen Jensen's pattern of misconduct evidenced specific intent to deceive the USPTO, which would not have issued the '743 patent if it had been made properly aware of the buried references.

As discussed below, Jarom Kesler and Stephen Jensen are among the individuals who owed a duty of disclosure to the USPTO during the prosecution of the '743 patent and committed inequitable conduct by breaching that duty of disclosure. Each of these individuals was an attorney of record for prosecuting the application that resulted in the '743 patent.

Jarom Kesler

Jarom Kesler had a duty to disclose information material to the patentability of the '743 patent to the USPTO during prosecution of the '743 patent. Mr. Kesler is a partner at the law firm of Knobbe Martens and an attorney of record for prosecution of the '743 who prepared and prosecuted the application resulting in the '743 patent. Among other things, Mr. Kesler signed and filed documents submitted by Masimo during prosecution of the '743 patent, including Masimo's February 14, 2020 Patent Application; February 14, 2020 Request for Prioritized Examination; March 11, 2020 Rescission of any Prior Disclaimers and Request to Revisit Art, March 11, 2020 Amendments, March 11, 2020 Information Disclosure Statement; March 30, 2020 Interview; April 8, 2020 Information Disclosure Statement and Notice of Concurrent Litigation;

37

April 15, 2020 Comments on Statement of Reasons for Allowance; and August 10, 2020 Certificate of Correction.

Among other things, Mr. Kesler prepared, signed, and filed Masimo's March 11, 2020 Information Disclosure Statement, which cited no fewer than *1,339* prior art references.  This March 11, 2020 Information Disclosure Statement included all of the same 1,339 references that were included in the Information Disclosure Statement submitted for a different patent, the '159 patent, on the same date.

**INFORMATION DISCLOSURE STATEMENT**

| | | |
|---|---|---|
| First Inventor | : | Ammar Al-Ali |
| App. No. | : | 16/791955 |
| Filed | : | February 14, 2020 |
| For | : | PHYSIOLOGICAL MEASUREMENT DEVICES, SYSTEMS, AND METHODS |
| Examiner | : | Unassigned |
| Art Unit | : | 2875 |
| Conf. No. | : | 3106 |

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**References and Listing**

Pursuant to 37 CFR 1.56, an Information Disclosure Statement listing references is provided herewith. References numbered 1-1219 and 1221-1339 are of record in U.S. patent application No. 16/532061, filed August 5, 2019, which is relied upon for an earlier filing date under 35 USC 120. Accordingly, copies of references 1-1219 and 1221-1339 are not submitted pursuant to 37 CFR 1.98(d).

**No Disclaimers**

To the extent that anything in the Information Disclosure Statement or the listed references could be construed as a disclaimer of any subject matter supported by the present application, Applicant hereby rescinds and retracts such disclaimer.

**Timing of Disclosure**

This Information Disclosure Statement is being filed within three months of the filing date or date of national phase entry, with an RCE or before receipt of a First Office Action after an RCE, and no fee is believed to be required.

The Commissioner is hereby authorized to charge any additional fees which may be required, or credit any overpayment, to Account No. 11-1410.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: March 11, 2020

By: _____ /Jarom Kesler/ _____
   Jarom D. Kesler
   Registration No. 57,046
   Registered Practitioner
   Customer No. 64735
   (949) 760-0404

('743 Prosecution, March 11, 2020 Information Disclosure Statement).

Among other things, Mr. Kesler also prepared, signed, and filed Masimo's February 14, 2020 Request for Prioritized Examination, which was granted on March 5, 2020.

**CERTIFICATION AND REQUEST FOR PRIORITIZED EXAMINATION**
**UNDER 37 CFR 1.102(e)** (Page 1 of 1)

| First Named Inventor: | Ammar Al-Ali | Nonprovisional Application Number (if known): | Unassigned |
|---|---|---|---|
| Title of Invention: | PHYSIOLOGICAL MEASUREMENT DEVICES, SYSTEMS, AND METHODS | | |

**APPLICANT HEREBY CERTIFIES THE FOLLOWING AND REQUESTS PRIORITIZED EXAMINATION FOR THE ABOVE-IDENTIFIED APPLICATION.**

1. The processing fee set forth in 37 CFR 1.17(i)(1) and the prioritized examination fee set forth in 37 CFR 1.17(c) have been filed with the request. The publication fee requirement is met because that fee, set forth in 37 CFR 1.18(d), is currently $0. The basic filing fee, search fee, and examination fee are filed with the request or have been already been paid. I understand that any required excess claims fees or application size fee must be paid for the application.

2. I understand that the application may not contain, or be amended to contain, more than four independent claims, more than thirty total claims, or any multiple dependent claims, and that any request for an extension of time will cause an outstanding Track I request to be dismissed.

3. The applicable box is checked below:

   I. &#9745; **Original Application (Track One) - Prioritized Examination under § 1.102(e)(1)**

   i. (a) The application is an original nonprovisional utility application filed under 35 U.S.C. 111(a). This certification and request is being filed with the utility application via EFS-Web.
   ---OR---
   (b) The application is an original nonprovisional plant application filed under 35 U.S.C. 111(a). This certification and request is being filed with the plant application in paper.

   ii. An executed inventor's oath or declaration under 37 CFR 1.63 or 37 CFR 1.64 for each inventor, **or** the application data sheet meeting the conditions specified in 37 CFR 1.53(f)(3)(i) is filed with the application.

   II. &#9744; **Request for Continued Examination - Prioritized Examination under § 1.102(e)(2)**

   i. A request for continued examination has been filed with, or prior to, this form.
   ii. If the application is a utility application, this certification and request is being filed via EFS-Web.
   iii. The application is an original nonprovisional utility application filed under 35 U.S.C. 111(a), or is a national stage entry under 35 U.S.C. 371.
   iv. This certification and request is being filed prior to the mailing of a first Office action responsive to the request for continued examination.
   v. No prior request for continued examination has been granted prioritized examination status under 37 CFR 1.102(e)(2).

| Signature /Jarom Kesler/ | Date 2020-02-14 |
|---|---|
| Name (Print/Typed) Jarom D. Kesler | Practitioner Registration Number 57046 |

**Note:** This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4(d) for signature requirements and certifications. Submit multiple forms if more than one signature is required.*

&#9745; *Total of _____ forms are submitted.

('743 Prosecution, February 14, 2020 Certification and Request for Prioritized Examination).

40

| | Application No. 16/791,955 | Applicant(s) Al-Ali, Ammar | |
|---|---|---|---|
| *Decision Granting Request for Prioritized Examination (Track I)* | Examiner BRIAN W BROWN | Art Unit OPET | AIA (FITF) Status Yes |

1. THE REQUEST FILED <u>14 February 2020</u> IS <u>**GRANTED**</u> .

   The above-identified application has met the requirements for prioritized examination
   A.  ☑ for an original nonprovisional application (Track I).
   B.  ☐ for an application undergoing continued examination (RCE).

2. **The above-identified application will undergo prioritized examination**. The application will be accorded special status throughout its entire course of prosecution until one of the following occurs:

   A.  filing a **petition for extension of time** to extend the time period for filing a reply;

   B.  filing an **amendment to amend the application to contain more than four independent claims, more than thirty total claims** , or a multiple dependent claim;

   C.  filing a **request for continued examination** ;

   D.  filing a notice of appeal;

   E.  filing a request for suspension of action;

   F.  mailing of a notice of allowance;

   G.  mailing of a final Office action;

   H.  completion of examination as defined in 37 CFR 41.102; or

   I.  abandonment of the application.

   Telephone inquiries with regard to this decision should be directed to BRIAN BROWN at (571)272-5338. In his/her absence, calls may be directed to Petition Help Desk at (571) 272-3282.

   | /BRIAN W BROWN/ Petitions Examiner, OPET | |
   |---|---|

('743 Prosecution, March 5, 2020 Decision Granting Request for Prioritized Examination).

