# EXHIBIT 2

```
                    IN THE UNITED STATES DISTRICT COURT

                    IN AND FOR THE DISTRICT OF DELAWARE

                                  - - -
MASIMO CORPORATION,
                                          :    CIVIL ACTION
            Plaintiff,                    :
                                          :
v                                         :
                                          :
PHILIPS ELECTRONICS NORTH AMERICA         :
CORPORATION and PHILIPS MEDIZIN           :
SYSTEME BOBLINGEN GMBH,                   :
                                          :    NO. 09-80-LPS
            Defendants.                   :
------------------------------------
AND RELATED COUNTERCLAIMS.                :
------------------------------------

                              Wilmington, Delaware
                         Thursday, February 12, 2015
                            Bench Trial - Volume B

                                  - - -

BEFORE:     HONORABLE LEONARD P. STARK, Chief Judge

                                  - - -

APPEARANCES:


            MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
            BY:  JULIA HEANEY, ESQ.

                 and

            KNOBBE, MARTENS, OLSON & BEAR, LLP
            BY:  JOSEPH R. RE, ESQ.,
                 JON W. GURKA, ESQ., and
                 STEPHEN LARSON, ESQ.
                 (Irvine, California)

                 and


Kevin Maurer                              Brian P. Gaffigan
Official Court Reporter                   Official Court Reporter
```

```
 1    APPEARANCES:  (Continued)

 2
              KNOBBE, MARTENS, OLSON & BEAR, LLP
 3            BY:  KAREN VOGEL WEIL, ESQ.
                   (Los Angeles, California)
 4
                      Counsel for Masimo Corporation
 5

 6            POTTER, ANDERSON & CORROON, LLP
              BY:  RICHARD L. HORWITZ, ESQ.
 7
                   and
 8
              MAYER BROWN, LLP
 9            BY:  BRIAN A. ROSENTHAL, ESQ.,
                   ALAN M. GRIMALDI, ESQ., and
10                 BRIAN K. ANDREA, ESQ.
                   (Washington, District of Columbia)
11
                   and
12
              GIBSON DUNN & CRUTCHER, LLP
13            BY:  WILLIAM C. ROOKLIDGE, ESQ.
                   (Irvine, California)
14
                   and
15
              JONES DAY, LLP
16            BY:  SASHA MAYERGOYZ, ESQ.
                   (Chicago, Illinois)
17
                      Counsel for Philips Electronics North
18                    America Corporation and Philips
                      Medizin Systeme Boiblingen GmbH
19

20

21

22

23

24

25
```

```
 1   prosecution or litigation, and so she was the right fit.  We
 2   would ask -- any one of us on the prosecution team for any
 3   of the reexams, we would go ask her to go pull documents
 4   from the litigators.  She would go do that, prepare the
 5   IDS's, and we would file them in any case where any of those
 6   documents were even remotely relevant.
 7   Q.     So if I understand your testimony, who prompted a
 8   request for documents in this process that was set up?
 9   A.     The prosecutors.
10   Q.     And how would you decide when to issue a prompt for
11   litigation documents?
12   A.     So any time we were preparing a response to an
13   Office Action or any other action that was coming up in a
14   reexamination or any case at all, we would ask Kendall to go
15   find those.  And that was true for any of us, so if any of
16   us asked, or she would go prepare it for all of them.
17          I would also, when I ran into litigators in
18   the hallway, for example, I would generally ask, how is the
19   litigation going?  And if they sounded like there were some
20   documents that needed to be pulled, I would go make sure
21   that Kendall -- I would go ask Kendall, hey, it sounds like
22   there is something going on in litigation.  Why don't you go
23   out and find if there are any documents we need to submit.
24   Q.     So would you ever be the one to ask, for example,
25   Steve Jensen:  Hey, Steve.  Do you have any documents to
```