<u>Stephen Jensen</u>

Stephen Jensen had a duty to disclose information material to the patentability of the '743 patent to the USPTO during prosecution of the '743 patent.  As a partner at the law firm of Knobbe Martens, Mr. Jensen was Masimo's primary outside counsel and an attorney of record for

prosecution of the '743 patent who was substantively involved in the preparation and prosecution of the application that resulted in the '743 patent.

For example, the USPTO expressly lists Mr. Jensen as an attorney of record for prosecution of the '743 patent.

In addition to his own role as an attorney of record for prosecuting the '743 patent, Mr. Jensen—as Masimo's primary outside patent attorney and client liaison—was the Knobbe Martens partner who had ultimate responsibility for and control over Knobbe Martens' legal work for Masimo, including prosecution of the '743 patent. As such, Mr. Jensen had the incentive to, and as discussed below, did in fact prioritize his longstanding loyalties to Masimo over his duties of disclosure to the PTO to facilitate issuance of the '743 patent by committing inequitable conduct.

Mr. Kiani and others at Masimo selected the law firm of Knobbe Martens to prosecute the '743 patent to ensure that the firm with which Masimo had a 30-year commingled relationship would control the prosecution process, including which material prior art to withhold from the USPTO or otherwise bury under voluminous disclosures of irrelevant prior art, as discussed further below.

During prosecution of the '743 patent, Masimo, through its prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '743 patent, submitted unreasonably voluminous prior art disclosures to obscure five of the most important prior art references, namely U.S. Pub. No. US2011/0004106 to Iwamiya et al. ("Iwamiya"), U.S. Patent No. 6,801,799 to Mendelson ("Mendelson 799"), U.S. Patent No. 6,343,223 to Chin et al. ("Chin"), U.S. Patent No. 5,099,842 to Mannheimer et al. ("Mannheimer 842"), and U.S. Patent No. 6,580,086 to Schulz et al. ("Schulz"). Masimo's prosecution attorneys cited no fewer than 1,339 references in an Information Disclosure Statement submitted during

prosecution.  Masimo's March 11, 2020 Information Disclosure Statement, which essentially comprised a document dump of these 1,339 references, included numerous clearly irrelevant and (at best) marginally relevant references.  Because these references were buried amongst 1,339 disclosed references, the patent examiner could not have considered each of them and, in fact, did not cite them in any office action.

Among the 1,339 cited references was Iwamiya.  Iwamiya concerns an optical biological information detecting apparatus and teaches "a light emitting unit which emits observation light of a specific wavelength band to optically observe a desired portion of a tissue; an annular light guide unit which guides the observation light to a desired area of a surface of the skin…; and a light receiving unit which is disposed at a position surrounded by the annular light guide unit…" Iwamiya at claim 1.  Iwamiya is prior art to the '743 patent, and at least claims 1, 4-8, 11-12, 14, 16, 18-19, and 21 of the '743 patent are invalid as anticipated by Iwamiya under 35 U.S.C. § 102 or as obvious under § 103 in view of Iwamiya standing alone, or combined with a person of ordinary skill in the art.  As shown in the attached exemplary claim chart, Iwamiya (charted as U.S. Patent No. 8,670,819) discloses every element of at least claims 1, 4-8, 11-12, 14, 16, 18-19, and 21 of the '743 patent and otherwise contains disclosures material to the invalidity of the asserted claims of the '743 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '743 patent, knew during the prosecution of the '743 patent that Iwamiya existed and that its subject matter and disclosure was closely related and material to the subject matter of the alleged inventions claimed in the '743 patent, as evidenced by the submission of Masimo's March 11, 2020 Information Disclosure Statement.  At least Kesler and Jensen knew that Iwamiya was material to patentability of the '743 patent.

43

Also among the 1,339 cited references was Chin.  Chin concerns oximeter sensors with a heating element to improve blood perfusion, and the patent teaches "[a]n oximeter sensor comprising . . . a light emitter mounted on a first side of a tissue region of a patient . . . [and] a light detector mounted on a second side of said tissue region of said patient[.]" Chin at 10:25-30. Chin is prior art to the '743 patent, and at least claims 1, 4-8, 11-12, 14, 16, 18-19, and 21 of the '743 patent are invalid as anticipated by Chin under 35 U.S.C. § 102 or as obvious under § 103 in view of Chin standing alone, or combined with a person of ordinary skill in the art.  As shown in the attached exemplary claim chart, Chin discloses every element of at least claims 1, 4-8, 11-12, 14, 16, 18-19, and 21 of the '743 patent and otherwise contains disclosures material to the invalidity of the asserted claims of the '743 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '743 patent, knew during the prosecution of the '743 patent that Chin existed and that its subject matter and disclosure was closely related and material to the subject matter of the alleged inventions claimed in the '743 patent, as evidenced by the submission of Masimo's March 11, 2020 Information Disclosure Statement.  At least Kesler and Jensen knew that Chin was material to patentability of the '743 patent.

Among the 1,339 cited references was Mendelson 799.  Mendelson 799 concerns non-invasive blood parameter measurements and teaches "[a] sensor for use in an optical measurement device and a method for non-invasive measurement of a blood parameter." Mendelson 799 at Abstract.  Mendelson 799 is prior art to the '743 patent, and at least claims 1, 4-8, 11-12, 14, 16, 18-19, and 21 of the '743 patent are invalid as obvious under § 103 in view of Mendelson 799 standing alone, or combined with a person of ordinary skill in the art.  As shown in the attached

44

exemplary claim chart, Mendelson 799 contains disclosures material to the invalidity of the asserted claims of the '743 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '743 patent, knew during the prosecution of the '743 patent that Mendelson 799 existed and that its subject matter and disclosure was closely related and material to the subject matter of the alleged inventions claimed in the '743 patent, as evidenced by the submission of Masimo's March 11, 2020 Information Disclosure Statement.  At least Kesler and Jensen knew that Mendelson 799 was material to patentability of the '743 patent.

Also among the 1,339 cited references was Mannheimer 842.  Mannheimer 842 concerns a fetal pulse oximetry probe and teaches "[a] transflectance-type pulse oximetry probe comprising . . . a light source and a light detector mounted within a probe . . . ." Mannheimer 842 at 4:35-38. Mannheimer 842 is prior art to the '743 patent, and at least claims 1, 4-8, 11-12, 14, 16, 18-19, and 21 of the '743 patent are invalid as obvious under § 103 in view of Mannheimer 842 standing alone, or combined with a person of ordinary skill in the art.  As shown in the attached exemplary claim chart, Mannheimer 842 contains disclosures material to the invalidity of the asserted claims of the '743 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '743 patent, knew during the prosecution of the '743 patent that Mannheimer 842 existed and that its subject matter and disclosure was closely related and material to the subject matter of the alleged inventions claimed in the '743 patent, as evidenced by the submission of Masimo's March 11, 2020 Information Disclosure Statement.  At least Kesler and Jensen knew that Mannheimer 842 was material to patentability of the '743 patent.

Also among the 1,339 cited references was Schulz.  Schulz concerns an optical probe for use in measurements on tissue material of a patient, including for blood oximetry.  Schulz teaches an "optical probe for use in non-invasive energy absorption or reflection measurements, as well as a method of using the same."  Schulz at 3:46-48.  Schulz is prior art to the '743 patent, and at least claims 1, 4-8, 11-12, 14, 16, 18-19, and 21 of the '743 patent are invalid as obvious under § 103 in view of Schulz standing alone, or combined with a person of ordinary skill in the art.  As shown in the attached exemplary claim chart, Schulz contains disclosures material to the invalidity of the asserted claims of the '743 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '743 patent, knew during the prosecution of the '743 patent that Schulz existed and that its subject matter and disclosure was closely related and material to the subject matter of the alleged inventions claimed in the '743 patent, as evidenced by the submission of Masimo's March 11, 2020 Information Disclosure Statement.  At least Kesler and Jensen knew that Schulz was material to patentability of the '743 patent.

Accordingly, the buried Iwamiya reference, Mendelson 799 reference, Chin reference, Mannheimer 842 reference, and Schulz reference were, at the very least, highly material to patentability of the alleged inventions claimed in what would become the '743 patent.