1  give me?
2  A.    No, absolutely not.  He is such a busy guy, and I
3  have such a hard time catching him that that is just not a
4  good process.  That is why we have Kendall to go ask the
5  lower level litigators what is going on?  Pull the
6  documents, bring them to us.
7  Q.    I have to ask you in that regard, Mr. Kesler,
8  yesterday you talked about a five point plan referring to
9  Mr. Jensen.  What were you referring to?
10 A.    Okay.  So I initially start by trying to call his
11 office or walk down to it.
12        If he is not there, I ask his assistant to let
13 me know where he is and let me know when he comes into the
14 office.
15        If it doesn't sound like he is going to be in
16 any time soon, then I'll send him an e-mail, I'll give him a
17 call on his phone, I'll call him on his cellphone, I'll
18 leave a message on both of those.
19        And then I will text him if I really need to get
20 ahold of him.
21 Q.    And how long would it typically take for litigation
22 documents to be submitted once with the litigation document
23 is created or issued, entered?  How long would it typically
24 take for these litigation documents to be submitted to the
25 Patent Office?

1 possible to do so.
2 Q. Mr. Jensen, you're the client confidant. You are Mr.
3 Kiani's contact. As he described, you are brothers from
4 different mothers. You advised Masimo on all important
5 strategic decisions in this litigation where your client is
6 seeking hundreds of millions of dollars on two patents, one
7 of which is the '984 patent. You learned that the sole
8 argument advanced through the PTO for patentability had been
9 rejected. You had been stung before for failing to disclose
10 litigation to the PTO, yet Judge Stark's March 31st Order
11 comes in and it stops you with you in that conversation with
12 Mr. Grover and Mr. Kesler so that the Order never gets to
13 the PTO. And your explanation, Mr. Jensen, is that it was
14 not your job?
15 A. No.
16         MR. ROOKLIDGE: No further questions.
17         THE COURT: Okay. Round two.
18             CROSS-EXAMINATION
19 BY MS. WEIL:
20 Q. Good afternoon, Mr. Jensen.
21 A. Good afternoon, Ms. Weil.
22 Q. Can you explain why you said no to that last
23 question?
24 A. Well, there was a lot of things built into it that I
25 found objectionable. And so in saying "no" to that, the

```
 1   that you were the only lawyer with complete knowledge of all
 2   the enforcement efforts of Masimo's patents?
 3   A.    With knowledge, yeah.  What time period?
 4   Q.    2013-2014.
 5   A.    2013, no.  That's what I said in my prior testimony.
 6   This was 2010.  Very, very, very different time periods in
 7   terms of what I was doing.
 8   Q.    You can put that away.
 9         All right.  I want to talk about the '984
10   reexam.  Actually, the reexams in general.  So you know that
11   there were 23 reexams filed against Masimo's patents?
12   A.    I was informed, again, at a very high level, I think
13   it was about three years into the case, that there had been
14   23, a couple dozen reexams filed.  Many of those by Philips.
15   Some by, many additional ones by Masimo's competitor
16   Nellcor.  And by some who we don't know.
17   Q.    Do you supervise any of those reexams?
18   A.    I don't supervise them at all, no.
19   Q.    Do you oversee or coordinate any of them?
20   A.    No.  That doesn't even come with my coordination, as
21   the chart shows, that is not even one that I coordinate.
22   That I leave to the prosecution team, to coordinate and
23   figure out how to staff those and trust that they will do
24   it.
25   Q.    Do you control any of them in any way?
```

1  A.     No, I do not control them.
2  Q.     Do you have day-to-day or even regular knowledge of
3  the details of what has been going on in those reexams?
4  A.     No.  It's actually pretty rare that I get even a
5  general update on that.  I trust the team.
6  Q.     So we have already heard some testimony from you
7  regarding the procedures that you instigated for the
8  disclosure of litigation documents to the Patent and
9  Trademark Office in connection with the reexams and other
10 pending patent prosecution.  I want to turn to that a little
11 bit.
12         Could you tell us what impact, if any, the
13 determination in the Nellcor case that you had committed
14 inequitable conduct had on that procedure?
15 A.     It had an enormous effect.  That was a very upsetting
16 time for me, a very stressful period.  I think, as Mr. Re
17 said in opening, it gets somebody's attention.  It's a
18 patent lawyer's worst nightmare.  I think it was for me.  It
19 was very, very upsetting for me.
20         And so it really caused an entire shift, not
21 only in my practice, in the way that I interacted with
22 Masimo and the way my practice was formulated, I think it
23 actually made changes throughout the firm.
24         I almost quit the practice of law at that point
25 in time.  But it made very, very, very significant changes