Masimo, through its prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '743 patent, submitted two Information Disclosure Statements during prosecution of the patent application that led to the '743 patent on the following dates: March 11, 2020 and April 8, 2020.  These Information Disclosure Statements listed 1,339 prior art references, a substantial number of which were clearly irrelevant

or at most minimally relevant to the alleged inventions covered by the pending claims at any point during prosecution.

One example of an irrelevant (or at most minimally relevant) reference submitted to the USPTO is U.S. Patent No. Des. 359,546 to Savage et al. ("Savage"), titled "Housing for a dental unit disinfecting device." Whereas the '743 patent concerns a non-invasive, optical-based physiological monitoring sensor, Savage, a design-patent reference, concerns very different subject matter—the ornamental design for a housing for a dental unit disinfecting device. Shown in Figure 1 below is a perspective view of the housing for a dental unit disinfecting device.



This subject matter is far afield from that of the '743 patent and had the effect of obscuring and thereby burying the most material references, including at least Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz.

Another example of an irrelevant (or at most minimally relevant) reference submitted to the USPTO is U.S. Patent No. 6,595,316 to Cybulski et al. ("Cybulski"), titled "Tension-adjustable mechanism for stethoscope earpieces." Whereas the '743 patent concerns a non-invasive, optical-

based physiological monitoring sensor, this reference concerns very different subject matter—stethoscope earpieces.  For example, the patent discloses a "tension-adjustable headset for [an] electronic stethoscope." Cybulski at 3:42-43.  Figure 1 below shows said headset.



This subject matter is far afield from that of the '743 patent and had the effect of obscuring and thereby burying the most pertinent references, including Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz.

During prosecution of the '743 patent, Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '743 patent submitted the March 11, 2020 and April 8, 2020 Information Disclosure Statements, burying the USPTO with at least 1,339 references.  Buried in these unreasonably voluminous submissions were the material Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz.  Out of the 1,339 references cited in the March 11, 2020 Information Disclosure Statement, the Iwamiya reference was document 769, the Mendelson 799 reference was document 158, the Chin reference

was document 101, the Mannheimer 842 reference was document 5, and the Schulz reference was document 123.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '743 patent, were aware of the relevance and high materiality of Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz.  They knew that Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz existed because they included them in Information Disclosure Statements, and by submitting them in Information Disclosure Statements, thereby acknowledged their relevance to the prosecution of the application leading to the '743 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '743 patent, therefore had knowledge of Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz as well as their materiality to patentability, at least giving rise to an inference of intentional breach of their duties of disclosure.

Although Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz were submitted into the file history in the patent application that matured into the '743 patent via citations in the Information Disclosure Statement, these references were buried within a large number of other less relevant or irrelevant documents and were never brought to the examiner's attention.

Notably, despite their knowledge of the contents and materiality of Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz, Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '743 patent, failed to highlight these references or otherwise distinguish them in any way from the other 1,000-plus cited references at any point during the prosecution of what would become the '743

patent.  And Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz are not cumulative of other prior art relied on by the examiner.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '743 patent, thus buried Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz and failed to bring those references to the examiner's attention to intentionally mislead the examiner in order to improperly procure the '743 patent, notwithstanding that Masimo was not entitled to such patent based on Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz under 35 U.S.C. §§ 102, 103.

Masimo's prosecution attorneys of record Kesler and Jensen sought expedited review, which was granted on March 5, 2020.  Only six days later, on March 11, 2020, Masimo's prosecution attorneys of record Kesler and Jensen submitted 1,339 prior art references for the patent examiner's review.  Bound by USPTO's agreement to review the prosecution on an expedited basis, the patent examiner signed that March 11, 2020 Information Disclosure Statement on March 19, 2020, only eight days after receiving it, stating that the patent examiner has considered the 1,339 prior art references.  It defies reality that the patent examiner could have actually obtained, read, and considered 1,339 prior art references in just eight days.  On April 9, 2020, only a few weeks later, the patent examiner issued its Notice of Allowance.  Accordingly, by requesting expedited review and then submitting 1,339 prior art references for review on a compressed schedule, Masimo's prosecution attorneys of record Kesler and Jensen compounded the USPTO's inability to review the 1,339 prior art references with appropriate scrutiny. Therefore, the patent examiner could not possibly have read each reference that Masimo's prosecution attorneys of record had identified.  The single most reasonable inference that can be drawn from the evidence is that Masimo's prosecution attorneys of record intended to deceive the

USPTO by burying the patent examiner with prior art and leaving the patent examiner with no practical way to review everything that was disclosed or figure out what was pertinent among the 1,339 listed references.

But for this misleading conduct, the examiner would have cited either or all of Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz alone or in combination with other cited references to reject the claims of the '743 patent, including at least claims 1, 4-8, 11-12, 14, 16, 18-19, and 21 as invalid.

Accordingly, the '743 patent is unenforceable due to inequitable conduct.

The effect of Kesler and Jensen 's conduct is not limited to the '743 patent. All subsequent "child" or other related patents that are based on the same specification or relevant portions thereof are tainted by Masimo's inequitable conduct and, therefore, are also unenforceable under the doctrine of infectious unenforceability.

### '159 Patent — Burying of Material Prior Art

The '159 patent is unenforceable due to inequitable conduct occurring during its prosecution, including, among other misconduct, Jarom Kesler and Stephen Jensen's burying key prior art references that each of those individuals knew were material to patentability. Specifically, during prosecution of the '159 patent, Jarom Kesler and Stephen Jensen intentionally buried known, highly material prior art among voluminous submissions of less relevant and even clearly irrelevant prior art. Jarom Kesler and Stephen Jensen's pattern of misconduct evidenced specific intent to deceive the USPTO, which would not have issued the '159 patent if it had been made properly aware of the buried references.

As discussed below, Jarom Kesler and Stephen Jensen are among the individuals who owed a duty of disclosure to the USPTO during the prosecution of the '159 patent and committed

inequitable conduct by breaching that duty of disclosure.  Each of these individuals was an attorney of record for prosecuting the application that resulted in the '159 patent.

Jarom Kesler

Jarom Kesler had a duty to disclose information material to the patentability of the '159 patent to the USPTO during prosecution of the '159 patent.  Mr. Kesler is a partner at the law firm of Knobbe Martens and an attorney of record for prosecution of the '159 who prepared and prosecuted the application resulting in the '159 patent.  Among other things, Mr. Kesler signed and filed documents submitted by Masimo during prosecution of the '159 patent, including Masimo's February 14, 2020 Patent Application; February 24, 2020 Request for Prioritized Examination; March 11, 2020 Rescission of any Prior Disclaimers and Request to Revisit Art, March 11, 2020 Amendments, March 11, 2020 Information Disclosure Statement; April 8, 2020 Information Disclosure Statement and Notice of Concurrent Litigation; April 21, 2020 Comments on Statement of Reasons for Allowance; and August 10, 2020 Certificate of Correction.

Among other things, Mr. Kesler prepared, signed, and filed Masimo's March 11, 2020 Information Disclosure Statement, which cited no fewer than *1,339* prior art references.  This March 11, 2020 Information Disclosure Statement included all of the same 1,339 references that were included in the Information Disclosure Statement submitted for a different patent, the '743 patent, on the same date.

---

**INFORMATION DISCLOSURE STATEMENT**

| | | |
|---|---|---|
| First Inventor | : | Ammar Al-Ali |
| App. No. | : | 16/791963 |
| Filed | : | February 14, 2020 |
| For | : | PHYSIOLOGICAL MONITORING DEVICES, SYSTEMS, AND METHODS |
| Examiner | : | Unassigned |
| Art Unit | : | 3791 |
| Conf. No. | : | 4439 |

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**References and Listing**

Pursuant to 37 CFR 1.56, an Information Disclosure Statement listing references is provided herewith. References numbered 1-1219 and 1221-1339 are of record in U.S. patent application No. 16/532065, filed August 5, 2019, which is relied upon for an earlier filing date under 35 USC 120. Accordingly, copies of references 1-1219 and 1221-1339 are not submitted pursuant to 37 CFR 1.98(d).