1    in the way my practice was formed and what I was going to do
2    going forward to make sure it never happened again.
3    Q.    And was that one of the reasons for this procedure
4    that you instigated for the reexams with the go-between of
5    Ms. Loebakka that we've heard testimony about?
6    A.    It was clearly the primary reason that I asked that.
7    I mean these documents that are coming in in the litigation,
8    the prosecutors wouldn't even know about them on a normal
9    basis.  And I wanted to make sure that everything just got
10   sent in because, otherwise, somebody would forget something.
11   It was document by document, relying on someone to just
12   remember: Oh, I need to send this over to the prosecutors.
13   I knew from experience there is no way that would work.  And
14   so I wanted to have a process in place.
15           There were two teams.  They didn't really know
16   what was going on on a day-to-day basis.  They didn't have
17   the details.  They were separated.  There was actually a
18   Protective Order in this case by Philips' design that made
19   it so they weren't connected.  You couldn't have the
20   prosecution team rummaging through litigation materials and
21   happen across something that was under the Protective Order.
22           So we had to come up with something where
23   they would somehow go to the litigation teams, and there
24   were multiple of them, and there are hundreds of patent
25   applications, and they would know what was going on in those

1   patent applications rather than some litigator having to keep
2   track, which would have been impossible, and trigger them
3   providing materials from, get the litigation teams to provide
4   them materials that related to any patent that was involved in
5   litigation.  They could communicate that easier.  Let's find
6   out what was going on in the prosecution, get that information
7   and send it in, just send it all in to the Patent Office.  And
8   that's the prior finding, was the single most significant
9   reason in asking that that be done.
10  Q.    I bet you have never want that again.
11  A.    I never want that again.
12  Q.    And how did that Court determination affect the kind
13  of work that you did for Masimo going forward?
14  A.    It took me out of the prosecution, out of -- if
15  you remember that case, I was actually supervising the
16  prosecution at the time, and not necessarily doing all of it
17  but that's the way I was supervising it.  And I was actually
18  litigating the case as one of the lead lawyers in the case.
19           That completely changed and stopped and
20  separated from that point forward.  And I stepped out of
21  supervising, directing, controlling, doing, providing the
22  oversight or even coordinating the prosecution from that
23  point forward.
24           And like I said, I'd get consulted.  I went on
25  an interview.  That is something I get pulled into and it's

Jensen - cross

```
 1   a quick in and out.  But I stepped out of it.
 2   Q.    And just a few things that I want to zero in on with
 3   respect to this process for the disclosure.  At any time
 4   during the reexam of the '984 patent, have you been part of
 5   the review or decision process of what to submit to the PTO?
 6   A.    No, I am not part of that process.  The process
 7   happens without any of my involvement.
 8   Q.    And at any time during the '984 reexam, have you been
 9   part of the process of getting litigation materials to the
10   prosecution teams?
11   A.    No, the group that was set up there did not involve,
12   did not include me.  It excluded me.
13   Q.    All right.  Now, I would like to talk about the
14   interview in the reexam.
15   A.    Okay.
16   Q.    I believe that you testified earlier that that
17   interview involved both the '222 and the '984; is that
18   right?
19   A.    Correct.
20   Q.    What was the status of the '222 patent at the time of
21   the interview?
22   A.    It was an expired patent.  It was actually very
23   important, but it was expired, as was the '984.
24   Q.    The '984 was expired as well?
25   A.    The '984 was expired as well.
```