**No Disclaimers**

To the extent that anything in the Information Disclosure Statement or the listed references could be construed as a disclaimer of any subject matter supported by the present application, Applicant hereby rescinds and retracts such disclaimer.

**Timing of Disclosure**

This Information Disclosure Statement is being filed within three months of the filing date or date of national phase entry, with an RCE or before receipt of a First Office Action after an RCE, and no fee is believed to be required.

The Commissioner is hereby authorized to charge any additional fees which may be required, or credit any overpayment, to Account No. 11-1410.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: March 11, 2020

By: _____ /Jarom Kesler/ _____
Jarom D. Kesler
Registration No. 57,046
Registered Practitioner
Customer No. 64735
(949) 760-0404

('159 Prosecution, March 11, 2020 Information Disclosure Statement).

Among other things, Mr. Kesler also prepared, signed, and filed Masimo's February 24, 2020 Request for Prioritized Examination, which was granted on March 5, 2020.

53

**CERTIFICATION AND REQUEST FOR PRIORITIZED EXAMINATION**
**UNDER 37 CFR 1.102(e)** (Page 1 of 1)

| First Named Inventor: | Ammar Al-Ali | Nonprovisional Application Number (if known): | Unassigned |
|---|---|---|---|
| Title of Invention: | PHYSIOLOGICAL MONITORING DEVICES, SYSTEMS, AND METHODS | | |

**APPLICANT HEREBY CERTIFIES THE FOLLOWING AND REQUESTS PRIORITIZED EXAMINATION FOR THE ABOVE-IDENTIFIED APPLICATION.**

1. The processing fee set forth in 37 CFR 1.17(i)(1) and the prioritized examination fee set forth in 37 CFR 1.17(c) have been filed with the request. The publication fee requirement is met because that fee, set forth in 37 CFR 1.18(d), is currently $0. The basic filing fee, search fee, and examination fee are filed with the request or have been already been paid. I understand that any required excess claims fees or application size fee must be paid for the application.

2. I understand that the application may not contain, or be amended to contain, more than four independent claims, more than thirty total claims, or any multiple dependent claims, and that any request for an extension of time will cause an outstanding Track I request to be dismissed.

3. The applicable box is checked below:

    I.   ☑ **Original Application (Track One) - Prioritized Examination under § 1.102(e)(1)**

    i.   (a) The application is an original nonprovisional utility application filed under 35 U.S.C. 111(a). This certification and request is being filed with the utility application via EFS-Web.
         ---OR---
         (b) The application is an original nonprovisional plant application filed under 35 U.S.C. 111(a). This certification and request is being filed with the plant application in paper.

    ii.  An executed inventor's oath or declaration under 37 CFR 1.63 or 37 CFR 1.64 for each inventor, **or** the application data sheet meeting the conditions specified in 37 CFR 1.53(f)(3)(i) is filed with the application.

    II.  ☐ **Request for Continued Examination - Prioritized Examination under § 1.102(e)(2)**

    i.   A request for continued examination has been filed with, or prior to, this form.
    ii.  If the application is a utility application, this certification and request is being filed via EFS-Web.
    iii. The application is an original nonprovisional utility application filed under 35 U.S.C. 111(a), or is a national stage entry under 35 U.S.C. 371.
    iv.  This certification and request is being filed prior to the mailing of a first Office action responsive to the request for continued examination.
    v.   No prior request for continued examination has been granted prioritized examination status under 37 CFR 1.102(e)(2).

| Signature /Jarom Kesler/ | Date 2020-02-24 |
|---|---|
| Name (Print/Typed) Jarom D. Kesler | Practitioner Registration Number 57046 |

**Note:** This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4(d) for signature requirements and certifications. Submit multiple forms if more than one signature is required.*

☑ *Total of 1 _____ forms are submitted.

('159 Prosecution, February 24, 2020 Certification and Request for Prioritized Examination).

54

| Decision Granting Request for Prioritized Examination (Track I) | Application No. 16/791,963 | Applicant(s) Al-Ali, Ammar | |
|---|---|---|---|
| | Examiner CHERYL P GIBSON BAYLOR | Art Unit OPET | AIA (FITF) Status Yes |

1. THE REQUEST FILED <u>14 February 2020</u> IS **GRANTED** .

   The above-identified application has met the requirements for prioritized examination
   A.   ☑ for an original nonprovisional application (Track I).
   B.   ☐ for an application undergoing continued examination (RCE).

2. **The above-identified application will undergo prioritized examination**. The application will be accorded special status throughout its entire course of prosecution until one of the following occurs:

   A.   filing a **petition for extension of time** to extend the time period for filing a reply;

   B.   filing an **amendment to amend the application to contain more than four independent claims, more than thirty total claims** , or a multiple dependent claim;

   C.   filing a **request for continued examination** ;

   D.   filing a notice of appeal;

   E.   filing a request for suspension of action;

   F.   mailing of a notice of allowance;

   G.    mailing of a final Office action;

   H.    completion of examination as defined in 37 CFR 41.102; or

   I.    abandonment of the application.

   Telephone inquiries with regard to this decision should be directed to CHERYL GIBSON BAYLOR at (571)272-3213. In his/her absence, calls may be directed to Petition Help Desk at (571) 272-3282.

| /CHERYL GIBSON BAYLOR/ Paralegal Specialist, OPET | |
|---|---|

('159 Prosecution, March 5, 2020 Decision Granting Request for Prioritized Examination).

<u>Stephen Jensen</u>

Stephen Jensen had a duty to disclose information material to the patentability of the '159 patent to the USPTO during prosecution of the '159 patent.  As a partner at the law firm of Knobbe Martens, Mr. Jensen was Masimo's primary outside counsel and an attorney of record for

prosecution of the '159 patent who was substantively involved in the preparation and prosecution of the application that resulted in the '159 patent.

For example, the USPTO expressly lists Mr. Jensen as an attorney of record for prosecution of the '159 patent.

In addition to his own role as an attorney of record for prosecuting the '159 patent, Mr. Jensen—as Masimo's primary outside patent attorney and client liaison—was the Knobbe Martens partner who had ultimate responsibility for and control over Knobbe Martens' legal work for Masimo, including prosecution of the '159 patent. As such, Mr. Jensen had the incentive to, and as discussed below, did in fact prioritize his longstanding loyalties to Masimo over his duties of disclosure to the PTO to facilitate issuance of the '159 patent by committing inequitable conduct.

Mr. Kiani and others at Masimo selected the law firm of Knobbe Martens to prosecute the '159 patent to ensure that the firm with which Masimo had a 30-year commingled relationship would control the prosecution process, including which material prior art to withhold from the USPTO or otherwise bury under voluminous disclosures of irrelevant prior art, as discussed further below.

During prosecution of the '159 patent, Masimo, through its prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '159 patent, submitted unreasonably voluminous prior art disclosures to obscure five of the most important prior art references, namely U.S. Pub. No. US2011/0004106 to Iwamiya et al. ("Iwamiya"), U.S. Patent No. 6,801,799 to Mendelson ("Mendelson 799"), U.S. Patent No. 6,343,223 to Chin et al. ("Chin"), U.S. Patent No. 5,099,842 to Mannheimer et al. ("Mannheimer 842"), and U.S. Patent No. 6,580,086 to Schulz et al. ("Schulz"). Masimo's prosecution attorneys cited no fewer than 1,339 references in Information Disclosure Statements submitted during

prosecution.  Masimo's March 11, 2020 Information Disclosure Statement, which essentially comprised a document dump of these 1,339 references, included numerous clearly irrelevant and (at best) marginally relevant references.  Because these references were buried amongst 1,339 disclosed references, the patent examiner could not have considered each of them and, in fact, did not cite them in any office action.

Among the 1,339 cited references was Iwamiya.  Iwamiya concerns an optical biological information detecting apparatus and teaches "a light emitting unit which emits observation light of a specific wavelength band to optically observe a desired portion of a tissue; an annular light guide unit which guides the observation light to a desired area of a surface of the skin . . . ; and a light receiving unit which is disposed at a position surrounded by the annular light guide unit . . . ." Iwamiya at claim 1.  Iwamiya is prior art to the '159 patent, and at least claims 1-5, 7-9, 13, 19-23, and 25 of the '159 patent are invalid as anticipated by Iwamiya under 35 U.S.C. § 102 or as obvious under § 103 in view of Iwamiya standing alone, or combined with a person of ordinary skill in the art.  As shown in the attached exemplary claim chart, Iwamiya (charted as U.S. Patent No. 8,670,819) discloses every element of at least claims 1-5, 7-9, 13, 19-23, and 25 of the '159 patent and otherwise contains disclosures material to the invalidity of the asserted claims of the '159 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '159 patent, knew during the prosecution of the '159 patent that Iwamiya existed and that its subject matter and disclosure was closely related and material to the subject matter of the alleged inventions claimed in the '159 patent, as evidenced by the submission of Masimo's March 11, 2020 Information Disclosure Statement.  At least Kesler and Jensen knew that Iwamiya was material to patentability of the '159 patent.

Also among the 1,339 cited references was Chin.  Chin concerns oximeter sensors with a heating element to improve blood perfusion, and the patent teaches "[a]n oximeter sensor comprising . . . a light emitter mounted on a first side of a tissue region of a patient . . . [and] a light detector mounted on a second side of said tissue region of said patient[.]" Chin at 10:25-30. Chin is prior art to the '159 patent, and at least claims 1-5, 7-9, 13, 19-23, and 25 of the '159 patent are invalid as anticipated by Chin under 35 U.S.C. § 102 or as obvious under § 103 in view of Chin standing alone, or combined with a person of ordinary skill in the art.  As shown in the attached exemplary claim chart, Chin discloses every element of at least claims 1-5, 7-9, 13, 19-23, and 25 of the '159 patent and otherwise contains disclosures material to the invalidity of the asserted claims of the '159 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '159 patent, knew during the prosecution of the '159 patent that Chin existed and that its subject matter and disclosure was closely related and material to the subject matter of the alleged inventions claimed in the '159 patent, as evidenced by the submission of Masimo's March 11, 2020 Information Disclosure Statement.  At least Kesler and Jensen knew that Chin was material to patentability of the '159 patent.

Among the 1,339 cited references was Mendelson 799.  Mendelson 799 concerns non-invasive blood parameter measurements and teaches "[a] sensor for use in an optical measurement device and a method for non-invasive measurement of a blood parameter." Mendelson 799 at Abstract.  Mendelson 799 is prior art to the '159 patent, and at least claims 1-5, 7-9, 13, 19-23, and 25 of the '159 patent are invalid as obvious under § 103 in view of Mendelson 799 standing alone, or combined with a person of ordinary skill in the art.  As shown in the attached exemplary claim

chart, Mendelson 799 contains disclosures material to the invalidity of the asserted claims of the '159 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '159 patent, knew during the prosecution of the '159 patent that Mendelson 799 existed and that its subject matter and disclosure was closely related and material to the subject matter of the alleged inventions claimed in the '159 patent, as evidenced by the submission of Masimo's March 11, 2020 Information Disclosure Statement.  At least Kesler and Jensen knew that Mendelson 799 was material to patentability of the '159 patent.

Also among the 1,339 cited references was Mannheimer 842.  Mannheimer 842 concerns a fetal pulse oximetry probe and teaches "[a] transflectance-type pulse oximetry probe comprising . . . a light source and a light detector mounted within a probe . . . ." Mannheimer 842 at 4:35-38. Mannheimer 842 is prior art to the '159 patent, and at least claims 1-5, 7-9, 13, 19-23, and 25 of the '159 patent are invalid as obvious under § 103 in view of Mannheimer 842 standing alone, or combined with a person of ordinary skill in the art.  As shown in the attached exemplary claim chart, Mannheimer 842 contains disclosures material to the invalidity of the asserted claims of the '159 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '159 patent, knew during the prosecution of the '159 patent that Mannheimer 842 existed and that its subject matter and disclosure was closely related and material to the subject matter of the alleged inventions claimed in the '159 patent, as evidenced by the submission of Masimo's March 11, 2020 Information Disclosure Statement.  At least Kesler and Jensen knew that Mannheimer 842 was material to patentability of the '159 patent.

59

Also among the 1,339 cited references was Schulz.  Schulz concerns an optical probe for use in measurements on tissue material of a patient, including for blood oximetry.  Schulz teaches an "optical probe for use in non-invasive energy absorption or reflection measurements, as well as a method of using the same."  Schulz at 3:46-48.  Schulz is prior art to the '159 patent, and at least claims 1-5, 7-9, 13, 19-23, and 25 of the '159 patent are invalid as obvious under § 103 in view of Schulz standing alone, or combined with a person of ordinary skill in the art.  As shown in the attached exemplary claim chart, Schulz contains disclosures material to the invalidity of the asserted claims of the '159 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '159 patent, knew during the prosecution of the '159 patent that Schulz existed and that its subject matter and disclosure was closely related and material to the subject matter of the alleged inventions claimed in the '159 patent, as evidenced by the submission of Masimo's March 11, 2020 Information Disclosure Statement.  At least Kesler and Jensen knew that Schulz was material to patentability of the '159 patent.

Accordingly, the buried Iwamiya, Mendelson 799 reference, Chin reference, Mannheimer 842 reference, and Schulz reference were, at the very least, highly material to patentability of the alleged inventions claimed in what would become the '159 patent.

Masimo, through its prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '159 patent, submitted two Information Disclosure Statements during prosecution of the patent application that led to the '159 patent on the following dates: March 11, 2020 and April 8, 2020.  These Information Disclosure Statements listed 1,339 prior art references, a substantial number of which were clearly irrelevant

or at most minimally relevant to the alleged inventions covered by the pending claims at any point during prosecution.

One example of an irrelevant (or at most minimally relevant) reference submitted to the USPTO is U.S. Patent No. Des. 359,546 to Savage et al. ("Savage"), titled "Housing for a dental unit disinfecting device."  Whereas the '159 patent concerns a non-invasive, optical-based physiological monitoring sensor, Savage, a design-patent reference, concerns very different subject matter—the ornamental design for a housing for a dental unit disinfecting device.  Shown in Figure 1 below is a perspective view of the housing for a dental unit disinfecting device.



This subject matter is far afield from that of the '159 patent and had the effect of obscuring and thereby burying the most material references, including at least Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz.

Another example of an irrelevant or at most minimally relevant reference submitted to the USPTO is U.S. Patent No. 6,595,316 to Cybulski et al. ("Cybulski"), titled "Tension-adjustable mechanism for stethoscope earpieces."  Whereas the '159 patent concerns a non-invasive, optical-

based physiological monitoring sensor, this reference concerns very different subject matter—stethoscope earpieces.  For example, the patent discloses a "tension-adjustable headset for [an] electronic stethoscope." Cybulski at 3:42-43.  Figure 1 below shows said headset.



This subject matter is far afield from that of the '159 patent and had the effect of obscuring and thereby burying the most pertinent references, including Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz.

During prosecution of the '159 patent, Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '159 patent submitted the March 11, 2020 and April 8, 2020 Information Disclosure Statements above, burying the USPTO with at least 1,339 references.  Buried in these unreasonably voluminous submissions were the material Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz.  Out of the 1,339 references cited in the March 11, 2020 Information Disclosure Statement, the Iwamiya reference was document 769, the Mendelson 799 reference was document 157, the Chin reference

was document 100, the Mannheimer 842 reference was document 5, and the Schulz reference was document 122.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '159 patent, were aware of the relevance and high materiality of Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz.  They knew that Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz existed because they included them in an Information Disclosure Statement, and by submitting them in an Information Disclosure Statement, thereby acknowledged their relevance to the prosecution of the application leading to the '159 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '159 patent, therefore had knowledge of Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz as well as their materiality to patentability, at least giving rise to an inference of intentional breach of their duties of disclosure.

Although Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz were submitted into the file history in the patent application that matured into the '159 patent via citations in an Information Disclosure Statement, these references were buried within a large number of other less relevant or irrelevant documents and were never brought to the examiner's attention.

Notably, despite their knowledge of the contents and materiality of Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz, Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '159 patent, failed to highlight these references or otherwise distinguish them in any way from the other 1,000-plus cited references at any point during the prosecution of what would become the '159

patent.  And Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz are not cumulative of other prior art relied on by the examiner.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '159 patent, thus buried Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz and failed to bring those references to the examiner's attention to intentionally mislead the examiner in order to improperly procure the '159 patent, notwithstanding that Masimo was not entitled to such patent based on Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz under 35 U.S.C. §§ 102, 103.

Masimo's prosecution attorneys of record Kesler and Jensen sought expedited review, which was granted on March 5, 2020.  Only six days later, on March 11, 2020, Masimo's prosecution attorneys of record Kesler and Jensen submitted 1,339 prior art references for the patent examiner's review.  Bound by USPTO's agreement to review the prosecution on an expedited basis, the patent examiner signed that March 11, 2020 Information Disclosure Statement on March 19, 2020, only eight days after receiving it, stating that the patent examiner has considered the 1,339 prior art references.  It defies reality that the patent examiner could have actually obtained, read, and considered 1,339 prior art references in just eight days.  On April 9, 2020, only a few weeks later, the patent examiner issued its Notice of Allowance.  Accordingly, by requesting expedited review and then submitting 1,339 prior art references for review on a compressed schedule, Masimo's prosecution attorneys of record Kesler and Jensen compounded the USPTO's inability to review the 1,339 prior art references with appropriate scrutiny.  On information and belief, this conduct was specifically intended to, and did, obscure material references from the examiner among many minimally relevant references.  Therefore, the patent examiner could not possibly have read each reference that Masimo's prosecution attorneys of

64

record had identified.  The single most reasonable inference that can be drawn from the evidence is that Masimo's prosecution attorneys of record intended to deceive the USPTO by burying the patent examiner with prior art and leaving the patent examiner with no practical way to review everything that was disclosed or figure out what was pertinent among the 1,339 listed references.

But for this misleading conduct, the examiner would have cited either or all of Iwamiya, Mendelson 799, Chin, Mannheimer 842, and Schulz alone or in combination with other cited references to reject the claims of the '159 patent, including at least claims 1-5, 7-9, 13, 19-23, and 25, as invalid.

Accordingly, the '159 patent is unenforceable due to inequitable conduct.

The effect of Kesler and Jensen's conduct is not limited to the '159 patent.  All subsequent "child" or other related patents that are based on the same specification or relevant portions thereof are tainted by Masimo's inequitable conduct and, therefore, are also unenforceable under the doctrine of infectious unenforceability.

### '911 Patent — Burying of Material Prior Art

The '911 patent is unenforceable due to inequitable conduct occurring during its prosecution, including, among other misconduct, Jarom Kesler and Stephen Jensen's burying key prior art references that each of those individuals knew were material to patentability.  Specifically, during prosecution of the '911 patent, Jarom Kesler and Stephen Jensen intentionally buried known highly material prior art among voluminous submissions of less relevant and even clearly irrelevant prior art.  Jarom Kesler and Stephen Jensen's pattern of misconduct evidenced specific intent to deceive the USPTO, which would not have issued the '911 patent if it had been made properly aware of the buried references.

As discussed below, Jarom Kesler and Stephen Jensen are among the individuals who owed a duty of disclosure to the USPTO during the prosecution of the '911 patent and committed inequitable conduct by breaching that duty of disclosure.  Each of these individuals was an attorney of record for prosecuting the application that resulted in the '911 patent.

<u>Jarom Kesler</u>

Jarom Kesler had a duty to disclose information material to the patentability of the '911 patent to the USPTO during prosecution of the '911 patent.  Mr. Kesler is a partner at the law firm of Knobbe Martens and an attorney of record for prosecution of the '911 patent who prepared and prosecuted the application resulting in the '911 patent.  Among other things, Mr. Kesler signed and filed documents submitted by Masimo during prosecution of the '911 patent, including Masimo's September 22, 2020 Patent Application; September 22, 2020 Certification and Request for Prioritized Examination; September 22, 2020 Information Disclosure Statement; September 22, 2020 Transmittal for Power of Attorney; October 22, 2020 Preliminary Amendment; March 4, 2021 Amendment After Allowance; March 4, 2021 Comments on Reasons for Allowance; and May 25, 2021 Request for Certificate of Correction.

Among other things, Mr. Kesler prepared, signed, and filed Masimo's September 22, 2020 Information Disclosure Statement, which cited no fewer than *1,725* prior art references.

| Docket No.: MLR.002C6 | Page 1 of 1 |
|---|---|

**INFORMATION DISCLOSURE STATEMENT**

| First Inventor | : | Robert A. Smith |
|---|---|---|
| App. No. | : | Herewith |
| Filed | : | Herewith |
| For | : | MULTIPLE WAVELENGTH SENSOR EMITTERS |
| Examiner | : | To Be Assigned |
| Art Unit | : | To Be Assigned |
| Conf. No. | : | To Be Assigned |

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**References and Listing**

Pursuant to 37 CFR 1.56, an Information Disclosure Statement listing references is provided herewith. Listed references are of record in U.S. patent application No. 16/437611, filed June 11, 2019, which is relied upon for an earlier filing date under 35 USC 120. Copies of the references are not submitted pursuant to 37 CFR 1.98(d).

**No Disclaimers**

To the extent that anything in the Information Disclosure Statement or the listed references could be construed as a disclaimer of any subject matter supported by the present application, Applicant hereby rescinds and retracts such disclaimer.

**Timing of Disclosure**

This Information Disclosure Statement is being filed within three months of the filing date or date of national phase entry, with an RCE or before receipt of a First Office Action after an RCE, and no fee is believed to be required.

The Commissioner is hereby authorized to charge any additional fees which may be required, or credit any overpayment, to Account No. 11-1410.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  September 22, 2020

By:   /Jarom Kesler/
Jarom D. Kesler
Registration No. 57,046
Registered Practitioner
(949) 760-0404

3355273

('911 Prosecution, September 22, 2020 Information Disclosure Statement).

Among other things, Mr. Kesler also prepared, signed, and filed Masimo's February 14, 2020 Request for Prioritized Examination.

| | | |
|---|---|---|
| **CERTIFICATION AND REQUEST FOR PRIORITIZED EXAMINATION** **UNDER 37 CFR 1.102(e)** (Page 1 of 1) | | |
| First Named Inventor: | Robert A. Smith | Nonprovisional Application Number (if known): |
| Title of Invention: | MULTIPLE WAVELENGTH SENSOR EMITTERS | |

**APPLICANT HEREBY CERTIFIES THE FOLLOWING AND REQUESTS PRIORITIZED EXAMINATION FOR THE ABOVE-IDENTIFIED APPLICATION.**

1. The processing fee set forth in 37 CFR 1.17(i)(1) and the prioritized examination fee set forth in 37 CFR 1.17(c) have been filed with the request. The publication fee requirement is met because that fee, set forth in 37 CFR 1.18(d), is currently $0. The basic filing fee, search fee, and examination fee are filed with the request or have been already been paid. I understand that any required excess claims fees or application size fee must be paid for the application.

2. I understand that the application may not contain, or be amended to contain, more than four independent claims, more than thirty total claims, or any multiple dependent claims, and that any request for an extension of time will cause an outstanding Track I request to be dismissed.

3. The applicable box is checked below:

   I. ☑ **Original Application (Track One) - Prioritized Examination under § 1.102(e)(1)**

   i. (a) The application is an original nonprovisional utility application filed under 35 U.S.C. 111(a). This certification and request is being filed with the utility application via EFS-Web.
   ---OR---
   (b) The application is an original nonprovisional plant application filed under 35 U.S.C. 111(a). This certification and request is being filed with the plant application in paper.

   ii. An executed inventor's oath or declaration under 37 CFR 1.63 or 37 CFR 1.64 for each inventor, **or** the application data sheet meeting the conditions specified in 37 CFR 1.53(f)(3)(i) is filed with the application.

   II. ☐ **Request for Continued Examination - Prioritized Examination under § 1.102(e)(2)**

   i. A request for continued examination has been filed with, or prior to, this form.
   ii. If the application is a utility application, this certification and request is being filed via EFS-Web.
   iii. The application is an original nonprovisional utility application filed under 35 U.S.C. 111(a), or is a national stage entry under 35 U.S.C. 371.
   iv. This certification and request is being filed prior to the mailing of a first Office action responsive to the request for continued examination.
   v. No prior request for continued examination has been granted prioritized examination status under 37 CFR 1.102(e)(2).

| | | |
|---|---|---|
| Signature /Jarom Kesler/ | | Date 2020-09-22 |
| Name (Print/Typed) Jarom D. Kesler | | Practitioner Registration Number 57046 |

**Note:** *This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4(d) for signature requirements and certifications. Submit multiple forms if more than one signature is required.*

☑ *Total of __1__ forms are submitted.*

('911 Prosecution, September 22, 2020 Certification and Request for Prioritized Examination).

<u>Stephen Jensen</u>

Stephen Jensen had a duty to disclose information material to the patentability of the '911 patent to the USPTO during prosecution of the '911 patent. As a partner at the law firm of Knobbe Martens, Mr. Jensen was Masimo's primary outside counsel and an attorney of record for

prosecution of the '911 patent who was substantively involved in the preparation and prosecution of the application that resulted in the '911 patent.

For example, the USPTO expressly lists Mr. Jensen as an attorney of record for prosecution of the '911 patent.

In addition to his own role as an attorney of record for prosecuting the '911 patent, Mr. Jensen—as Masimo's primary outside patent attorney and client liaison—was the Knobbe Martens partner who had ultimate responsibility for and control over Knobbe Martens' legal work for Masimo, including prosecution of the '911 patent.  As such, Mr. Jensen had the incentive to, and as discussed below, did in fact prioritize his longstanding loyalties to Masimo over his duties of disclosure to the PTO to facilitate issuance of the '911 patent by committing inequitable conduct.

During prosecution of the '911 patent, Masimo, through its prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '911 patent, submitted unreasonably voluminous prior art disclosures to obscure four of the most important prior art references, namely U.S. Patent No. 6,816,241 to Grubisic ("Grubisic"), U.S. Patent No. 5,782,756 to Mannheimer ("Mannheimer 756"), U.S. Patent No. 5,638,816 to Kiani et al. ("Kiani 816"), and U.S. Patent No. 5,203,329 to Takatani et al. ("Takatani").  Masimo's prosecution attorneys cited no fewer than 1,748 cited references spanning approximately 65 pages via two information disclosure statements submitted during prosecution.  Masimo's September 22, 2020 Information Disclosure Statement, which essentially comprised a document dump of 1,725 references, included numerous clearly irrelevant and (at best) marginally relevant references. Because these references were buried amongst 1,725 disclosed references, the patent examiner could not have considered each of them and, in fact, did not cite them in any office action.

69

Among the 1,725 cited references was Grubisic.  Grubisic relates to the use of LEDs to measure blood parameters and teaches "[a] compact, lightweight instrument for non-invasive blood analyte determination." Grubisic at Abstract.  Grubisic is prior art to the '911 patent, and at least claim 19 of the '911 patent is invalid as anticipated by Grubisic under 35 U.S.C. § 102 and as obvious under § 103 in view of Grubisic standing alone, or combined with a person of ordinary skill in the art.  As shown in the attached exemplary claim chart, Grubisic discloses every element of at least claim 19 of the '911 patent and otherwise contains disclosures material to the invalidity of the asserted claims of the '911 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '911 patent, knew during the prosecution of the '911 patent that Grubisic existed and that its subject matter and disclosure was closely related and material to the subject matter of the alleged inventions claimed in the '911 patent, as evidenced by the submission of Masimo's September 22, 2020 Information Disclosure Statement.  At least Kesler and Jensen knew that Grubisic was material to patentability of the '911 patent.

Also among the 1,725 cited references was Mannheimer 756.  Mannheimer 756 relates to the measurement of blood parameters, and the patent teaches the use of "at least three wavelengths of electromagnetic radiation for determining a blood constituent, such as arterial oxygen saturation, in a patient." Mannheimer 756 at Abstract.  Mannheimer 756 is prior art to the '911 patent, and at least claim 19 of the '911 patent is invalid as anticipated by Mannheimer 756 under 35 U.S.C. § 102 and as obvious under § 103 in view of Mannheimer 756 standing alone, or combined with a person of ordinary skill in the art.  As shown in the attached exemplary claim chart, Mannheimer 756 discloses every element of at least claim 19 of the '911 patent and otherwise contains disclosures material to the invalidity of the asserted claims of the '911 patent.

70

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '911 patent, knew during the prosecution of the '911 patent that Mannheimer 756 existed and that its subject matter and disclosure was closely related and material to the subject matter of the alleged inventions claimed in the '911 patent, as evidenced by the submission of Masimo's September 22, 2020 Information Disclosure Statement.  At least Kesler and Jensen knew that Mannheimer 756 was material to patentability of the '911 patent.

Also among the 1,725 cited references was Kiani 816.  Kiani 816 relates to pulse monitoring and teaches "[a] blood glucose monitoring system . . . which provides for inducing an active pulse in the blood volume of a patient."  Kiani 816 at Abstract.  Kiani 816 is prior art to the '911 patent, and at least claim 19 of the '911 patent is invalid as anticipated by Kiani 816 under 35 U.S.C. § 102 and as obvious under § 103 in view of Kiani 816 standing alone, or combined with a person of ordinary skill in the art.  As shown in the attached exemplary claim chart, Kiani 816 discloses every element of at least claim 19 of the '911 patent and otherwise contains disclosures material to the invalidity of the asserted claims of the '911 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '911 patent, knew during the prosecution of the '911 patent that Kiani 816 existed and that its subject matter and disclosure was closely related and material to the subject matter of the alleged inventions claimed in the '911 patent, as evidenced by the submission of Masimo's September 22, 2020 Information Disclosure Statement. At least Kesler and Jensen knew that Kiani 816 was material to patentability of the '911 patent.

Also among the 1,725 cited references was Takatani.  Takatani relates to a pulse oximetry sensor, and Takatani teaches "[a] noninvasive oximeter sensor for controlling and optimizing the

minimum detection depth in the tissue of a patient." Takatani at Abstract.  Takatani is prior art to the '911 patent, and at least claim 19 of the '911 patent is invalid as anticipated by Takatani under 35 U.S.C. § 102 and as obvious under § 103 in view of Takatani standing alone, or combined with a person of ordinary skill in the art.  As shown in the attached exemplary claim chart, Takatani discloses every element of at least claim 19 of the '911 patent and otherwise contains disclosures material to the invalidity of the asserted claims of the '911 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '911 patent, knew during the prosecution of the '911 patent that Takatani existed and that its subject matter and disclosure was closely related and material to the subject matter of the alleged inventions claimed in the '911 patent, as evidenced by the submission of Masimo's September 22, 2020 Information Disclosure Statement. At least Kesler and Jensen knew that Takatani was material to patentability of the '911 patent.

Accordingly, the buried Grubisic reference, Mannheimer 756 reference, Kiani 816 reference, and Takatani reference were, at the very least, highly material to patentability of the alleged inventions claimed in what would become the '911 patent.

Masimo, through its prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '911 patent, submitted two Information Disclosure Statements during prosecution of the patent application that led to the '911 patent on the following dates: September 22, 2020 and February 9, 2021.  These Information Disclosure Statements listed 1,748 prior art references, a substantial number of which were clearly irrelevant or at most minimally relevant to the alleged inventions covered by the pending claims at any point during prosecution.

One example of an irrelevant (or at most minimally relevant) submitted reference is U.S. Patent No. Des. 359,546 to Savage et al. ("Savage"), titled "Housing for a dental unit disinfecting device."  Whereas the '911 patent concerns a physiological monitoring optical sensor, this reference concerns very different subject matter—the ornamental design of a housing for a dental unit disinfecting device.  Shown in Figure 1 below is a perspective view of the housing for a dental unit disinfecting device.



This subject matter is far afield from that of the '911 patent and had the effect of obscuring and thereby burying the most material references, including at least Grubisic, Mannheimer 756, Kiani 816, and Takatani.

Another example of an irrelevant (or at most minimally relevant) submitted reference is U.S. Patent No. 4,305,059 to Benton ("Benton"), titled "Modular funds transfer system."  Whereas the '911 patent concerns a physiological monitoring optical sensor, this reference concerns very different subject matter—a system for transferring funds in lieu of cash.  For example, the patent discloses that the "invention relates generally to electronic off-line data transfer and more

particularly toward a funds transfer system comprising a plurality of identical hand-held funds data storage and transfer modules for performing cashless transactions without any intervening local or centralized computer." Benton at 1:5-10. Figure 1 below shows two funds transaction modules.



This subject matter is far afield from that of the '911 patent and had the effect of obscuring and thereby burying the most material references, including at least Grubisic, Mannheimer 756, Kiani 816, and Takatani.

Another example of an irrelevant (or at most minimally relevant) submitted reference is U.S. Patent No. 6,595,316 to Cybulski et al. ("Cybulski"), titled "Tension-adjustable mechanism for stethoscope earpieces." Whereas the '911 patent concerns a physiological monitoring optical sensor, this reference concerns very different subject matter—stethoscope earpieces. For example, the patent discloses a "tension-adjustable headset for [an] electronic stethoscope . . . ." Cybulski at 3:42-43. Figure 1 below shows said headset.

74



This subject matter is far afield from that of the '911 patent and had the effect of obscuring and thereby burying the most material references, including at least Grubisic, Mannheimer 756, Kiani 816, and Takatani.

Another example of an irrelevant (or at most minimally relevant) submitted reference is U.S. Patent Pub. No. 2004/0034898 to Bruegl ("Bruegl"), titled "Self-Tinting Helmet Visor and Method of Making Same." Whereas the '911 patent concerns a physiological monitoring optical sensor, this reference concerns a "Helmet visor with a solar cell device that is arranged directly on the helmet visor, wherein the helmet visor can be darkened or tinted through voltage that is generated by a solar cell device . . . ." Bruegl at Abstract. This helmet visor with a solar cell device is shown in Figure 1:



*Fig. 1*

This subject matter is far afield from that of the '911 patent and had the effect of obscuring and thereby burying the most material references, including at least Grubisic, Mannheimer 756, Kiani 816, and Takatani.

During prosecution of the '911 patent, Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '911 patent submitted the Information Disclosure Statements, burying the USPTO with at least 1,748 references.  Buried in these unreasonably voluminous submissions were the material Grubisic, Mannheimer 756, Kiani 816, and Takatani references.  Out of the 1,725 references cited in the September 22, 2020 Information Disclosure Statement, the Grubisic reference was document 1,380, the Mannheimer 756 reference was document 205, the Kiani 816 reference was document 167, and the Takatani reference was document 81.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '911 patent, were aware of the relevance

and high materiality of Grubisic, Mannheimer 756, Kiani 816, and Takatani.  They knew that Grubisic, Mannheimer 756, Kiani 816, and Takatani existed because they included them in an Information Disclosure Statement, and by submitting them in an Information Disclosure Statement, thereby acknowledged their relevance to the prosecution of the application leading to the '911 patent.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '911 patent, therefore had knowledge of Grubisic, Mannheimer 756, Kiani 816, and Takatani as well as their materiality to patentability, at least giving rise to an inference of intentional breach of their duties of disclosure.

Although Grubisic, Mannheimer 756, Kiani 816, and Takatani were submitted into the file history in the patent application that matured into the '911 patent via citations in the Information Disclosure Statements, these references were buried within a large number of other less relevant or irrelevant documents and were never brought to the examiner's attention.

Notably, despite their knowledge of the contents and materiality of Grubisic, Mannheimer 756, Kiani 816, and Takatani, Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '911 patent, failed to highlight these references or otherwise distinguish them in any way from the other 1,000-plus cited references at any point during the prosecution of what would become the '911 patent.  And Grubisic, Mannheimer 756, Kiani 816, and Takatani are not cumulative of other prior art relied on by the examiner.

Masimo's prosecution attorneys of record Kesler and Jensen, as well as other Masimo agents substantively involved in the prosecution of the '911 patent, thus buried Grubisic, Mannheimer 756, Kiani 816, and Takatani and failed to bring those references to the examiner's

77

attention to intentionally mislead the examiner in order to improperly procure the '911 patent, notwithstanding that Masimo was not entitled to such patent under 35 U.S.C. §§ 102 and 103.

Masimo's prosecution attorneys of record Kesler and Jensen sought expedited review of the prosecution of the '911 patent while submitting 1,725 prior art references for consideration to the USPTO.  By requesting expedited review and submitting 1,725 prior art references for review on a compressed schedule, Masimo's prosecution attorneys of record Kesler and Jensen compounded the USPTO's inability to review the 1,725 prior art references with appropriate scrutiny.  On information and belief, this conduct was specifically intended to, and did, obscure material references from the examiner among many minimally relevant references.  Therefore, the patent examiner could not possibly have read each reference that Masimo's prosecution attorneys of record had identified.  The single most reasonable inference that can be drawn from the evidence is that Masimo's prosecution attorneys of record intended to deceive the USPTO by burying the patent examiner with prior art and leaving the patent examiner with no practical way to review everything that was disclosed or figure out what was pertinent among the 1,725 listed references.

But for this misleading conduct, the examiner would have cited either or all of Grubisic, Mannheimer 756, Kiani 816, and Takatani alone or in combination with other cited references to reject the claims of the '911 patent, including at least claims 1-5, 8, 10-14, 17, 19-25, and 28, as invalid.

Accordingly, the '911 patent is unenforceable due to inequitable conduct.

The effect of Kesler and Jensen's conduct is not limited to the '911 patent.  All subsequent "child" or other related patents that are based on the same specification or relevant portions thereof are tainted by Masimo's inequitable conduct and, therefore, are also unenforceable under the doctrine of infectious unenforceability.

78

Dated: August 2, 2023

OF COUNSEL:

John M. Desmarais
Jordan N. Malz
Cosmin Maier
Kerri-Ann Limbeek
Jamie L. Kringstein
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Tel: 212-351-3400

Peter C. Magic
DESMARAIS LLP
101 California Street
San Francisco, CA 94111
Tel: 415-573-1900

Jennifer Milici
Leon B. Greenfield
Dominic Vote
Thad Eagles
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington DC 20037
Tel: (202) 663-6000

Mark A. Ford
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6423

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By: _____
/s/ Bindu A. Palapura
David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew L. Brown (#6766)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
abrown@potteranderson.com

*Attorneys for Plaintiff, Apple Inc.*

## **CERTIFICATE OF SERVICE**

I, Jamie L. Kringstein, hereby certify that on August 2, 2023, a copy of the foregoing document was served on all counsel of record via email as follows:

John C. Phillips, Jr.
Megan C. Haney
PHILLIPS, MCLAUGHLIN & HALL, P.A.
1200 N. Broom Street
Wilmington, DE 19806
jcp@pmhdelaw.com
mch@pmhdelaw.com

Stephen C. Jensen
Stephen W. Larson
Jared C. Bunker
Benjamin A. Katzenellenbogen
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
joe.re@knobbe.com
steve.jensen@knobbe.com
stephen.larson@knobbe.com
jared.bunker@knobbe.com
ben.katzenellenbogen@knobbe.com

Brian Horne
KNOBBE, MARTENS, OLSON & BEAR, LLP
1925 Century Park E., Suite 600
Los Angeles, CA 90067
brian.horne@knobbe.com

Adam Powell
KNOBBE, MARTENS, OLSON & BEAR, LLP
3579 Valley Centre Drive, Suite 300
San Diego, CA 92130
adam.powell@knobbe.com

*/s/ Jamie L. Kringstein*

# EXHIBIT 21

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY